STEPHAN C. VOLKER (CSB #63093)
JOSHUA A. H. HARRIS (CSB #226898)
JAMEY M.B. VOLKER (CSB #273544)
M. BENJAMIN EICHENBERG (CSB #270893)
LAW OFFICES OF STEPHAN C. VOLKER
436 14th Street, Suite 1300
Oakland, California 94612
Tel:    510/496-0600
Fax:   510/496-1366

Attorneys for Plaintiffs
PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS, *et al.*

10.497.02

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, FRIENDS OF THE RIVER, SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION, INC., THE INSTITUTE FOR FISHERIES RESOURCES, and FELIX SMITH,<br><br>        Plaintiffs,<br><br>        v.<br><br>DONALD R. GLASER, Regional Director of the U.S. Bureau of Reclamation, U.S. BUREAU OF RECLAMATION, and SAN LUIS & DELTA-MENDOTA WATER AUTHORITY,<br><br>        Defendants. | Civ. No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.    In 1983, biologist and plaintiff Felix Smith discovered and documented widespread deformities and fatalities of waterfowl at Kesterson National Wildlife Refuge.  Rather than correct the unlawful discharges that led to this massive contamination of fish and wildlife habitat, the defendants U.S. Bureau of Reclamation (the "Bureau") and the San Luis & Delta Mendota Water Authority (the "Authority") kicked the can down the road by constructing a drainage system that carried the polluted water downstream where it poisons the San Luis Drain and Mud Slough, and thence the San Joaquin River and the San Francisco Bay-Delta ("Bay-Delta").  The

resulting discharge of toxic groundwater contaminates the Bay-Delta and its tributaries with dangerous pollutants including selenium, arsenic, boron, mercury, uranium, chromium, molybdenum and sodium sulfates.  The defendants' discharge of these pollutants into waters of the United States without the permits required to protect water quality from pollution are destroying habitat essential to fish and wildlife and contaminating drinking water utilized by 20 million people throughout California.  Plaintiffs have filed this lawsuit to put an end to defendants' unlawful pollution of California's Bay-Delta and its principal southern tributary, the San Joaquin River.

2.     This is a civil action under 33 U.S.C. section 1365, the citizen suit provision of the Federal Water Pollution Control Act (hereinafter referred to as the "Clean Water Act", or "CWA"), 33 U.S.C. sections 1251 *et seq*.  Defendants have discharged and are continuing to discharge pollutants into the waters of the United States ("U.S.") without a permit, in violation of section 301(a) of the CWA, 33 U.S.C. section 1311(a).

3.     Plaintiffs challenge two separate illegal discharges of polluted groundwater associated with the Grasslands Bypass Project ("Project"), a jointly administered drainage project carried out by defendants.

4.     First, defendants' tile drainage facilities and agricultural ditches and drains illegally discharge groundwater contaminated with selenium and other pollutants into the San Luis Drain. Because this discharge is polluted and because the San Luis Drain is a water body of the U.S., a National Pollutant Discharge Elimination System ("NPDES") permit is required.  Defendants, however, have failed to obtain an NPDES permit and are therefore in ongoing violation of the Clean Water Act.

5.     Second, after the contaminated groundwater flows down the San Luis Drain, defendants discharge the polluted water directly into Mud Slough, which is also a water body of the U.S.  As with the discharge into the San Luis Drain, the discharge into Mud Slough requires an NPDES permit.  From Mud Slough, the polluted groundwater flows into the San Joaquin River and eventually into the Bay-Delta, causing extensive harm to fish and wildlife in and around those water bodies.

6.     Indeed, the Project's pollution threatens some of California's most critical ecological

1    resources.  It degrades water quality in the Bay-Delta, which in turn threatens the Bay-Delta's

2    endangered and threatened fish species, including delta smelt, salmon, steelhead, and sturgeon.

3    The Project's polluted discharge is also drawn into drinking water supplies through the Central

4    Valley Project ("CVP") and State Water Project ("SWP"), thereby degrading drinking water for

5    20 million Californians.

6         7.    Plaintiffs seek a permanent end to this unpermitted pollution of the San Luis Drain,

7    Mud Slough, San Joaquin River, and the Bay-Delta, and commencement of the long-overdue

8    process of restoring – rather than further destroying – the region's imperiled water quality.

9         8.    Accordingly, plaintiffs seek orders from this Court (1) declaring that defendants have

10   failed to comply with the CWA's NPDES permit system and (2) granting permanent injunctive

11   relief halting further polluted discharges pending defendants' compliance with the CWA.

12   Plaintiffs also seek remedial relief, the imposition of civil penalties, and the award of costs,

13   including attorney and expert witness fees.

14                              **JURISDICTION AND VENUE**

15        9.    This Court has jurisdiction in accordance with 33 U.S.C. section 1365(a) (action

16   arises under the CWA's citizen suit provision), 28 U.S.C. section 1331 (action raises a federal

17   question under the laws of the United States); 28 U.S.C. section 1346 (United States is

18   defendant); 28 U.S.C. section 1361 (action to compel officers of the United States to perform

19   their duties); and 28 U.S.C. sections 2102-2202 (action requests declaratory and injunctive relief

20   in cases of actual controversy).

21        10.   In compliance with 33 U.S.C. section 1365(b)(1)(A), on June 8, 2011 plaintiffs gave

22   notice of the defendants' ongoing violations of the CWA and of plaintiffs' intent to sue to all

23   applicable parties.  A copy of this 60-day notice is attached hereto as Exhibit 1 and incorporated

24   by this reference.

25        11.   More than 60 days have passed since this notice was sent and all of the violations

26   alleged therein continue unabated.  Defendants remain in violation of the Clean Water Act.

27        12.   Neither the U.S. nor the State of California has commenced and is diligently pursuing

28   a civil or criminal enforcement action addressing the violations alleged in plaintiffs' 60-day

1   notice.

2   13.   Venue is proper under 33 U.S.C. section 1365(c)(1) because the unlawful discharges

3   of pollutants at issue occur within the Eastern District of California.  Venue is also proper under

4   28 U.S.C. section 1391(e) because a substantial part of the events or omissions giving rise to the

5   claim occurred in the Eastern District of California.

6   14.   This Complaint is timely filed within the applicable statute of limitations.

7   15.   Plaintiffs have standing to assert their claims.

8   **PARTIES**

9   16.   Plaintiff PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS

10  ("PCFFA") is a non-profit, tax-exempt corporation which represents a coalition of 16 fishermen's

11  organizations in California, Oregon, and Washington with a combined membership of more than

12  750 fishing men and women.  As such, PCFFA is a "person" under CWA section 502(5), 33

13  U.S.C. section 1362(5) ("an individual, corporation, partnership, association, State, municipality,

14  commission, or political subdivision of a State, or any interstate body").  In addition, PCFFA is a

15  "citizen" under CWA section 505(g), 33 U.S.C. section 1365(g) ("a person or persons having an

16  interest which is or may be adversely affected").  Each of its members depends on the ocean's

17  fisheries – including many species of anadromous fish that use the San Joaquin River and Bay-

18  Delta as juveniles when migrating out to sea and again as adults when returning to spawn – for

19  their livelihood.  The interests of PCFFA and its members in healthy fisheries in the Bay-Delta

20  and San Joaquin River have been, are being, and unless the relief requested herein is granted, will

21  continue to be adversely affected and injured by defendants' continued discharge of pollutants

22  that harm fish in violation of the CWA.  CWA enforcement will help restore and preserve water

23  quality, directly benefitting the fisheries upon which PCFFA's members rely.

24  17.   Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is

25  a non-profit corporation organized under the laws of the State of California.  CSPA has thousands

26  of members who reside and recreate throughout California.  As such, CSPA is a "person" under

27  CWA section 502(5), 33 U.S.C. section 1362(5).  In addition, CSPA is a "citizen" under CWA

28  section 505(g), 33 U.S.C. section 1365(g).  CSPA's members are citizens who, in addition to

1  being duly licensed sport fishing anglers, are interested in the preservation and enhancement of

2  California's public trust fishery resources and vigorous enforcement of California's

3  environmental laws.  CSPA members have been involved for decades in public education and

4  advocacy efforts to protect and restore the public trust resources of California's rivers.  CSPA

5  members use California's rivers, including the San Joaquin River, and the Bay-Delta for

6  recreation, scientific study, and aesthetic enjoyment.  The interests of CSPA and its members

7  have been, are being, and unless the relief requested herein is granted, will continue to  be

8  adversely affected and injured by defendants' continued discharge of pollutants that harm fish in

9  violation of the CWA.  CWA enforcement will help restore and preserve water quality, thereby

10  promoting the objectives of CSPA and improving the use and enjoyment of fisheries resources by

11  its members.

12      18.  Plaintiff FRIENDS OF THE RIVER ("FOR") was founded in 1973 and is

13  incorporated under the non-profit laws of the State of California, with its principal place of

14  business in Sacramento, California.  As such, FOR is a "person" under CWA section 502(5), 33

15  U.S.C. section 1362(5).  In addition, FOR is a "citizen" under CWA section 505(g), 33 U.S.C.

16  section 1365(g).  FOR has more than 5,000 members dedicated to the protection, preservation,

17  and restoration of California's rivers, streams, watersheds, and aquatic ecosystems.  FOR has

18  been involved in activities to protect and restore the Bay-Delta for more than 30 years.  Many of

19  Friends of the River's members recreate on California rivers, including the San Joaquin River,

20  and in the Bay-Delta.  The interests of FOR and its members have been, are being, and unless the

21  relief requested herein is granted, will continue to be adversely affected and injured by the

22  defendants' continued discharge of pollutants that harm aquatic ecosystems in violation of the

23  CWA.  CWA enforcement will help restore and preserve water quality, thereby promoting FOR's

24  objectives and improving the use and enjoyment of aquatic resources by FOR members.

25      19.  Plaintiff SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION, INC.

26  ("SFCBOA") has been protecting the rich seafood fisheries off the coast of San Francisco since

27  1913.  As such, SFCBOA is a "person" under CWA section 502(5), 33 U.S.C. section 1362(5).

28  In addition, SFCBOA is a "citizen" under CWA section 505(g), 33 U.S.C. section 1365(g).

1 SFCBOA's members operate small, family owned fishing boats that catch Dungeness crab, wild

2 California king salmon, herring, and many other fish species that live in the cold waters of the

3 Pacific Ocean.  Members are also actively involved in community education, and fishing resource

4 advocacy to ensure that the rich heritage of commercial fishing for Bay Area residents will

5 survive for future generations.  The interests of SFCBOA and its members have been, are being,

6 and unless the relief requested herein is granted, will continue to be adversely affected and

7 injured by defendants' continued discharge of pollutants that harm seafood resources in violation

8 of the CWA.  CWA enforcement will help restore and preserve water quality, directly benefitting

9 the fisheries upon which SFCBOA's members rely.

10     20.  Plaintiff THE INSTITUTE FOR FISHERIES RESOURCES ("IFR") is a non-profit

11 public benefit corporation headquartered in San Francisco, California.  As such, IFR is a "person"

12 under CWA section 502(5), 33 U.S.C. section 1362(5).  In addition, IFR is a "citizen" under

13 CWA section 505(g), 33 U.S.C. section 1365(g).  Since 1993, IFR has been carrying out the

14 fishery research and conservation needs of working fishing men and women.  IFR works on

15 conservation projects and policy issues at the regional, national and international levels.  The

16 interests of IFR and its members have been, are being, and unless the relief requested herein is

17 granted, will continue to be adversely affected and injured by the defendants' continued discharge

18 of pollutants that harm fisheries resources in violation of the CWA.  CWA enforcement will help

19 restore and preserve water quality, directly benefitting the fisheries upon which IFR's members

20 rely.

21     21.  Plaintiff FELIX SMITH is a veteran fish and wildlife biologist with 37 years of

22 managerial and technical experience with the U.S. Fish and Wildlife Service prior to his

23 retirement from that agency.  He discovered and reported the deformed migratory birds poisoned

24 at Kesterson National Wildlife Refuge in June 1983.  He has spent over 50 years working on

25 water management, wildlife, and fish related issues including 40 years on California ecosystem

26 issues.  He is an outspoken advocate for using the public trust doctrine to protect the people's fish

27 and wildlife resources, fish and wildlife habitats, and associated uses and values.  Mr. Smith is an

28 avid outdoorsman and uses the Bay-Delta, the San Joaquin River and their tributaries for

scientific study, recreation and aesthetic enjoyment.  Mr. Smith's interests have been, are being, and, unless the relief requested herein is granted, will continue to be harmed by the defendants' violation of the CWA.  CWA enforcement will help restore and preserve water quality, directly benefitting the ecosystems that Mr. Smith has spent 40 years trying to protect and restore.

22.  Plaintiffs have no plain, speedy, or adequate remedy at law.  Additionally, plaintiffs' injuries are fairly tracable to defendants' actions.  These injuries are actual, concrete, and imminent and cannot be adequately remedied by money damages.  Accordingly, plaintiffs seek injunctive and declaratory relief from this Court to rectify defendants' unlawful acts.

23.  Defendant DONALD R. GLASER is the Regional Director of the U.S. BUREAU OF RECLAMATION, and is being sued in his official capacity.  The U.S. Bureau of Reclamation (the "Bureau") is the federal agency within the U.S. Department of the Interior charged with managing the Nation's water.  The Bureau, in association with defendant San Luis & Delta-Mendota Water Authority, operates the Project.

24.  Defendant SAN LUIS & DELTA-MENDOTA WATER AUTHORITY (the "Authority") serves 29 member agencies reliant upon water exported from the Bay-Delta by the Bureau's Central Valley Project.  The members of the Authority deliver water to approximately 1.1 million acres of farmland and nearly 2 million California residents.  The Authority, in association with the Bureau, operates the Project.

**FACTUAL BACKGROUND**

25.  For decades now, the Bureau and the Authority (collectively, the "Operators") have been discharging water laden with pollutants harmful to human health and to the fragile ecosystems of Mud Slough, the San Joaquin River, and the Bay-Delta without first obtaining the required NPDES permits.  Most notably, discharges by the Operators contain high levels of selenium.  Selenium kills juvenile salmon and steelhead and causes birth defects in the birds that nest and feed along the shorelines and in the wetlands affected by the Project.  According to recent monitoring reports, selenium levels in the San Joaquin River exceed safe drinking water standards.  Selenium pollution is also present throughout the entire Bay-Delta, a vital system which, through the Central Valley Project and the State Water Project, serves as the water supply

1  for 20 million Californians.  The operators are in violation of the CWA by discharging selenium-

2  contaminated water without an NPDES permit.

3       26.  The water that the defendants collect, pump, and then discharge into the San Luis

4  Drain, Mud Slough, and then into the San Joaquin River and Bay-Delta contains significant

5  amounts of contaminated groundwater.  This is so because the Project collects and then

6  discharges polluted groundwater from tile drainage systems.  These tile drainage systems consist

7  of a parallel network of drain laterals perforated on their upper side and buried at variable depths

8  and spacings. The drain laterals are typically installed at depths ranging from 6 to 9 feet below

9  land surface, and spaced horizontally from 100 to 600 feet apart.  Drainwater production is

10  proportional to the hydraulic gradient between the water table and the drain laterals.  Drainflow

11  increases as the water table rises, decreases as the water table declines, and is zero when the

12  water table is below the drain laterals.  Consequently, because the Project collects its discharge

13  water from tile drainage systems, it necessarily discharges polluted groundwater along with

14  irrigation water.

15       27.  The Project's canals, including the San Luis Drain, discharge contaminated

16  groundwater to the flows of Mud Slough and the San Joaquin River, and so are tributaries of

17  those waterways.  "A 'stream which contributes its flow to a larger stream or other body of water'

18  is a tributary."  *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001),

19  quoting *Random House College Dictionary* 1402 (rev. ed. 1980).

20       28.  Defendants continuously discharge highly contaminated groundwater through the tile

21  drainage system and associated ditches – both point sources – first into the San Luis Drain and

22  from there into Mud Slough and ultimately into the San Joaquin River and the Bay-Delta.

23  Monthly water quality reports of this discharge are compiled by the San Francisco Estuary

24  Institute through a cooperative agreement with the Bureau, the Central Valley Regional Water

25  Quality Control Board, the U.S. Fish and Wildlife Service, the California Department of Fish and

26  Game, the Authority, the U.S. Environmental Protection Agency, and the U.S. Geological Survey.

27  The pollutants contained in the Project's discharge include selenium, salt, boron, and mercury,

28  among others.  Defendants' discharge thus alters "the chemical, physical, biological, and

1  radiological integrity of water" in the San Luis Drain, Mud Slough, the San Joaquin River and the

2  Bay-Delta, and so constitutes a discharge of pollutants into waters of the U.S.  33 U.S.C. § 1362.

3       29.  In 1996, defendants obtained an NPDES permit for the discharge of groundwater

4  from the Project.  The 1996 permit was rescinded in September 1996.  Defendants' current

5  discharges are not authorized by any NPDES permit.  The Project thus collects and pumps

6  polluted groundwater to the surface and then discharges it into the San Luis Drain, Mud Slough,

7  and eventually into the San Joaquin River and the Bay-Delta without a valid NPDES permit.

8                                       **LEGAL BACKGROUND**

9       30.  The CWA states that "[t]he objective of this chapter is to restore and maintain the

10 chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251.  The CWA

11 prohibits the "discharge of any pollutant by any person" unless done in compliance with the Act.

12 *Id.* at § 1311(a).  Section 402 of the CWA requires a permit for the discharge of pollutants from

13 point sources such as pipes and ditches into navigable waters.  *Id.* at section 1342 (a)(1).

14      31.  Under the CWA, the "discharge of a pollutant" means "any addition of any pollutant

15 to navigable waters from any point source." 33 U.S.C. § 1362(12).  An addition occurs when a

16 point source introduces a pollutant into a navigable water that would not exist in the same form or

17 concentration but for the addition from the point source. *Rybachek v. EPA*, 904 F.2d 1276, 1285-

18 1286 (9th Cir. 1990); *cf.*, *Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 261 F.3d

19 810, 815 (9th Cir. 2001) (interpreting "addition" under CWA § 404); *United States v. Deaton*,

20 209 F.3d 331, 335 (4th Cir. 2000) (same); and *United States v. M.C.C. of Florida, Inc.*, 772 F.2d

21 1501 (11th Cir. 1985) (same), *vacated on other grounds,* 481 U.S. 1034 (1987), readopted in

22 relevant part, 848 F.2d 1133 (11th Cir. 1988).

23      32.  Under the CWA, "pollutant" is broadly defined to include "dredged soil . . .

24 biological materials . . . heat . . . rock, sand . . . and agricultural waste discharged into water." 33

25 U.S.C. at section 1362(6).  The term "pollution" is defined as "the man-made or man-induced

26 alteration of the chemical, physical, biological, and radiological integrity of water." *Id.* at § 1362

27 (19).  Courts consider the definition of "pollution" in determining whether discharged water is a

28 "pollutant." *PUD No. 1 of Jefferson County v. Washington Department of Ecology,* 511 U.S.

1  700, 705 (1994); *Northern Plains Resource Council v. Fidelity Exploration and Development*
2  *Co.*, 325 F.3d 1155, 1162 (9th Cir. 2003).

3      33.  A "point source" is defined as "any discernible, confined and discrete conveyance . . .
4  from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).  "[A] point source need
5  not be the original source of the pollutant;" it "need only convey the pollutant to navigable
6  waters." *South Florida Water Management District v. Miccosukee Tribe of Indians*, 541 U.S. 95,
7  105 (2004).  Here, the Project's canals and ditches that transport water from the drainage area to
8  the San Luis Drain and then on to Mud Slough are exactly the type of "discrete conveyance[s]"
9  that are covered by the NPDES program.  *Id.*

10     34.  Navigable waters under the Clean Water Act are "waters of the United States." 33
11  U.S.C. § 1362(7).  Mud Slough and the San Joaquin River are navigable waters under the Clean
12  Water Act because they are used by power boats, rowboats, rafts, canoes, kayaks, and other
13  recreational watercraft and are thus navigable in fact.  *Rapanos v. U.S.*, 547 U.S. 715, 731 (2006).

14     35.  The Project's canals, including the San Luis Drain, are waters of the United States
15  because they are tributaries of Mud Slough and the San Joaquin River.  *United States v. Riverside*
16  *Bayview Homes, Inc.*, 474 U.S. 121 (1985); *Northern California River Watch v. City of*
17  *Healdsburg*, 496 F.3d 993, 997 (9th Cir. 2007) ("regulable waters of the United States include
18  tributaries of traditionally navigable waters"); *United States v. Eidson*, 108 F.3d 1336, 1341-42
19  (11th Cir. 1997) (tributaries are "waters of the United States," and manmade ditches and canals
20  that flow intermittently into creeks may be tributaries); *United States v. TGR Corp.*, 171 F.3d 762,
21  764 (2d Cir. 1999) (non-navigable tributaries flowing into navigable streams are "waters of the
22  United States"); *United States v. Texas Pipe Line Co.*, 611 F.2d 345, 347 (10th Cir. 1979)
23  (unnamed tributary of creek that is tributary to river is "water of the United States").

24     36.  Although agricultural return flows are exempt from the CWA's permit requirements
25  (33 U.S.C. § 1362(14); 40 C.F.R. § 122.3(f)), the CWA only exempts "discharges composed
26  *entirely* of return flows from irrigated agriculture . . . ." 33 U.S.C. § 1342(l)(1), emphasis added;
27  *South Florida Water Management Dist. v. Miccosukee Tribe of Indians, supra*, 541 U.S. 95
28  (agricultural return flows commingled with other water sources required NPDES permit).

1  Defendants' discharges in question consist mostly of groundwater, not agricultural return flows.
2  Thus, the agricultural return flows exemption does not apply and defendants are in violation of
3  the CWA because they have not obtained an NPDES permit.

**CLAIM FOR RELIEF**

(Violation of the Clean Water Act)

(Against all defendants)

7      37.  The paragraphs set forth above are realleged and incorporated herein by reference.

8      38.  Section 301(a) of the CWA, 33 U.S.C. section 1311, prohibits the discharge of
9  pollutants from a point source into navigable waters of the U.S., unless pursuant to the terms of
10  an NPDES permit issued under section 402 of the Clean Water Act, 33 U.S.C. section 1342.

11      39.  Defendants discharged and continue to discharge pollutants from the Project's canals,
12  pipes, and ditches, point sources, into waters of the United States, including the San Luis Drain
13  and Mud Slough, without an NPDES permit.

14      40.  Defendants' actions in discharging and continuing to discharge pollutants into waters
15  of the United States without an NPDES permit violate the Clean Water Act.  33 U.S.C. §
16  1342(a)(1) (NPDES permit requirement).

**PRAYER FOR RELIEF**

18      41.  WHEREFORE, plaintiffs respectfully request that the Court grant the following
19  relief:

20      42.  Adjudge and declare defendants to have violated and to continue to be in violation of
21  the Clean Water Act.

22      43.  Preliminarily and permanently enjoin defendants' operation of the Project and enjoin
23  them from initiating any activities in furtherance of the Project that could result in any change or
24  alteration of the physical environment unless and until defendants comply with the requirements
25  of the CWA and its implementing regulations.

26      44.  Order defendants to pay civil penalties of $37,500 per day of violation pursuant to 33
27  U.S.C. section 1319(d) and adjusted for inflation by 40 CFR section 19.4, including violations
28  identified in plaintiffs' notice letter, violations identified during discovery, and violations

1 committed subsequent to those identified in this Complaint.

2     45.   Issue a remedial injunction ordering defendants to pay the cost of any environmental

3 restoration or remediation, including additional monitoring, deemed necessary and proper by the

4 Court to comply with the CWA and ameliorate the water degradation caused by defendants'

5 violations.

6     46.   Award plaintiffs their reasonable attorneys' fees and costs and expenses incurred in

7 connection with the litigation of this action, as authorized by 33 U.S.C. section 1365(d).

8     47.   Grant plaintiffs such additional relief as the Court may deem just and proper.

9

10 Dated:  November 9, 2011                    Respectfully submitted,

11

12                                            _____
                                             STEPHAN C. VOLKER
13                                           Attorney for Plaintiffs PACIFIC COAST FEDERATION
                                             OF FISHERMEN'S ASSOCIATIONS, CALIFORNIA
14                                           SPORTFISHING PROTECTION ALLIANCE,
                                             FRIENDS OF THE RIVER, SAN FRANCISCO CRAB
15                                           BOAT OWNERS ASSOCIATION, INC., THE
                                             INSTITUTE FOR FISHERIES RESOURCES, and
16                                           FELIX SMITH

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Law Offices of

# Stephan C. Volker

Stephan C. Volker
Joshua A.H. Harris
Shannon L. Chaney
Alexis E. Krieg
Stephanie L. Abrahams
Daniel P. Garrett-Steinman
Jamey M.B. Volker
M. Benjamin Eichenberg

436 – 14th Street, Suite 1300
Oakland, California 94612
Tel: (510) 496-0600 ❖ Fax: (510) 496-1366
svolker@volkerlaw.com

June 7, 2011

*VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED*

Michael L. Connor, Commissioner
U.S. Bureau of Reclamation
1849 C Street NW
Washington D.C. 20240-0001

Daniel G. Nelson, Executive Director
San Luis & Delta-Mendota Water Authority
842 6th Street, Suite 7
Los Banos, CA 93635-4214

*VIA FIRST CLASS U.S. MAIL*

Jared Blumenfeld
Regional Administrator, Region 9
U.S. Environmental Protection Agency
75 Hawthorne Street
San Francisco, CA 94105

Lisa Jackson, EPA Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Thomas Howard, Executive Director
State Water Resources Control Board
Division of Water Quality
P.O. Box 100
Sacramento, CA 95812-0100

RE:   Sixty-day notice of intent to sue the U.S. Bureau of Reclamation and the San
Luis & Delta-Mendota Water Authority over their failure to obtain Clean Water
Act NPDES permits for the Grasslands Bypass Project and its ongoing discharges
into the San Luis Drain, Mud Slough, and the San Joaquin River

Dear Sir or Madam:

## INTRODUCTION

This letter is a sixty-day notice under the citizen suit provision of the Clean Water Act,
33 U.S.C. section 1251, et seq. ("CWA") on behalf of the Pacific Coast Federation of
Fishermen's Associations, California Sportfishing Protection Alliance, Friends of the River, San
Francisco Crab Boat Owners Association, Inc., The Institute for Fisheries Resources, and Felix
Smith (collectively, "Conservation Groups"). It communicates these groups' intent to sue the
U.S. Bureau of Reclamation (the "Bureau") and the San Luis & Delta-Mendota Water Authority
(the "Authority") (collectively, the "Operators") for operation of the Grassland Bypass and San

June 7, 2011
Page 2

Luis Drain ("Project") in violation of the CWA. The Operators' pumping and discharge of polluted water into Mud Slough, the San Joaquin River, and eventually the San Francisco Bay Delta constitutes the discharge of a pollutant from a point source into a water of the United States for which no permit has been issued. This letter is provided pursuant to the 60-day notice requirement of the citizen suit provision of the CWA, 33 U.S.C. § 1365(b)(1)(A), and its implementing regulations, 40 C.F.R. §§ 135.2-135.3.

The Project's pollution threatens not only California's most critical ecological resources, the San Francisco Bay-Delta and its endangered fish species – including delta smelt, salmon, steelhead, and sturgeon – but also the quality of water that is pumped from the Bay-Delta to supply drinking water to 20 million Californians. Conservation Groups seek a permanent end to this unpermitted pollution of Mud Slough, the San Joaquin River, and the San Francisco Bay-Delta and the commencement of the long-overdue process of restoring – rather than further destroying – the region's imperiled water quality.

## BACKGROUND

1. **Drainage Problems in the Grasslands Area**

As explained in U.S. Fish and Wildlife's Final Biological Opinion for the Grasslands Bypass Project, September 27, 2001 ("2001 BiOp"):

> In some areas of the western San Joaquin Valley, deep percolation of groundwater is inhibited by the hydraulic properties of soils and other subsurface materials. As a result, the groundwater table rises, potentially threatening crop production (through flooding of the root zone, often with saline water). Evaporation and capillary action also can draw dissolved solids in shallow groundwater to the surface, resulting in salinization of the soils. High salinity in shallow groundwater and/or soils adversely affects agricultural productivity by reducing crop yields and limiting the diversity of crops that can be grown [cite]. In general, for irrigated agriculture to be productive and sustainable, the groundwater table must not be allowed to rise into the crop root zone for extended periods of time and a salt balance must be achieved and maintained.

2001 BiOp, p. 1-8.

2. **History of the Grassland Bypass Project**

During the 1950's and 1960's, farmers on the west side of the San Joaquin Valley installed subsurface drainage systems in an ill-advised attempt to convert drainage-impaired and contaminated soils in the Grasslands Area of the San Joaquin Valley into arable farmland. *Id.* Water collected by those systems was predominantly contaminated groundwater. The water was discharged into sloughs and creeks of the western Grasslands area *en route* to the San Joaquin

June 7, 2011
Page 3

River. These discharges contributed to the pollution of tens of thousands of acres of wetlands in the area.

The discovery of avian developmental abnormalities at Kesterson National Wildlife Refuge caused by selenium contamination from drainwater disposal prompted belated changes in management of the Grasslands area by resource managers. Contamination surveys were conducted in the San Joaquin River beginning in the fall of 1984. They revealed elevated concentrations of salts, arsenic, boron, and/or selenium in waters, sediments, food-chain organisms, and fish and wildlife in the area. In 1985, managers stopped using drainwater as a water supply for the Grasslands' public and private wetlands.

After a series of unsuccessful attempts to resolve the Grasslands area's drainage problems, the federal government instituted the present project. The original agreement for use of the San Luis Drain ("Use Agreement") between the Authority and the Bureau (dated November 3, 1995) permitted the Authority to use a portion of the San Luis Drain to convey drainwater in channels that passed through adjacent wildlife management areas and then to discharge the water into Mud Slough, a tributary of the San Joaquin River. The 1995 Use Agreement allowed use of the Drain in this manner until September 30, 2001, and the 2001 Use Agreement allowed continued use of the Drain through December 31, 2009.

Use of the Project beyond December 31, 2009, required a revised Use Agreement, an amendment to the 1998 *Water Quality Control Plan for the Sacramento River and San Joaquin River Basins Fourth Edition* ("1998 Basin Plan"), and additional environmental review. Under the 2010 Use Agreement, the project is authorized to operate for another ten years, until December 31, 2019.

## FAILURE TO OBTAIN NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM ("NPDES") PERMIT

The CWA states that "[t]he objective of this chapter is to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The CWA prohibits the "discharge of any pollutant by any person" unless done in compliance with the Act. *Id.* at § 1311(a). Section 402 of the CWA requires a permit for the discharge of pollutants from point sources such as pipes and ditches into navigable waters. *Id.* at § 1342 (a)(1).

For decades now, the Operators have been discharging water laden with pollutants harmful to human health and to the fragile ecosystems of Mud Slough, the San Joaquin River, and the San Francisco Bay-Delta without the required NPDES permit. Most notably, the discharges by the Operators contain high levels of selenium that kill juvenile salmon and steelhead and cause birth defects in birds that nest and feed along the shorelines and in the wetlands affected by the Project. According to recent monitoring reports, selenium levels in the San Joaquin River sometimes exceed safe drinking water standards. Selenium pollution is also

June 7, 2011
Page 4

present throughout the Bay-Delta, which serves as the water supply pumped into the California Aqueduct for use by over 20 million Californians. Because the Operators' discharges of selenium-contaminated water occur without an NPDES permit, the Operators are in violation of the CWA.

## 1.    DISCHARGE OF A POLLUTANT

The phrase "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). An addition occurs when a point source introduces a pollutant into a navigable water that would not exist in the same form or concentration but for the addition from the point source. *Rybachek v. EPA*, 904 F.2d 1276, 1285-1286 (9th Cir. 1990); *cf.*, *Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 261 F.3d 810, 815 (9th Cir. 2001) (interpreting "addition" under CWA section 404), *United States v. Deaton*, 209 F.3d 331, 335 (4th Cir. 2000) (same); and *United States v. M.C.C. of Florida, Inc.* (772 F.2d 1501 (11th Cir. 1985) (same), *vacated on other gds,* 481 U.S. 1034 (1987), readopted in relevant part, 848 F.2d 1133 (11th Cir. 1988).

Under the CWA, "pollutant" is broadly defined to include "dredged soil . . . biological materials . . . heat . . . rock, sand . . . and agricultural waste discharged into water." 33 U.S.C. at §1362(6). The term "pollution" is defined as "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." *Id.* at §1362 (19). Courts consider the definition of "pollution" in determining whether discharged water is a "pollutant." *PUD No. 1 of Jefferson County v. Washington Department of Ecology*, 511 U.S. 700, 705 (1994); *Northern Plains Resource Council v. Fidelity Exploration and Development Co.*, 325 F.3d 1155, 1162 (9th Cir. 2003).

Here, the Operators discharge highly contaminated water through tile drains and ditches – both point sources – first into the San Luis Drain and from there into Mud Slough and ultimately into the San Joaquin River and the San Francisco Bay Delta on a continuous basis. Monthly water quality reports of this discharge are compiled by the San Francisco Estuary Institute through a cooperative agreement with U.S. Bureau of Reclamation, Central Valley Regional Water Quality Control Board, U.S. Fish and Wildlife Service, California Department of Fish and Game, San Luis & Delta-Mendota Water Authority, U.S. Environmental Protection Agency, and U.S. Geological Survey and can be viewed at: http://www.sfei.org/gbp/reports/monthly. The pollutants contained in the Project's discharge include selenium, salt, boron and mercury, among others. The Operators' discharge thus alters "the chemical, physical, biological, and radiological integrity of water" in both the San Luis Drain and Mud Slough and constitutes a discharge of a pollutant. 33 U.S.C. §1362.

## 2.    POINT SOURCE

A "point source" is defined as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "[A] point source

need not be the original source of the pollutant;" it "need only convey the pollutant to navigable waters." *South Florida Water Management District v. Miccosukee Tribe of Indians,* 541 U.S. 95, 105 (2004). Here, the Project's canals and ditches that transport water from the drainage area to the San Luis Drain and then to Mud Slough are exactly the type of "discrete conveyance" that is covered by the NPDES program. *Id.*

3.    NAVIGABLE WATER

Navigable waters under the Clean Water Act are "waters of the United States." 33 U.S.C. § 1362(7). Mud Slough and the San Joaquin River are navigable waters under the Clean Water Act because they are used by power boats, rowboats, rafts, canoes, kayaks, and other recreational watercraft and are thus navigable in fact. *Rapanos v. U.S.,* 547 U.S. 715, 731 (2006).

The Project canals, including the San Luis Drain, are also waters of the United States because they are tributaries of Mud Slough and the San Joaquin River. *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121 (1985); *Northern California River Watch v. City of Healdsburg,* 496 F.3d 993, 997 (9th Cir. 2007) ("regulable waters of the United States include tributaries of traditionally navigable waters"); *United States v. Eidson,* 108 F.3d 1336, 1341-42 (11th Cir. 1997) (tributaries are "waters of the United States," and manmade ditches and canals that flow intermittently into creek may be tributaries); *United States v. TGR Corp.,* 171 F.3d 762, 764 (2d Cir. 1999) (non-navigable tributaries flowing into navigable streams are "waters of the United States"); *United States v. Texas Pipe Line Co.,* 611 F.2d 345, 347 (10th Cir. 1979) (unnamed tributary of creek that is tributary to river is "water of the United States").

4.    AGRICULTURAL RETURN FLOW EXEMPTION

The Operators may take the position that their discharge does not require an NPDES permit because it allegedly only contains agricultural return flows, which are exempt from the CWA's permit requirements. 33 U.S.C. § 1362(14); 40 C.F.R. § 122.3(f).[1] But the CWA only exempts "discharges composed *entirely* of return flows from irrigated agriculture . . . ." 33 U.S.C. § 1342(l)(1), emphasis added.

---

[1] *See, e.g.* Final Environmental Impact Statement, Grassland Bypass Project, 2010-2019, August 2009 ("2010-2019 FEIS"), pp. 4-5 to 4-9, available at: http://www.usbr.gov/mp/nepa/documentShow.cfm?Doc_ID=4412

June 7, 2011
Page 6


    Discharges from the Project are not exempt as agricultural return flow because the
polluted water being pumped and discharged into the San Luis Drain, Mud Slough, and then
into the San Joaquin River through the Project is predominantly contaminated groundwater, not
just irrigation return flows.  As noted, groundwater pumped by the Project is heavily
contaminated with selenium and other pollutants including boron and mercury.  Groundwater
levels are at their highest both during the summer when irrigation return flows are at their
highest, *and* during the winter when irrigation flows are at their *lowest.*  2010-2019 FEIS, p. 5-7
("[m]inimum water table depth and maximum drainflow occurred during March (preirrigation)
and July (the peak of the irrigation season).").  The Project is the primary means by which this
polluted groundwater is collected and discharged into waters of the United States.  As explained
in the Grassland Bypass Project 2010-2019 FEIS, "[p]resently, groundwater discharge is
predominantly by tile drainage systems and water table evaporation."  2010-2019 FEIS, p. 5-3.
The FEIS/EIR elaborates:

    Tile drainage systems consist of a parallel network of perforated drain laterals
    buried at variable depths and spacings. The drain laterals are typically installed at
    depths ranging from 6 to 9 feet below land surface, and spaced horizontally from
    100 to 600 feet apart. Drainwater production is proportional to the hydraulic
    gradient between the water table and the drain laterals; *drainflow increases as the
    water table rises, decreases as the water table declines, and is zero when the
    water table is below the drain laterals.*

2010-2019 FEIS, p. 5-7 emphasis added.  Similarly, the CVRWQCB has explained:

    Dry conditions make irrigation necessary for nearly all crops grown commercially
    in the watershed.  Irrigation of soils derived from marine sediments leaches
    selenium into the shallow groundwater.  Subsurface drainage is produced when
    farmers drain the salty groundwater from the root zone to protect their crops . . . .

CVRWQCB, Staff Report for Selenium TMDL for Grassland marshes, April 2000, p. 3; *see
also,* 2001 BiOp, p. 1-8.

    Accordingly, the "subsurface drainage" discharged by the Project is predominantly water
from the water table, or groundwater, which during the winter and at other times is not "return
flow[] from irrigated agriculture." 33 U.S.C. §§ 1342(l)(1), 1362(14).  And, as explained, the
groundwater underlying the Grassland drainage area contains high levels of selenium among
other pollutants.  The Project thus collects, pumps and discharges polluted groundwater to the
surface and discharges it into the San Luis Drain, Mud Slough, and eventually into the San
Joaquin River.  Under the CWA, any discharge that is not made up

June 7, 2011
Page 7

"entirely" of agricultural return flows is not exempt.  33 U.S.C. § 1342(l)(1); *see South Florida Water Management Dist. v. Miccosukee Tribe of Indians, supra*, 541 U.S. 95 (agricultural return flows commingled with other water sources required NPDES permit).  Thus, the agricultural return flows exemption does not apply and the Operators are required to obtain an NPDES permit.[2]

## NOTICE OF INTENT TO SUE

If the Operators do not act within 60 days to correct their ongoing violation of the CWA, by applying to the California Regional Water Quality Control Board for an NPDES permit or ceasing all unpermitted discharges of polluted groundwater to the waters of the United States, we will seek relief in federal district court under the Clean Water Act's citizen suit provision, 33 U.S.C. § 1365(b)(1)(A).

Please contact the undersigned if you have any questions concerning this notice.

Very truly yours,

Stephan C. Volker
Attorney for Pacific Coast Federation of
Fishermen's Associations, California
Sportfishing Protection Alliance, Friends of
the River, San Francisco Crab Boat Owners
Association, Inc., The Institute for Fisheries
Resources, and Felix Smith

---

[2]Indeed, it should be noted that in 1996 the Operators *previously obtained* an NPDES permit for the discharge of groundwater from this very Project even though *some* agricultural return flows are included in the Project's discharges.  2010-2019 FEIS, p. 4-8.  But the 1996 permit was rescinded in September 1996.  The Operators' current discharges are not covered by any required NPDES permit and therefore violate the CWA.

June 7, 2011
Page 8


cc (*via First Class U.S. Mail*):


Eric H. Holder, Jr.
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington D.C. 20530-0001

Kamala D. Harris
California Attorney General
P.O. Box 944255
Sacramento, CA 94244-2550

Pamela C. Creedon, Executive Officer
Central Valley Regional Water Quality
    Control Board
11020 Sun Center Drive, Suite 200
Rancho Cordova, CA 95670-6114