1  STEPHAN C. VOLKER (CSB #63093)                                    10.497.02
   JOSHUA A. H. HARRIS (CSB #226898)
2  JAMEY M.B. VOLKER (CSB #273544)
   M. BENJAMIN EICHENBERG (CSB #270893)
3  LAW OFFICES OF STEPHAN C. VOLKER
   436 14th Street, Suite 1300
4  Oakland, California 94612
   Tel:     510/496-0600
5  Fax:     510/496-1366

6  Attorneys for Plaintiffs
   PACIFIC COAST FEDERATION OF
7  FISHERMEN'S ASSOCIATIONS, et al.

8

9                IN THE UNITED STATES DISTRICT COURT

10             FOR THE EASTERN DISTRICT OF CALIFORNIA

11  PACIFIC COAST FEDERATION OF        )  Civ. No. 2:11-cv-02980-KJM-CKD
    FISHERMEN'S ASSOCIATIONS, CALIFORNIA )
12  SPORTFISHING PROTECTION ALLIANCE,  )  **PLAINTIFFS' NOTICE OF MOTION**
    FRIENDS OF THE RIVER, SAN FRANCISCO )  **AND MOTION FOR JUDGMENT ON**
13  CRAB BOAT OWNERS ASSOCIATION, INC., )  **THE PLEADINGS AND SUPPORTING**
    THE INSTITUTE FOR FISHERIES RESOURCES, )  **MEMORANDUM OF POINTS AND**
14  and FELIX SMITH,                   )  **AUTHORITIES**
                                       )
15            Plaintiffs,              )  Date:      November 30, 2012
                                       )  Time:        10:00 a.m.
16        v.                           )  Courtroom: 3, 15th Floor
                                       )  Judge:     Hon. Kimberly J. Mueller
17  DONALD R. GLASER, Regional Director of the )
    U.S. Bureau of Reclamation, U.S. BUREAU OF )
18  RECLAMATION, and SAN LUIS & DELTA- )
    MENDOTA WATER AUTHORITY,           )
19                                     )
              Defendants.              )
20  ─────────────────────────────────  )

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -ii-

NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

V.      ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      THE GRASSLANDS BYPASS PROJECT FITS ALL OF THE CLEAN
                WATER ACT'S NPDES PERMIT CRITERIA . . . . . . . . . . . . . . . . . . . . . . . 6

                1.      Defendants' Operations Constitute Discharges from a Point Source . . . . . . . . 6

                2.      Defendants' Discharges of Polluted Groundwater Do Not Constitute
                        "Discharges Composed Entirely of Return Flow From Irrigated
                        Agriculture" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                3.      The San Luis Drain and Mud Slough Constitute Waters of
                        the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                4.      No NPDES Permit Covers the Discharges . . . . . . . . . . . . . . . . . . . . . 8

        B.      THE CLEAN WATER ACT'S IRRIGATED AGRICULTURE EXCEPTION
                CANNOT BE APPLIED TO THE DISCHARGES AT ISSUE HERE . . . . . . . . . . . 9

                1.      Statutory Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                        a.      Interpretation of CWA Exemptions . . . . . . . . . . . . . . . . . . . . . 9

                        b.      Plain Meaning Versus Legislative Intent . . . . . . . . . . . . . . . . . . 10

                2.      Under the Plain Meaning of the Statutory Language, Defendants' Discharges
                        of Polluted Groundwater Do Not Constitute "Discharges Composed
                        Entirely of Return Flow From Irrigated Agriculture" . . . . . . . . . . . . . . . 11

                3.      The CWA's Legislative History Demonstrates That Polluted
                        Groundwater Is Not Exempt from NPDES Permitting . . . . . . . . . . . . . . . 15

                        a.      Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                        b.      Legislative History Analysis . . . . . . . . . . . . . . . . . . . . . . . . . 17

        C.      DEFENDANTS' AFFIRMATIVE DEFENSES DO NOT PRECLUDE
                THIS COURT FROM RULING ON PLAINTIFFS' 12(C) MOTION . . . . . . . . . . . 18

VI.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3

*Aldridge v. Williams*
        3 How. 9, 11 L.Ed. 469 (1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

4

*Avoyelles Sportsmen's League v. Alexander*
        473 F.Supp. 525 (D.La. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5

6

*Borden Ranch Partnership v. U.S. Army Corps of Engineers*
        261 F.3d 810 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

7

*Campbell v. Allied Van Lines Inc.*
        410 F.3d 618 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

8

9

*Community Ass'n for Restoration of the Environment v. Henry Bosma Dairy*
        65 F.Supp.2d 1129 (E.D.Wash. 1999), *affirmed*, 305 F.3d 943 (9th Cir. 2002) . . . . . . . . . . . . . 14

10

*Connecticut National Bank v. Germain*
        503 U.S. 249 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

11

12

*Conroy v. Aniskoff*
        507 U.S. 511 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

13

*Cordiano v. Metacon Gun Club, Inc.*
        575 F.3d 199 (2nd Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

14

15

*Department of Interior v. Klamath Water Users Protective Association*
        532 U.S. 1 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

16

*Exxon Mobil Corp. v. Allapattah Services, Inc.*
        545 U.S. 546 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

17

18

*Fleming v. Pickard*
        581 F.3d 922 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

19

*Fishermen Against Destruction of Environment, Inc. v. Closter Farms, Inc.*
        300 F.3d 1294 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

20

21

*General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*
        887 F.2d 228 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

22

23

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*
        484 U.S. 49 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

24

*Headwaters, Inc. v. Talent Irrigation Dist.*
        243 F.3d 526 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25

26

*Heliotrope Gen., Inc. v. Ford Motor Co.*
        189 F.3d 971 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

27

28

*In re Hedrick*
    524 F.3d 1175 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Roman Catholic Archbishop of Portland in Oregon*
    661 F.3d 417 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*John Doe Agency v. John Doe Corp.*
    493 U.S. 146 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Leslie Salt Co. v. U.S.*
    820 F.Supp. 478 (N.D.Cal. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Miranda v. Anchondo*
    684 F.3d 844 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*National Cotton Council of America v. U.S. E.P.A.*
    553 F.3d 927 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Natural Res. Def. Council v. Costle,*
    568 F.2d 1369 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Natural Res. Def. Council v. Train,*
    396 F. Supp. 1393 (D.D.C.1975), *aff'd sub nom, Natural Res. Def.*
    *Council v. Costle,* 568 F.2d 1369 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Northwest Environmental Defense Center v. Brown*
    640 F.3d 1063 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10, 13, 16, 17

*Northern Plains Resource Council v. Fidelity Exploration & Development Co.*
    325 F.3d 1155 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

*Northern California River Watch v. City of Healdsburg*
    496 F.3d 99 (9th Cir. 2007), *cert. den. sub nom. City of Healdsburg,*
    *California v. Northern California River Watch*
    552 U.S. 1180 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

*Oncale v. Sundowner Offshore Services, Inc.*
    523 U.S. 75 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Oregon Natural Desert Association v. Dombeck*
    172 F.3d 1092 (9th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Perrin v. United States*
    444 U.S. 37 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*PUD No. 1 of Jefferson County v. Washington Department of Ecology*
    511 U.S. 700 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Regions Hospital v. Shalala*
    522 U.S. 448 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rybachek v. EPA*
    904 F.2d 1276 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1   *Sierra Club v. Union Oil Company of California*
        813 F.2d 1480 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10
2
    *Smallwood v. Allied Van Lines, Inc.*
3       660 F.3d 1115 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
4   *South Florida Water Management Dist. v. Miccosukee Tribe of Indians*
        541 U.S. 95 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5, 6-7
5
    *Strigliabotti v. Franklin Resources, Inc.*
6       398 F.Supp.2d 1094 (N.D.Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
7   *Turner v. Cook*
        362 F.3d 1219 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
8
    *United States v. Akers*
9       785 F.2d 814 (9th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
10  *United States v. Begay*
        622 F.3d 1187 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
11
    *United States v. Eidson*
12      108 F.3d 1336 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
13  *United States v. Deaton*
        209 F.3d 331 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
14
    *United States v. First City National Bank*
15      386 U.S. 361 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
16  *United States v. M.C.C. of Florida, Inc.*
        772 F.2d 1501 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
17
    *United States v. Oxford Royal Mushroom Products, Inc.*
18      487 F.Supp. 852 (D.Pa. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
19  *United States v. Real Property Located at 475 Martin Lane*
        545 F.3d 1134 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
20
    *United States v. Texas Pipe Line Co.*
21      611 F.2d 345 (10th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
22  *United States v. TGR Corp.*
        171 F.3d 762 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
23
    *United States v. Wright*
24      625 F.3d 583 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
25  *Washington Market Co. v. Hoffman*
        101 U.S. 112 (1879) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# FEDERAL STATUTES

United States Code, Title 33
    § 1251(a) (Federal Water Pollution Control Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    § 1251(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    § 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9
    § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 5, 9
    § 1312 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    § 1316 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    § 1317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    § 1328 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    § 1342 (Clean Water Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
    § 1342(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    § 1342(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    § 1342(*l*)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 9, 11, 13, 14, 15
    § 1344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    § 1362(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14
    § 1362(12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    § 1362(14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 11, 13
    § 1365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5
    § 1365(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

# FEDERAL RULES

Federal Rules of Civil Procedure
    § 12(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 18

# REGULATIONS

40 Code of Federal Regulations
    § 122.3(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11
    § 125.4 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    § 125.53(a)(2) (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    § 125.53(a)(2)-(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

# OTHER AUTHORITIES

Federal Register, Volume 41
    28,493-28,496 (July 12, 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Congressional Record
    Vol. 123, p. 39, 210 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

H.R.Rep. No. 92-911 (1971)
    § 125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Random House College Dictionary (rev. ed. 1980)
    p. 1402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Sen. Rep. No. 95-370 (1977)
    reprinted in 1977 U.S. Code & Congressional Administrative News
    at pages 4326, 4360 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

Webster's Third New International Dictionary (Unabridged) (1971)

p. 44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
p. 758 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
p. 1941 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
p. 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

1    **NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

2    TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

3         PLEASE TAKE NOTICE that at 10:00 a.m. on November 30, 2012, or as soon thereafter as this

4    matter may be heard in Courtroom 3 of the United States District Court for the Eastern District of

5    California, located at 501 I Street, Sacramento, CA 95814, plaintiffs Pacific Coast Federation of

6    Fishermen's Associations, *et al*. will, and hereby do, move the Court for judgment on the pleadings on

7    the grounds that there are no genuine issues of material fact in dispute, and plaintiffs are entitled to

8    judgment as a matter of law for the reason that defendants, the Bureau of Reclamation, *et al*., failed to

9    comply with section 402 of the Clean Water Act, 33 U.S.C. section 1342.  This motion is based on this

10   Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the pleadings

11   and records on file in this matter, and on such argument of counsel as may be heard at the hearing on this

12   motion.  Counsel met by phone on November 1, 2012 to discuss the substantive merit and procedural

13   context of this motion, and were unable to reach agreement on its merits but did agree that it was

14   appropriate to have this motion heard at the same time as the Bureau of Reclamation's motion for

15   judgment on the pleadings, November 30, 2012.

16   Dated:  November 1, 2012                    Respectfully submitted,

17                                              LAW OFFICES OF STEPHAN C. VOLKER

18
19                                              */s/ Stephan C. Volker*
                                                STEPHAN C. VOLKER
                                                Attorney for Plaintiffs PACIFIC COAST FEDERATION
20                                              OF FISHERMEN'S ASSOCIATION, et al.

21            **MEMORANDUM OF POINTS AND AUTHORITIES**

                              **I.   INTRODUCTION**

22

23        Plaintiffs brought this citizen suit[1] under the Clean Water Act ("CWA"), 33 U.S.C. section 1365,

24   to compel defendants to obtain a National Pollutant Discharge Elimination System ("NPDES") permit,

25   required by sections 301(a) and 402 of the CWA, 33 U.S.C. section 1311(a) and 1342(a), for the

26

27   [1]When Congress enacted the CWA in 1972, it set the goal of restoring and maintaining the chemical, physical, and biological integrity of the waters of the United States.  33 U.S.C. § 1251(a).  Congress

28   included a citizen suit provision to help achieve this important goal.  *Id*. at § 1365.

1    discharge of pollution from the Project into the waters of the United States.  Specifically, defendants'

2    operation of the Grassland Bypass Project ("Project") violates the CWA by discharging water laden with

3    pollutants, including selenium, boron, and salt, from the Grasslands Bypass Channel into the San Luis

4    Drain and then into Mud Slough.  Both San Luis Drain and Mud Slough are waters of the United States

5    that flow into the San Joaquin River and thence into the San Francisco Bay-Delta ("Bay-Delta").

6           None of the pertinent facts is disputed by the parties.  Accordingly, plaintiffs move this Court for

7    judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

8                                  **II.    FACTUAL BACKGROUND**

9           The following facts are undisputed:

10          1.     The Grasslands Drainage Area is a 97,400 acre "agricultural region on the west side of

11   California's San Joaquin Valley."  Answer of Federal Defendants filed January 9, 2012 (Dkt. #15) ("Fed.

12   Ans.") 1:18.

13          2.     Defendants United States Bureau of Reclamation ("Bureau") and the San Luis &

14   Delta-Mendota Water Authority ("Authority") jointly administer the Project.  Fed. Ans. 2:14 ("the Project

15   is jointly administered by Reclamation and the Authority"); Authority Answer to Complaint filed

16   September 21, 2012 (Dkt. #49) ("Authority Ans.") 9:9-12 (permit for "[t]he conveyance of agricultural

17   drainage water into Mud Slough from the San Luis Drain" is held jointly by the "Bureau of Reclamation

18   and the Authority").

19          3.     The Project conveys water from the area's tile drainage systems.  Fed. Ans. 7:16-20;

20   Authority Ans. 12:21-25.

21          4.     The area's tile drainage systems consist of a network of perforated, parallel drain laterals

22   installed six to nine feet deep.  The horizontal spacing varies, but the drains are typically set 100 to 600

23   feet apart. Fed. Ans. 8:16-20 ("tile drainage systems underneath agricultural fields in the Grassland

24   Drainage Area are located between 6-9 feet below the surface such that shallow groundwater may be

25   collected in such systems, and consequently be conveyed . . . from the Grassland Bypass Channel into the

26   San Luis Drain, which connects into Mud Slough"); 8:22-23 (admitting allegations of same in plaintiffs'

27   Complaint); Authority Ans. 10:24 to 11:2.

28

5.     Water collected in these tile drains consists in part of groundwater, or water from the "perched water table" underlying the Grassland Drainage Area (hereinafter "groundwater").  Fed. Ans. 7:18 (tile drains collect "shallow groundwater"); Authority Ans. 11:10-12 ("[t]he water that flows into the tile lines is the pooled water consisting of recently applied irrigation water and water already perched beneath the surface"); 11:12-17 ("subsurface agricultural drainage inherently consists of water applied to the surface of the ground, either through irrigation *or rainfall*, which percolated into the perched water table, sometimes years before collection. [] The water picked up in tile drainage systems is subsurface agricultural drainage water resulting from irrigation of crops with water applied to the surface of the ground, *and/or rainfall*." (Emphasis added.)).

6.     Drainflow increases as the water table rises, decreases as the water table declines, and is zero when the water table is below the drain laterals.  Fed. Ans. 7:22-23 (admitting allegations of same in plaintiffs' Complaint); Authority Ans. 12:13-14 (same).

7.     The water collected in the tile drains flows into ditches that empty into the San Luis Drain and subsequently into Mud Slough.  Fed. Ans. 6:15-17; 6:20-22; 7:16-20; 8:4-10; 9:4-6 ("Federal Defendants admit that the agricultural drainage water collected pursuant to the Project is eventually conveyed from the Grassland Bypass Channel into the San Luis Drain, which connects to Mud Slough"); Authority Ans. 9:9-12; 12:3-4; 12:22-26.

8.     From Mud Slough, the water flows into the San Joaquin River and the Bay-Delta.  Fed. Ans. 3:9-10 ("agricultural drainage water in Mud Slough flows into the San Joaquin River, which flows eventually into the Bay-Delta).

9.     The water collected in the tile drains, transported through the Project, and released into Mud Slough contains various pollutants, including selenium, salt, and boron.  Fed. Ans. 8:16-18; Authority Ans. 13:2-4.

10.    The water collected in the tile drains, transported through the Project, and released into Mud Slough contains high concentrations of selenium.  Fed. Ans. 6:20-22 ("agricultural drainage water conveyed into Mud Slough from the San Luis Drain has high concentrations of selenium (typically 30 – 60 parts per billion)"); 7:20-21; 8:10-11.

1    11.    Water is conveyed through the tile drainage systems and into the San Luis Drain and Mud

2 Slough throughout the year.  Fed. Ans. 8:4-11; Authority Ans. 12:22-25 ("drainage water is conveyed

3 throughout the year at differing volumes from privately owned tile drains within the Grassland Drainage

4 Area through ditches to the Grassland Bypass Channel and into the San Luis Drain").

5    12.    Neither Reclamation, nor the Authority, has obtained an NPDES permit authorizing

6 discharges of pollutants into waters of the United States.  Fed. Ans. 8:28 to 9:1 ("Federal Defendants

7 admit that the Project's conveyance of agricultural drainage water is not authorized by an NPDES

8 permit"); Authority Ans. 13:28 to 14:1 (same).

9                              **III.    LEGAL BACKGROUND**

10    Congress passed the Federal Water Pollution Control Act of 1972, later renamed the Clean Water

11 Act in 1977 (hereinafter referred to as the "Clean Water Act", or "CWA"), in order to "restore and

12 maintain the chemical, physical, and biological integrity of the Nation's waters" by replacing water

13 quality standards with point source effluent limitations.  33 U.S.C. § 1251(a); *Oregon Natural Desert*

14 *Association v. Dombeck*, 172 F.3d 1092, 1096 (9th Cir. 1998).  The CWA prohibits the "discharge of any

15 pollutant by any person" unless done in compliance with the Act.  33 U.S.C. § 1311(a).  The CWA

16 "requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be

17 released into the Nation's waters."  *South Florida Water Management Dist. v. Miccosukee Tribe of*

18 *Indians*, 541 U.S. 95, 102 (2004) ("*Miccosukee*"), *citing* section 402 of the CWA, 33 U.S.C. § 1342.

19    Section 402 of the CWA requires a permit for the discharge of pollutants from point sources such

20 as pipes and ditches into navigable waters.  *Id*. at § 1342(a)(1).  In the language of the CWA, a permit is

21 required for "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. §

22 1362(12).  An addition occurs when a point source introduces into a navigable water (or its tributary) a

23 pollutant that would not exist there in the same form or concentration but for the addition from the point

24 source.  *Rybachek v. EPA*, 904 F.2d 1276, 1285-1286 (9th Cir. 1990); *cf.*, *Borden Ranch Partnership v.*

25 *U.S. Army Corps of Engineers*, 261 F.3d 810, 815 (9th Cir. 2001) (interpreting "addition" under CWA §

26 404); *United States v. Deaton*, 209 F.3d 331, 335 (4th Cir. 2000) (same); and *United States v. M.C.C. of*

27 *Florida, Inc.*, 772 F.2d 1501 (11th Cir. 1985) (same), *vacated on other grounds*, 481 U.S. 1034 (1987),

28

1  *readopted in relevant part*, 848 F.2d 1133 (11th Cir. 1988).  Based on these parameters, the requirements

2  for an NPDES permit can be broken down into four elements: "the discharge of" (1) "any pollutant," (2)

3  "from a point source," (3) "into navigable waters of the United States," (4) "without an NPDES permit."

4  *Northwest Environmental Defense Center v. Brown*, 640 F.3d 1063, 1070 (9th Cir. 2011) ("*Brown*"),

5  *quoting Northern Plains Resource Council v. Fidelity Exploration & Development Co.*, 325 F.3d 1155,

6  1160 (9th Cir. 2003).

7         In its 1977 amendments to the CWA, Congress exempted "discharges composed *entirely* of return

8  flows from irrigated agriculture" from the NPDES permit program.  33 U.S.C. § 1342(*l*)(1) (emphasis

9  added).  Thus, this exemption does not extend to defendants' discharges of *polluted groundwater* through

10  the area's tile drains, as shown below.

11         The current action has been brought under 33 U.S.C. section 1365, the citizen suit provision of the

12  Clean Water Act.  In compliance with the CWA's notice requirements for citizen suits, 33 U.S.C. section

13  1365(b)(1)(A), on June 8, 2011, plaintiffs gave notice of the defendants' ongoing violations of the CWA

14  and of plaintiffs' intent to sue to all applicable parties.  A copy of this 60-day notice was attached as

15  Exhibit 1 to the Complaint filed by plaintiffs on November 9, 2011 (Dkt. #2).  Defendants have

16  discharged and are continuing to discharge pollutants into the waters of the United States without a

17  permit, in violation of sections 301(a) and 402 of the CWA, 33 U.S.C. sections 1311(a) and 1342.

18                                          **IV.   STANDARD OF REVIEW**

19         In reviewing motions made pursuant to Rule 12(c), courts "must accept all factual allegations" in

20  the non-moving party's pleading "as true and construe them in the light most favorable to the non-moving

21  party."  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009), *citing Turner v. Cook*, 362 F.3d 1219,

22  1225 (9th Cir. 2004).  "Judgment on the pleadings is properly granted when there is no issue of material

23  fact in dispute, and the moving party is entitled to judgment as a matter of law."  *Id.*, *citing Heliotrope*

24  *Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 979 (9th Cir. 1999).  Here, there are no issues of material

25  fact in dispute, and plaintiffs are entitled to judgment as a matter of law.

26  ///

27  ///

28

PLAINTIFFS' MOTION FOR JUDGMENT
ON THE PLEADINGS                               - 5 -                Case No. 2:11-cv-02980-KJM-CKD

1

**V.   ARGUMENT**

2      The narrow question presented here is whether defendants' discharges of polluted groundwater are

3 exempt from the NPDES permit program as "return flows from irrigated agriculture" pursuant to 33

4 U.S.C. § 1342(*l*)(1).  They are not, for the simple reason that these discharges are *not* limited to return

5 flows from irrigated agriculture.  Rather, the drains discharge polluted groundwater, which is not covered

6 by the irrigation return flow exemption.  As demonstrated below, defendants' discharges of pollutants

7 from a point source into waters of the United States are subject to the NPDES permit program and are not

8 exempted therefrom as "return flows from irrigated agriculture."

9  **A.    THE GRASSLANDS BYPASS PROJECT FITS ALL OF THE CLEAN WATER ACT'S
        NPDES PERMIT CRITERIA**
10

11      There are at least two separate illegal discharges of polluted groundwater associated with

12 defendants' jointly administered Grasslands Bypass Project.  First, tile drainage facilities and agricultural

13 ditches and drains, including the Grasslands Bypass Channel, illegally discharge groundwater

14 contaminated with selenium, boron, and other pollutants *into the San Luis Drain*.  Because this discharge

15 is polluted and because the San Luis Drain is a water body of the United States, an NPDES permit is

16 required.  Second, after the contaminated groundwater flows down the San Luis Drain, defendants

17 discharge the polluted water directly *into Mud Slough*, which is likewise a water body of the United

18 States.  As with the discharge into the San Luis Drain, the discharge into Mud Slough requires an NPDES

19 permit.  From Mud Slough, the polluted discharge flows into the San Joaquin River and eventually into

20 the Bay-Delta.

21      **1.    Defendants' Operations Constitute Discharges from a Point Source**

22      Defendants continuously discharge contaminated groundwater through the tile drainage system

23 and associated ditches – both point sources – first into the San Luis Drain, thence into Mud Slough, and

24 ultimately into the San Joaquin River and the Bay-Delta.  Fed. Ans. 6:15-17; 6:20-22; 7:16-20; 8:4-10;

25 9:4-6 ("Federal Defendants admit that the agricultural drainage water collected pursuant to the Project is

26 eventually conveyed from the Grassland Bypass Channel into the San Luis Drain, which connects to Mud

27 Slough"); Authority Ans. 9:9-12; 12:3-4; 12:22-26; Fed. Ans. 3:9-10 ("agricultural drainage water in

28

1   Mud Slough flows into the San Joaquin River, which flows eventually into the Bay-Delta).

2       A "point source" is defined as "any discernible, confined and discrete conveyance . . . from which

3   pollutants are or may be discharged." 33 U.S.C. § 1362(14).  "[A] point source need not be the original

4   source of the pollutant; it need only convey the pollutant to . . . 'waters of the United States.'"

5   *Miccosukee,* 541 U.S. at 105.  Here, the Project's canals and ditches that transport water from the

6   drainage area to the San Luis Drain and then into Mud Slough are exactly the type of "discrete

7   *conveyance[s]*" that are covered by the NPDES program.  *Id.* (emphasis in the original).  33 U.S.C.

8   1362(14) (defining "point source" to include "ditch[es]," and "channel[s]" among other things).

9       **2.    The Discharges Contain Pollutants**

10      Defendants do not dispute that the groundwater that is collected by the tile drains and then flows

11  through the Project contains pollutants, including selenium, salt, and boron.  Fed. Ans. 8:16-18 ("Federal

12  Defendants admit that the agricultural drainage water at issue contains selenium, salt, and boron"); 6:20-

13  22 ("agricultural drainage water conveyed into Mud Slough from the San Luis Drain has high

14  concentrations of selenium (typically 30 – 60 parts per billion)"); 7:20-21; 8:10-11; Authority Ans. 13:2-

15  4.  The term "pollution" is defined in the CWA as "the man-made or man-induced alteration of the

16  chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19).  Courts

17  consider the definition of "pollution" in determining whether discharged water is a "pollutant."  *PUD No.*

18  *1 of Jefferson County v. Washington Department of Ecology,* 511 U.S. 700, 705 (1994); *Northern Plains*

19  *Resource Council v. Fidelity Exploration and Development Co.*, 325 F.3d 1155, 1162 (9th Cir. 2003).

20      As noted, defendants admit that the Project discharges pollutants such as selenium, salt, and boron

21  into the San Luis Drain and Mud Slough.  Fed. Ans. 6:15-17; 6:20-22; 7:16-20; 8:4-10; 9:4-6 ("Federal

22  Defendants admit that the agricultural drainage water collected pursuant to the Project is eventually

23  conveyed from the Grassland Bypass Channel into the San Luis Drain, which connects to Mud Slough");

24  Authority Ans. 9:9-12; 12:3-4; 12:22-26; Fed. Ans. 3:9-10 ("agricultural drainage water in Mud Slough

25  flows into the San Joaquin River, which flows eventually into the Bay-Delta").  Because defendants'

26  discharges alter "the chemical, physical, biological, and radiological integrity of" the San Luis Drain and

27  Mud Slough, they thus constitute discharges of pollutants into waters of the United States. 33 U.S.C. §

28

1   1362.

2          **3.**    **The San Luis Drain and Mud Slough Constitute Waters of the United States**

3         The Project discharges to waters of the United States in two ways.  First, it discharges to the San

4   Luis Drain.  Fed. Ans. 6:15-17; 6:20-22; 7:16-20; 8:4-10; 9:4-6 ("Federal Defendants admit that the

5   agricultural drainage water collected pursuant to the Project is eventually conveyed from the Grassland

6   Bypass Channel into the San Luis Drain, which connects to Mud Slough"); Authority Ans. 9:9-12; 12:3-

7   4; 12:22-26.  Second, the Project discharges into Mud Slough, which in turns flows into the San Joaquin

8   River and the Bay-Delta.  *Id.*; Fed. Ans. 3:9-10 ("agricultural drainage water in Mud Slough flows into

9   the San Joaquin River, which flows eventually into the Bay-Delta).  "A 'stream which contributes its flow

10  to a larger stream or other body of water' is a tributary."  *Headwaters, Inc. v. Talent Irrigation Dist.*, 243

11  F.3d 526, 533 (9th Cir. 2001), *quoting Random House College Dictionary* 1402 (rev. ed. 1980).

12  "[R]egulable waters of the United States include tributaries of traditionally navigable waters."  *Northern*

13  *California River Watch v. City of Healdsburg*, 496 F.3d 993, 997 (9th Cir. 2007) ("*River Watch*"), *cert.*

14  *denied sub nom. City of Healdsburg v. Nothern California River Watch*, 552 U.S. 1180 (2008); *United*

15  *States v. Eidson*, 108 F.3d 1336, 1341-42 (11th Cir. 1997) (tributaries are "waters of the United States,"

16  and manmade ditches and canals that flow intermittently into creeks may be tributaries); *United States v.*

17  *TGR Corp.*, 171 F.3d 762, 764 (2d Cir. 1999) (non-navigable tributaries flowing into navigable streams

18  are "waters of the United States"); *United States v. Texas Pipe Line Co.*, 611 F.2d 345, 347 (10th Cir.

19  1979) (unnamed tributary of creek that is tributary to river is "water of the United States").

20        The Project's canals, including the Grassland Bypass Channel and the San Luis Drain, are waters

21  of the United States because they are tributaries of Mud Slough, the San Joaquin River, and the Bay-

22  Delta.  Fed. Ans. 6:15-17; 6:20-22; 7:16-20; 8:4-10; 9:4-6 ("Federal Defendants admit that the

23  agricultural drainage water collected pursuant to the Project is eventually conveyed from the Grassland

24  Bypass Channel into the San Luis Drain, which connects to Mud Slough"); Authority Ans. 9:9-12; 12:3-

25  4; 12:22-26; Fed. Ans. 3:9-10 ("agricultural drainage water in Mud Slough flows into the San Joaquin

26  River, which flows eventually into the Bay-Delta).  The San Joaquin River and the Bay-Delta constitute

27  "traditionally navigable waters."  *River Watch*, 496 F.3d at 997.

28

1   Accordingly, the Project's canals, ditches, and drains including the San Luis Drain are waters of

2   the United States, as is Mud Slough into which the Project drains.  And, of course, the watercourses into

3   which Mud Slough drains – the San Joaquin River and the Bay-Delta – are likewise waters of the United

4   States.

5       **4.     No NPDES Permit Covers the Discharges**

6       Defendants' ongoing discharges are not authorized by any NPDES permit.  Fed. Ans. 8:28 to 9:1

7   ("Federal Defendants admit that the Project's conveyance of agricultural drainage water is not authorized

8   by a NPDES permit"); Authority Ans. 13:28 to 14:1 (same).  The Project thus collects polluted

9   groundwater and discharges it into the San Luis Drain, Mud Slough, and eventually into the San Joaquin

10  River and the Bay-Delta without a valid NPDES permit.

11  **B.    THE CLEAN WATER ACT'S IRRIGATED AGRICULTURE EXCEPTION IS
        INAPPLICABLE TO DEFENDANTS' DISCHARGES FROM THE PROJECT**

12

13      Although agricultural return flows are exempt from the CWA's NPDES permit requirements (33

14  U.S.C. § 1362(14); 40 C.F.R. § 122.3(f)), the CWA only exempts "discharges composed *entirely* of

15  return flows from irrigated agriculture . . . ." 33 U.S.C. § 1342(*l*)(1) (emphasis added).  Defendants'

16  discharges in question consist mostly of groundwater, not agricultural return flows.  Thus, the agricultural

17  return flows exemption does not apply and defendants are in violation of the CWA because they have not

18  obtained an NPDES permit.

19      Both the plain meaning of the statutory language and legislative intent underlying the Clean Water

20  Act support a reasoned limitation of the exception for return flows from irrigation.  As the Ninth Circuit

21  ruled 25 years ago in its seminal decision strictly enforcing the NPDES permit program, "'it is the

22  national goal that the discharge of pollutants into the navigable waters be eliminated by 1985.'" *Sierra*

23  *Club v. Union Oil Company of California*, 813 F.2d 1480, 1483 (9th Cir. 1987), *quoting* 33 U.S.C. §

24  1251(a)(1).  In furtherance of this goal, Congress declared that "the discharge of any pollutant by any

25  person shall be unlawful" "[e]xcept as in compliance with . . . sections [1311,] 1312, 1316, 1317, 1328,

26  1342, and 1344 of this Title [i.e., Title 33]." 33 U.S.C. § 1311(a); *Sierra Club*, 813 F.2d at 1483.  To

27  achieve the CWA's broad remedial purposes, the Ninth Circuit has consistently rejected attempts by

28

dischargers to broaden the Act's narrow exemptions from its jurisdiction and permitting requirements. *Sierra Club*, 813 F.2d at 1486-1492; *River Watch*, 496 F.3d at 1001.  In this case, under the plain language of the statute, the CWA's requirement for an NPDES permit clearly applies.  Moreover, the legislative history underlying the pertinent language of the Act fully supports the CWA's requirement for an NPDES permit here, as the following discussion demonstrates.

      **1.**    **Statutory Interpretation**

         **a.**      **Interpretation of CWA Exemptions**

      "Claims of exemption, from the jurisdiction or permitting requirements, of the CWA's broad pollution prevention mandate must be *narrowly construed* to achieve the purposes of the CWA." *River Watch,* 496 F.3d at 1001, *citing United States v. Akers*, 785 F.2d 814, 819 (9th Cir.1986) (emphasis added); *Leslie Salt Co. v. U.S.*, 820 F.Supp. 478, 481 (N.D.Cal. 1992); *Avoyelles Sportsmen's League v. Alexander*, 473 F.Supp. 525, 535 (D.La., 1979).  Particularly when interpreting exemptions to statutes like the CWA that protect the public's interests, courts read such exemptions narrowly to fulfill the statute's underlying remedial goals.  Specific exemptions should not be allowed to "obscure the basic polic[ies]" of statutes that protect the public's interest, and, "[a]ccordingly, these exemptions 'must be narrowly construed.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).

      "The House and Senate committees made clear that the [CWA's] term 'point source' was not to be interpreted narrowly." *Brown*, 640 F.3d at 1071-1072, *citing* H.R.Rep. No. 92-911, at 125 (1971).  The Clean Water Act's sharply "limited exemptions do not obscure the . . . dominant objective of the Act." *Department of Interior v. Klamath Water Users Protective Association*, 532 U.S. 1, 7-8 (2001).  The term "point source" includes "the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 219 (2d Cir. 2009).  Defendants bear a heavy burden to prove that any of the narrowly construed exemptions under the CWA applies to their particular discharges. *River Watch*, 496 F.3d at 1001, *citing United States v. First City National Bank*, 386 U.S. 361, 366 (1967); *Sierra Club*, 813 F.2d at 1486-1492.

1   **b.   Plain Meaning Versus Legislative Intent**

2      Under the "standard tools of statutory analysis," courts "start with the plain meaning of the

3   statute's text."   *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 432 (9th Cir.

4   2011), *citing United States v. Wright*, 625 F.3d 583, 591 (9th Cir. 2010); *Gwaltney of Smithfield, Ltd. v.*

5   *Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987) ("the starting point for interpreting a statute is the

6   language of the statute itself").  As the Supreme Court has repeatedly reminded the lower courts, "courts

7   must presume that a legislature says in a statute what it means and means in a statute what it says there."

8   *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-254 (1992).  "'[U]nless otherwise defined,

9   words [of a statute] will be interpreted as taking their ordinary, contemporary, common meaning.'"

10  *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012), *quoting Perrin v. United States*, 444 U.S. 37,

11  42 (1979).  Thus, "[u]nder the 'plain meaning' rule, '[w]here the language [of a statute] is plain and

12  admits of no more than one meaning the duty of interpretation does not arise, and the rules which are to

13  aid doubtful meanings need no discussion.'"   *Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115, 1121

14  (9th Cir. 2011), *quoting Campbell v. Allied Van Lines Inc.*, 410 F.3d 618, 620–621 (9th Cir. 2005)

15  (citations omitted, alterations in original)

16     Accordingly, courts and litigants should not use a "statute's legislative history to manufacture

17  ambiguity in this otherwise clear language."  *Miranda*, 684 F.3d at 849.  "Resorting to legislative history

18  as an interpretive device is inappropriate if the statute is clear."  *Id*., *citing Exxon Mobil Corp. v.*

19  *Allapattah Services., Inc.*, 545 U.S. 546, 568 (2005); *accord United States v. Real Property Located at*

20  *475 Martin Lane*, 545 F.3d 1134, 1143 (9th Cir. 2008).  Courts must "interpret and apply statutes, not

21  congressional purposes."  *In re Hedrick*, 524 F.3d 1175, 1188 (11th Cir.2008); *see also Oncale v.*

22  *Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws

23  rather than the principal concerns of our legislators by which we are governed").  This is because we are

24  "governed by laws, not by the intentions of legislators."  *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993),

25  *quoting Aldridge v. Williams*, 3 How. 9, 24, 11 L.Ed. 469 (1884).  "If one were to search for an

26  interpretive technique that, on the whole, was more likely to confuse than to clarify, one could hardly find

27  a more promising candidate than legislative history."  *Id*.  The use of legislative history is like "entering a

28

1   crowded cocktail party and looking over the heads of the guests for one's friends."  *Id*.

2          An analysis of the plain meaning of the statute should thus be the primary inquiry here, with resort

3   to legislative history a secondary and inferior methodology for statutory interpretation *only* when it has

4   been conclusively demonstrated that there is significant ambiguity in the language of the statute itself.

5          **2.     Under the Plain Meaning of the Statutory Language, Defendants' Discharges of
               Polluted Groundwater Do Not Constitute "Discharges Composed Entirely of Return
6              Flow From Irrigated Agriculture"**

7          The CWA exempts from the NPDES permit program "discharges composed entirely of return

8   flows from irrigated agriculture . . . ."  33 U.S.C. § 1342(*l*)(1); *see also* § 1362(14) (defining "point

9   source" and exempting "return flows from irrigated agriculture" from that definition) and 40 C.F.R.

10  122.3(f) (stating that "[r]eturn flows from irrigated agriculture" do not require NPDES permits).  To

11  determine the scope of the exemption, this Court must interpret the plain meaning of the exemption's

12  three requirements:  "irrigated agriculture," "return flow," and "entirely."  If any *one* of these three

13  criteria is not met here, the exemption fails and an NPDES permit is required.

14          The first requirement, that discharges be from "irrigated agriculture," is not met.  The term

15  "irrigated agriculture" denotes the activity of "suppl[ying] (as land or crops) with water by artificial

16  means (as by diverting streams, digging canals, flooding, or spraying)"[2] "to cultivat[e] the soil, harvest[]

17  crops, and rais[e] livestock . . . ."[3]  Thus, the discharges that are contemplated by the exemption are the

18  result of supplying land with water by artificial means – *not* the result of draining lands that are drainage

19  impaired.  As defendants admit, the discharged water at issue here consists of polluted groundwater.  Fed.

20  Ans. 7:18; 8:16-18; 6:20-22; 7:20-21; 8:10-11; Authority Ans. 11:10-12; 11:3-14; 13:2-4.  Drainage (or

21  as the Bureau puts it, "agricultural drainage water" (Fed. Ans. 2:21)) is *not* the same as water that is

22  produced and discharged during irrigation.  Drainage impairment is a wholly different agricultural

23  obstacle than a lack of reliable rain water.  Thus, folding drainwater into an exception for water from

24  "irrigated agriculture" is inconsistent with the plain meaning of the term "irrigated agriculture."

25

26

27  [2]Webster's Third New International Dictionary (Unabridged), 1996 (1971) (defining "irrigate").

28  [3]Webster's Third New International Dictionary (Unabridged), 44 (1971) (defining "agriculture").

1    The second requirement, that the discharges be from "return flow," is likewise not met.  The word

2    "return" means "to go or come back again (as to a place, person, or condition), or "to pass back to an

3    earlier possessor."[4]  In the adjective form, it is frequently used to denote "a trip back," as in the term

4    "return trip."  *Id.*  "Return" thus connotes re-entry into a "former place."  *Id.*  Accordingly, the term

5    "return flow" means water that is re-entering a former location.  Taking the simplest example, a farmer

6    sets up a pump on a river adjacent to her field.  She connects the pump to her irrigation system and turns

7    it on.  The water irrigates her field and then returns by gravity to the adjacent river through drainage

8    ditches.  This is "return flow."  The water comes from and returns to the nearby river.  In the present case,

9    water that is used for irrigation in the Grasslands Drainage Area is taken from the Delta, applied to

10    agricultural fields, and then returns to, or re-enters, the Delta via drainage ditches, the Grasslands Bypass

11    Channel, the San Luis Drain, Mud Slough, and the San Joaquin River.  Fed. Ans. 6:15-17; 6:20-22; 7:16-

12    20; 8:4-10; 9:4-6; 3:9-10; Authority Ans. 9:9-12; 12:3-4; 12:22-26.  Water that does *not* originate from

13    the irrigation process cannot be categorized as return flows because it is *not* re-entering "a former place,"

14    *e.g.* the Delta.  The contaminated groundwater at issue here does not originate in the Delta.  Hence it

15    cannot be said to be "returning" there.  Under the plain meaning of "return," polluted groundwater is not

16    "return flow."  Indeed, if the exemption were read any other way, the term "return" would be meaningless

17    and confusing.  "It is an unacceptable interpretation which causes the critical words of the text to be (1)

18    meaningless and (2) confusing."  *Regions Hospital v. Shalala*, 522 U.S. 448, 468 (1998).[5]  Defendants

19    may wish that the exemption included *all discharges* "from irrigated agriculture."  Congress, however,

20    only exempted "return flows."  33 U.S.C. § 1342(*l*)(1).

21    The third requirement, that the discharges be "entirely" from return flows from irrigated

[4]Webster's Third New International Dictionary (Unabridged), 1941 (1971) (defining "return").

[5] *See also Washington Market Co. v. Hoffman*, 101 U.S. 112, 115-116 (1879) ("We are not at liberty to construe any statute so as to deny effect to any part of its language.  It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word.  As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' This rule has been repeated innumerable times").

1  agriculture, similarly is not met.  The word "entirely" means "wholly, completely, [or] fully."[6]  The use of

2  "entirely" in the exemption means that only "discharges composed [wholly, completely, or fully] of return

3  flows from irrigated agriculture" are exempted.  33 U.S.C. § 1342(*l*)(1).  Polluted groundwater that

4  originates in the ground does not qualify as "return flow" or water that comes from "irrigated

5  agriculture."  Thus, the drainwater here is not "composed [solely/exclusively] of return flows from

6  irrigated agriculture."  33 U.S.C. § 1342(*l*)(1).  Accordingly, it cannot be exempted from the NPDES

7  program.

8        There is a fundamental distinction between irrigated agricultural operations and farms that are

9  *drainage impaired*.  The statutory exemption applies, by its own terms, only to irrigated agriculture.  It

10  does not exempt discharges that are necessary to drain lands that have significant drainage problems.

11  Indeed, there are many farms that irrigate *and* do *not have tile drains*.  On those farms, water is applied to

12  the fields and then it runs over the surface of the land back to its source, without any underground

13  drainwater from tile drains mixing with the runoff.  Unlike the drainage at issue here, such flows would

14  be exempt because they are made up "entirely" of "return flows from irrigated agriculture."  33 U.S.C. §

15  1342(*l*)(1).  If Congress had intended to exempt polluted flows from drainage impaired lands, *it would*

16  *have exempted polluted flows from drainage-impaired lands*.  Instead, it only exempted "return flows"

17  produced "entirely" from "irrigated agriculture."  *Id.*

18        Indeed, many types of discharges related to crop production are not exempt under the "return

19  flow" exemption.  For example, the CWA's definition of pollutant *includes* "agricultural waste

20  discharged into water," 33 U.S.C. § 1362(6), and thus agricultural waste discharged into water is not

21  exempt from the NPDES permit requirement.  Similarly, the discharge of water used to wash farm

22  vehicles is not exempt as a return flow.  *Community Ass'n for Restoration of the Environment v. Henry*

23  *Bosma Dairy*, 65 F.Supp.2d 1129, 1151 (E.D.Wash. 1999), *affirmed*, 305 F.3d 943, 954 (9th Cir. 2002).

24  Likewise, the application of agricultural pesticides is a discharge of a pollutant subject to the NPDES

25  program.  *National Cotton Council of America v. U.S. E.P.A.*, 553 F.3d 927, 930 (6th Cir. 2009).  And,

26  the use of waste water to irrigate fields also requires an NPDES permit.  *United States v. Oxford Royal*

27

28  [6]Webster's Third New International Dictionary (Unabridged), 758 (1971) (defining "entirely").

1   *Mushroom Products, Inc.*, 487 F.Supp. 852, 854 (D.Pa. 1980).

2            Farm vehicle maintenance, pesticide application, and irrigation with waste water are all activities

3   that are related to crop production, but are activities that nonetheless require a permit.  Thus, while the

4   activity of draining polluted water from underneath fields is often related to agriculture, the discharge of

5   polluted groundwater is clearly *not* exempt as "return flow from irrigated agriculture."  This conclusion is

6   compelled by the CWA's plain language, particularly in light of pertinent case law and cannons of

7   statutory interpretation that require a *narrow* interpretation of exemptions from the CWA's permitting

8   process.[7]  *See* section V.B.1.a, "Interpretation of CWA Exemptions," *supra,* pp. 9-10.

9            Although the CWA exemption for return flows from irrigated agriculture has never been squarely

10  addressed in the present context, a district court in Florida did briefly examine the exemption.  *Fishermen*

11  *Against Destruction of Environment, Inc. v. Closter Farms*, *Inc.*, 300 F.3d 1294 (11th Cir. 2002)

12  ("*Closter Farms*").  According to the *Closter Farms* Court, only water directly utilized in the "irrigation

13  process" is exempt as return flow from irrigated agriculture.  *Id*. at 1297.  Under the facts of the Florida

14  case, groundwater mixed with surface water was not exempt from the NPDES program absent its direct

15  use "to irrigate Closter Farms's sugar cane farm through the process of 'flood irrigation,' in which water

16  is forced into the sugar cane fields by raising the water levels in the canals."  *Id*.  Flood irrigation is a

17  process that is vastly different from draining polluted water from underneath agricultural operations

18  because *irrigation is directly involved in the discharge*.  As this Court correctly held, *Closter Farms* did

19  not address "the status of conveyances designed to catch both surface irrigation as well as polluted

20  groundwater."  Order filed August 31, 2012 (Dkt. #47) ("Order") 11:10-12.

21

22  _____

23  [7]Conservation Groups' position would not block the exemption in all cases in which irrigation water is
    mixed with "rainfall or other forms of precipitation."  *Id*.  For instance, "agricultural stormwater

24  discharges" are specifically exempt from NPDES regulation.  33 U.S.C. § 1362(14); *Brown*, 640 F.3d
    at 1070.  Obviously, every farm that irrigates is not required to obtain an NPDES permit.  *United States*

25  *v. Begay*, 622 F.3d 1187, 1197 (9th Cir. 2010) ("interpretations of a statute which would produce

26  absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are
    available").  However, in this case it is uncontested that a significant quantity of polluted groundwater

27  is being discharged from the tile drains.  Fed. Ans. 7:18; 8:16-18; 6:20-22; 7:20-21; 8:10-11; Authority
    Ans. 11:10-12; 11:3-14; 13:2-4.  That is the discharge for which an NPDES permit is required.

28

PLAINTIFFS' MOTION FOR JUDGMENT
ON THE PLEADINGS                              - 15 -                      Case No. 2:11-cv-02980-KJM-CKD

**3.    The CWA's Legislative History Demonstrates That Polluted Groundwater Is Not Exempt from NPDES Permitting**

If, despite the unambiguous language of 33 U.S.C. § 1342(*l*)(1) that specifies that only "discharges composed entirely of return flows from irrigated agriculture" are exempted from the NPDES permit program, and despite the general common law preference for avoiding the use of legislative history, this Court resorts to legislative history to interpret the statutory exemption, it will find, as it did in its Order, that this history supports Conservation Groups' interpretation.  Congress intended to exempt *surface* irrigation *return* flows, not polluted drainwater from tile drains.

In its Order denying the Authority's motion to dismiss, this Court held:

> [the] history leading to enactment of the irrigation return flows exemption focuses expressly on surface water and noticeably omits any reference to groundwater or subsurface drainage.  This accords with the colloquial use of the term "irrigation," which is generally understood to refer to the application of water to crops, not the drainage of excess groundwater from crop root zones.

Order, 10:4-8.  Accordingly, the Court refused to dismiss plaintiffs' claim that "intentional drainage of contaminated groundwater" is not "subsumed in the irrigation return flows exemption."  *Id.* at 11:14-15. The Court's determination relied in large part on the legislative history underlying the passage of the agricultural return flow exemption.  *Id.* at 8-11.  Plaintiffs ask the Court to go one step further and rule as a matter of law that the water produced from the Grassland Drainage Area's tile drainage systems is not exempt from the NPDES permitting program because it is not "entirely" return flow from irrigated agriculture.

**a.    Background**

As discussed by the Court in its Order (8-10), in crafting the first iteration of the CWA, Congress initially considered exempting activities related to irrigated agriculture from the NPDES program, but in the end did not include such a provision in the final version of the statute.  *See Brown*, 640 F.3d at 1072-1073.  The EPA then issued regulations exempting return flows from irrigated agriculture on parcels less than 3000 acres.  *Id.*; *see* 40 C.F.R. § 125.4 (1975).  This regulatory exemption was challenged as exceeding EPA's authority; and the district court hearing the case agreed.  *Natural Res. Def. Council v. Train*, 396 F. Supp. 1393 (D.D.C. 1975), *aff'd sub nom, Natural Res. Def. Council v. Costle*, 568 F.2d 1369 (D.C. Cir. 1977).

1    With the appeal on that case pending and in accordance with the *Train* Court's order, EPA

2    reversed its position.  41 Fed. Reg. 28,493-28,496 (July 12, 1976); *see also Brown*, 640 F.3d at 1074.

3    EPA issued revised regulations that (1) broadly included all point sources from irrigated agriculture in the

4    NPDES regulatory program and (2) specifically defined "irrigation return flow" as "surface water, other

5    than navigable waters, containing pollutants which result from the controlled application of water by any

6    person to land used primarily for crops, forage growth, or nursery operations." 40 C.F.R. § 125.53(a)(2)

7    (1976).  The regulations also defined "surface water" as "water that flows exclusively across the surface

8    of the land from the point of application to the point of discharge." 40 C.F.R. § 125.53(a)(3) (1976).  The

9    regulations specifically placed all agricultural "pollution sources amenable to effective regulatory control

10   within the NPDES permit program . . . ."  41 Fed. Reg. 28,493-28,495 (July 12, 1976).

11   Approximately one year later, the District of Columbia Court of Appeals affirmed the district

12   court's decision in *Train*.  *Costle*, 568 F.2d at 1369.  Congress then responded to the appellate decision in

13   *Costle* by enacting the irrigation return flow exemption at issue here.  *Brown*, 640 F.3d at 1085 ("[I]n

14   1977, Congress exempted return flows from irrigated agriculture to alleviate the EPA's burden in having

15   to permit 'every source or conduit returning water to the streams from irrigated lands' . . . .").  The

16   accompanying Senate report made clear that Congress intended to adopt EPA's definition of irrigation

17   return flows as including surface water only:  "These [irrigation return] flows have been defined by the

18   Environmental Protection Agency as conveyances carrying *surface irrigation return* as a result of the

19   controlled application of water by any person to land used primarily for crops . . . ."  S. Rep. No. 95-370

20   (1977) reprinted in 1977 U.S.C.C.A.N. 4326, 4360 (emphasis added).

21          **b.    Legislative History Analysis**

22   The above language from Senate Report 95-370 specifically addresses the key question in this

23   case.  The report unequivocally states that Congress' intent was to *define* "return flows from irrigated

24   agriculture" in harmony with the EPA's contemporaneous regulation, which included only "conveyances

25   carrying *surface irrigation return* as a result of the controlled *application of water* by any person *to land*

26   used primarily for crops."  Sen. Rep. No. 95-370, at 3, emphasis added.  Thus, Senate Report 95-370

27   supports Conservation Groups' plain language interpretation by emphasizing that return flows are defined

28

1   as "surface" flows that are caused by the "application of water" to farmland.  *Id*.  The report does not

2   mention tile drainage, the discharge of subsurface groundwater, or any other type of agricultural

3   drainwater because Congress did not contemplate a broad exemption of all types of farm discharges.  As

4   Senate Report 95-370 makes clear, Congress limited the exemption to *surface return flows caused by*

5   *irrigation*.  *Id*.

6         Nowhere does Congress indicate a desire to exempt the uncontrolled discharge of contaminated

7   groundwater from drainage impaired agricultural facilities.  If Congress had meant to exempt all flows

8   from tile drains from NPDES permitting, it would have, at the very least, *mentioned* such flows in the

9   statute – or at a bare minimum in the legislative history.  It did not.  Indeed, the legislative history makes

10  clear that Congress intended to level the playing field between irrigated and non-irrigated agriculture so

11  as to "correct[] what has been a discrimination against *irrigated agriculture*."  123 Cong. Rec. 39,210

12  (1977) (emphasis added).  No document indicates its intent was also to exempt farmers on drainage-

13  impaired land from the CWA's NPDES permit requirement.  Accordingly, the fact that the irrigation

14  return flow exemption specifically targets irrigated crop production – and not drainage-impaired

15  farmlands – further demonstrates that defendants' tile drainage in this case requires an NPDES permit.

16        By referring to EPA's contemporaneous definition of "irrigation return flows," Senate Report 95-

17  370 demonstrates that Congress did not contemplate a broad exemption for all discharges that are in some

18  remote sense related to irrigated agriculture.  The much more narrowly crafted exemption only includes

19  *surface* water return flows that are a direct consequence of *irrigation*.  Defendants' discharges challenged

20  herein are neither.

21              **C.   DEFENDANTS' AFFIRMATIVE DEFENSES DO NOT PRECLUDE**
                     **THIS COURT FROM RULING ON PLAINTIFFS' 12(C) MOTION**
22

23        In certain instances, a well-pled affirmative defense may preclude a plaintiff's motion for

24  judgment on the pleadings.  *General Conference Corp. of Seventh-Day Adventists v. Seventh-Day*

25  *Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989).  Here, unlike in *General*

26  *Conference*, defendants' answers do not contain any affirmative defenses that are tied to specific facts.

27  Rather, both answers contain affirmative defenses that have already been considered and rejected by this

28  Court or are boilerplate defenses unsupported by any alleged facts.  Fed. Ans. 10:26 to 11:11; Authority

1   Ans. 16:2-14.

2        If the Court, however, determines that one or more of defendants' affirmative defenses preclude

3   the granting of this motion, plaintiffs request a partial judgment on the pleadings with respect to the

4   merits of plaintiffs' claims.  *Strigliabotti v. Franklin Resources, Inc.*, 398 F.Supp.2d 1094, 1097

5   (N.D.Cal. 2005) ("While Rule 12(c) of the Federal Rules of Civil Procedure does not expressly provide

6   for partial judgment on the pleadings, neither does it bar such a procedure").

7                                      **VI.    CONCLUSION**

8        For the foregoing reasons, Conservation Groups are entitled to judgment on the pleadings on each

9   claim.  Accordingly, plaintiffs seek orders from this Court (1) declaring that defendants have failed to

10  comply with the CWA's NPDES permit system and (2) granting injunctive relief limiting further polluted

11  discharges pending defendants' compliance with the CWA.  Plaintiffs also seek remedial relief, the

12  imposition of civil penalties, and the award of costs, including attorney and expert witness fees.

13  Dated:  November 1, 2012                          Respectfully submitted,

14                                                    /s/ *Stephan C. Volker*
                                                      STEPHAN C. VOLKER
15                                                    Attorney for Plaintiffs PACIFIC COAST
                                                      FEDERATION OF FISHERMEN'S
16                                                    ASSOCIATIONS, et al.

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

1

2       I, Stephan C. Volker, am a citizen of the United States.  I am over the age of 18 years and not a

3  party to this action.  My business address is the Law Offices of Stephan C. Volker, 436 14th Street, Suite

4  1300, Oakland, California 94612.

5       On November 1, 2012, I served the following documents by electronic filing with the Clerk of the

6  Court using the CM/ECF system, which sends notification of such filing to the email addresses registered

7  in the above entitled action:

8  **PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND**

9  **AUTHORITIES IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**

10       I declare under penalty of perjury that the foregoing is true and correct.

11  Dated:  November 1, 2012.

12

13

14                                          /s/ *Stephan C. Volker*
                                          STEPHAN C. VOLKER
15

16

17

18

19

20

21

22

23

24

25

26

27

28