1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10   PACIFIC COAST FEDERATION OF
     FISHERMEN'S ASSOCIATIONS, *et al.*,
11
                 Plaintiffs,                    No. CIV S-2:11-2980-KJM-CKD
12
          vs.
13
     DONALD GLASER, Regional Director of
14   U.S. Bureau of Reclamation, U.S. BUREAU
     OF RECLAMATION; and SAN LUIS &
15   DELTA-MENDOTA WATER AUTHORITY,

16               Defendants.
                                                ORDER
17   _____/

18               Pacific Coast Federation of Fishermen's Associations, California Sportfishing

19   Protection Alliance, Friends of the River, San Francisco Crab Boat Owners, Institute for

20   Fisheries Resources, and Felix Smith (collectively, "plaintiffs") bring this action under the

21   Citizen Suit Provision of the Clean Water Act, 33 U.S.C. § 1251, *et seq*. ("Clean Water Act" or

22   "CWA").  (Compl. ¶ 2, ECF[1] 2.)  Plaintiffs allege that the Grasslands Bypass Project, jointly

23   administered by Donald Glaser, Regional Director of U.S. Bureau of Reclamation, the U.S.

24   _____

25         [1] All citations to Electronic Case Filing ("ECF") documents reference page numbers
     assigned by the court's CM/ECF system, not the page numbers assigned to those documents by
26   the parties.

                                              1

1   Bureau of Reclamation ("federal defendants"), and San Luis & Delta-Mendota Water Authority

2   (the "Authority" or "Auth.") (together with federal defendants, "defendants"), illegally

3   discharges polluted water into San Luis Drain and Mud Slough, two waterways that are covered

4   by the Clean Water Act.  (Compl. ¶¶ 3-5.)  Plaintiffs contend that this discharge violates the

5   CWA because the Grasslands Bypass Project is a point source for which defendants have failed

6   to obtain a National Pollutant Discharge Elimination System ("NPDES") permit.  The central

7   dispute before the court is whether the Project's long established method of channeling

8   discharges through a subsurface tile system requires an NPDES permit under the CWA.

9          This matter is before the court on federal defendants' and plaintiffs' motions for

10  judgment on the pleadings under Rule 12(c), filed on October 24, 2012, and November 1, 2012,

11  respectively.  (ECF 50; ECF 51.)  The court heard argument on the motions on January 18, 2013.

12  Stephan Volker appeared for plaintiffs; Martin McDermott, Eric Buescher, and Philip Gregory

13  appeared for defendants.  For the reasons below, both parties' 12(c) motions are DENIED and

14  plaintiffs' complaint is DISMISSED without prejudice.

15  I.     STATUTORY BACKGROUND, FACTS, AND PROCEDURAL HISTORY

16         A.     Statutory Background

17                Congress enacted the Clean Water Act, 33 U.S.C. § 1251, *et seq.* to "restore and

18  maintain the chemical, physical, and biological integrity of the Nation's waters" through limiting

19  pollution from "point sources."  *Nw. Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1070 (9th Cir.

20  2011), *rev'd on other grounds sub nom. Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. __, 133 S.Ct.

21  1326 (2013).  "A cornerstone of the Clean Water Act is that the 'discharge of any pollutant' from

22  a 'point source' into navigable waters of the United States is unlawful unless the discharge is

23  made according to the terms of an NPDES permit obtained from either the United States

24  Environmental Protection Agency ("EPA") or from an authorized state agency."  *Ass'n to*

25  *Protect Hammersley, Eld, & Totten Inlets v. Taylor Res.*, 299 F.3d 1007, 1009 (9th Cir. 2002).

26  The parties in this case do not dispute the Project discharges a pollutant into navigable waters.

An NPDES permit is required for any polluted discharge.  *See* 33 U.S.C. § 1311(a), 1342.  The term "discharge" is a term of art under the CWA that presumes the presence of a "point source."  33 U.S.C. § 1362(12).  Therefore, an NPDES permit is not required for a non-point source.  In this case, the primary disagreement between the parties is whether the underground tile drainage system utilized by defendants is a point source or nonpoint source.  Although not defined in the CWA, "nonpoint source pollution is . . . widely understood to be the type of pollution that arises from many dispersed activities over large areas, and is not traceable to any single discrete source.  Because it arises in such a diffuse way, it is very difficult to regulate through individual permits."  *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1184 (9th Cir. 2002).  By comparison, the CWA defines a "point source" as

> [a]ny discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14).  Moreover, in addition to this definitional exclusion for irrigated agriculture return flows, Congress also incorporated the exclusion when addressing NPDES permitting: "The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture . . . ."  33 U.S.C. § 1342(l)(1).[2]

B.    Facts

Irrigation has occurred on farmland in the Grasslands Area of the San Joaquin Valley for more than fifty years.  (Auth. Answer ¶ 26(a).)  Irrigation occurs both above and below ground.  (*Id.* ¶ 26(d).)  Farmers capture and reuse excess water above ground; however,

---

[2] The irrigation return flows exception is also restated in the EPA's regulations, in language identical to section 1362(14).  *See* 40 C.F.R. § 122.3(f) ("The following discharges do not require NPDES permits: . . . (f) Return flows from irrigated agriculture.").

excess water below ground must be drained, because an impervious layer of clay below the Valley's farmlands creates a shallow water table that threatens crops' root zones.  (*Id.* ¶ 26(c), (d), (j); Compl. Ex. 1 at 15, 19, ECF 2.)  This excess subsurface water is drained by the Grasslands Bypass Project (the "Project"), jointly administered by the federal defendants and the Authority.  (Auth. Answer ¶¶ 5, 26(j)-(m).)  The Project uses a tile drainage system, consisting of a network of perforated drain laterals underlying Valley farmland that catch water and direct it into the San Luis Drain and, from there, into the Mud Slough, the San Joaquin River, and the Bay-Delta.  (*Id.*)  It is undisputed both the San Luis Drain and Mud Slough are navigable waters under the CWA.  (*Id.* ¶ 5.)[3]  It is also undisputed that the discharged subsurface water is contaminated with naturally-occurring selenium leached from the soil, among other pollutants.  (Compl. ¶ 26; Federal Defs.' Answer ¶ 25.)  Plaintiffs allege that some amount of the contaminated subsurface water, or groundwater, is unrelated to irrigation; hence, discharging it into the San Luis Drain and the Mud Slough without an NPDES permit violates the CWA.  (*Id.* ¶ 5.)  Defendants counter that the CWA exempts from NPDES permitting all discharges that are, like the Project's, related to crop production.  (Auth. Answer ¶¶ 4, 26(j); Federal Defs.' Answer ¶¶ 26, 36.)

C.     Procedural History

Plaintiffs filed their complaint on November 9, 2011.  (ECF 2.)  Federal defendants filed their answer on January 9, 2012.  (ECF 15.)  On January 10, the Authority filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (ECF 21.)  Federal defendants filed their first motion for judgment on the pleadings on March 16, 2012.  (ECF 37.)  This court denied both the Authority's motion to dismiss and federal defendants' motion for judgment on the pleadings in a single order on August 31, 2012, after a hearing.  (ECF 47.)  The court held that plaintiffs established jurisdiction and, at that stage of the

---

[3] As described below, an NPDES permit is required only if discharges occur into navigable waters.

1    litigation, had sufficiently stated a claim that defendants were violating the CWA.  (*Id.* at 10-11.)

2    The court also denied the motion for judgment on the pleadings as premature, because the

3    Authority had not yet filed an answer and thus the pleadings were not closed.  (*Id.* at 11.)  After

4    the Authority filed its answer on September 21 (ECF 49), federal defendants filed a second

5    motion for judgment on the pleadings on October 24 (ECF 50), and plaintiffs filed a cross-

6    motion for judgment on the pleadings on November 1, 2012 (ECF 51).  Plaintiffs, federal

7    defendants, and the Authority filed oppositions on November 16, 2012.  (ECF 54; ECF 55; ECF

8    56.)  Each party filed its reply on January 11, 2013.  (ECF 58; ECF 59; ECF 60.)

9    II.    LEGAL STANDARD

10           "After the pleadings are closed — but early enough not to delay trial — a party

11   may move for judgment on the pleadings."  FED. R. CIV. P. 12(c).  "Judgment on the pleadings is

12   properly granted when, taking all allegations in the pleading as true, the moving party is entitled

13   to judgment as a matter of law."  *Merchs. Home Delivery Serv., Inc. v. Frank B. Hall & Co.*, 50

14   F.3d 1486, 1488 (9th Cir. 1995) (citing *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667,

15   670 (9th Cir. 1993)).  A Rule 12(c) motion is reviewed under the same standard as a Rule

16   12(b)(6) motion to dismiss for failure to state a claim.  *Harris v. Ventyx, Inc.*, No. S-11-308

17   FCD/GGH, 2011 WL 3584498, at *2 (E.D. Cal. Aug. 12, 2011) (citing *Enron Oil Trading &*

18   *Transp. Co. v. Walbrook Ins. Co.*, 132 F.3d 526, 528-29 (9th Cir. 1997)).

19           Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to

20   dismiss a complaint for "failure to state a claim upon which relief can be granted."  A court may

21   dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts alleged

22   under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

23   1990).  Although a complaint need contain only "a short and plain statement of the claim

24   showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), in order to survive a motion

25   to dismiss this short and plain statement "must contain sufficient factual matter . . . to 'state a

26   claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must include

something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or

"'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action . . . .'"

*Id.* (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint will survive a motion

to dismiss for failure to state a claim is a "context-specific task that requires the reviewing court

to draw on its judicial experience and common sense."  *Id.* at 679.  Ultimately, the inquiry

focuses on the interplay between the factual allegations of the complaint and the dispositive

issues of law in the action.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

In making this context-specific evaluation, this court "must presume all factual

allegations of the complaint to be true and draw all reasonable inferences in favor of the

nonmoving party."  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  This rule

does not apply to "'a legal conclusion couched as a factual allegation,'" *Papasan v. Allain*,

478 U.S. 265, 286 (1986) (quoted in *Twombly*, 550 U.S. at 555), nor to "allegations that

contradict matters properly subject to judicial notice" or to material attached to or incorporated

by reference into the complaint.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.

2001).  A court's consideration of documents attached to a complaint or incorporated by

reference or a matter of judicial notice will not convert a motion to dismiss into a motion for

summary judgment.  *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).

In short, judgment on the pleadings is proper when, taking all the allegations in

the pleading as true, the moving party is entitled to judgment as a matter of law.  *Merchs. Home

Delivery Serv., Inc.*, 50 F.3d at 1488.  In other words, a court should not grant a 12(c) motion

unless the movant clearly establishes that no disputed issues of material fact remain to be

resolved.  *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1229 (9th Cir. 1996) (quoting

*Yanez v. United States*, 63 F.3d 870, 872 (9th Cir. 1995)); *see also Fajardo v. County of Los

Angeles*, 179 F.3d 698, 701 (9th Cir. 1999) (not granting 12(c) motion because the parties

disputed material facts).  Finally, when, as here, both parties are moving for judgment on the

1  pleadings, the parties are "admitting all of the allegations in their adversary's pleadings only for

2  purposes of their own motion and not for the consideration of their opponent's motion."  5C

3  CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1371, at

4  267 (3d ed. 2004).

5  III.   <u>ANALYSIS</u>

6         Plaintiffs contend that the Project is a point source because it does not fall within

7  the plain language of the "return flows from irrigated agriculture" exemption contained in

8  sections 1362(14) and 1342(l)(1).  (ECF 51 at 19; ECF 54 at 14-18.)  Plaintiffs further argue that

9  the addition of the word "entirely" to the "return flows from irrigated agriculture" exemption in

10  section 1342(l)(1) is significant and must be interpreted to mean that adulterated flows do not

11  fall within the exemption.  (ECF 54 at 17-18.)  Plaintiffs move for judgment on the pleadings

12  because it is undisputed that some part of the Project's discharges is not irrigation water.  (ECF

13  51 at 9-10.)

14         All defendants contend that the discharges at issue fall into the plain meaning of

15  the exemption.  (ECF 50 at 18-19; ECF 55 at 4-5.)  Defendants argue that the addition of the

16  modifier "entirely" in one iteration of the statutory exemption creates sufficient ambiguity to

17  require the court to consider legislative history to discern Congress's intent.  (ECF 55 at 3-7; *cf.*

18  ECF 50 at 12-14.)  The legislative history, defendants contend, clearly demonstrates that

19  Congress intended to exempt discharges related to crop production, such as those at issue here,

20  from the CWA's NPDES permitting requirement.  (ECF 55 at 3; *cf.* ECF 50 at 12-14.)  Plaintiffs

21  reply that resorting to the legislative history is unwarranted because the statutory language is

22  unambiguous; moreover, the legislative history demonstrates that Congress intended the

23  exemption to apply only to surface discharges.  (ECF 51 at 23-25.)

24         Finally, defendants aver the court should grant the Authority's interpretation of

25  the CWA deference because the Authority has operated the Project for more than fifteen years

26  under the umbrella of the California Regional Water Quality Control Board, which has

regulatory authority over the discharges.  (ECF 50 at 18 (citing *S.F. Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 706 (9th Cir. 2007)); ECF 56 at 18; ECF 60 at 3-4.)  Plaintiffs distinguish *Baykeeper* by noting that case involved granting deference to federal agencies' formal regulations, not to a state agency's informal interpretation of a federal statute.  (ECF 54 at 13.)

Plaintiffs assert that there are three types of discharges at issue here: "1) surface irrigation return flows; 2) subsurface, *non-point* source irrigation return flows; and 3) subsurface *point source* tile drainage."  (ECF 54 at 23 (original emphasis).)  The first type of discharge is exempt from permitting under the irrigated agriculture exemption; the second is exempt because seepage is a classic "non-point source" under the CWA.  (*Id.*)  The third type, however, plaintiffs aver is not exempt, because it is not seepage and because it is subsurface.  (*Id.*)  The subsurface water that is channeled by the Project's tile drains is "polluted groundwater" "necessarily discharge[d]" "along with irrigation water."  (Compl. 26.)  Defendant Authority, at oral argument, contended there is no factual or legal distinction between the second and third types of discharges.  While conceding that some of the water discharged is "polluted groundwater," the Authority claims the tile drains exist only because of the irrigation of agriculture and are therefore statutorily exempt.  (Auth. Answer ¶¶ 4, 26(j); Federal Defs.' Answer ¶¶ 26, 36.)

The court first addresses the parties' deference arguments and then turns to statutory interpretation of the exemption language at issue here.  On the record before it, the court ultimately concludes that judgment on the pleadings is not warranted.  Moreover, because plaintiffs have not pled adequate facts, the court construes defendants' Rule 12(c) as a Rule 12(b)(6) motion and dismisses without prejudice plaintiffs' complaint for failure to state a claim upon which relief can be granted.

A.    Deference

Defendants argue the court should grant some deference to the Authority's interpretation of the statute because the State, under the CWA, has regulatory authority over the drainage flows at issue.  (ECF 50 at 17-18; ECF 55 at 2-3; ECF 56 at 18 (all citing *S.F.*

*Baykeeper*, 481 F.3d at 706).)  Given this regulatory authority, California's interpretation that the Project is exempt from NPDES permitting under the "return flows from irrigated agriculture" language, while not binding on this court, should be respected.  (ECF 50 at 17-18.)  The Authority also notes the EPA agrees with the Authority's conclusion that the Project is not a "point source."  (ECF 56 at 18-19.)  The EPA's agreement is evidenced by the EPA's discussion of the Project in its "Nonpoint Source Success Stories" section of its website, as well as its delisting of the San Joaquin River from the impaired waters list.  (*Id.*)  Furthermore, the Authority stresses that defendants' interpretation of the exemption does not leave the flows unregulated; rather, California regulates them through a Waste Discharge Requirements ("WDR") Order under California's Porter-Cologne Water Quality Control Act.  (ECF 50 at 17-18.)

In response, plaintiffs assert the Authority's interpretation of the statute deserves no deference.  (ECF 54 at 13-14.)  *Baykeeper* is inapplicable, plaintiffs argue, because the court there granted deference to federal agencies' formal regulations.  (*Id.* at 13 (citing 481 F.3d at 706).)  Such deference is not warranted when a state agency interprets a federal statute because a state agency does not have the expertise or familiarity with the federal subject matter and the need for coherent and uniform construction of federal law is not served.  (*Id.* at 13-14 (citing *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495-96 (9th Cir. 1997)).)  Federal defendants counter that a state permitting agency's determination that an NPDES permit is not needed at least "warrants consideration" by a reviewing court.  (ECF 60 at 3 (quoting *Ass'n to Protect Hammersley, Eld, &Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1012 (9th Cir. 2012)).

The court finds no formal deference is owed California's conclusion that the discharges at issue do not require an NPDES permit.  *Baykeeper* involved granting *Chevron* deference to federal agencies and is therefore inapposite.  581 F.3d at 706.  The *Hammersley* court, in the context of determining whether it had jurisdiction to hear the case under the CWA's citizen suit provision, stated that a state agency's conclusion that no NPDES permit is required

1    "warrants consideration," 299 F.3d at 1012, but the state agency was not a party to that litigation

2    and the court did not rely on the agency's arguments in deciding the merits of the CWA

3    provisions at issue, *id.* at 1015-19. The *Hammersley* court also noted that neither the EPA nor an

4    authorized state agency has exclusive authority to determine whether a discharge violates the

5    CWA. *Id.* at 1012. Moreover, *Chevron*'s purpose to promote uniformity in federal law is not

6    served by granting deference to a state agency's interpretation.

7            On this record, *Chevron* deference also is not appropriate with respect to the

8    position defendants ascribe to the EPA. The EPA actions defendants point to are at best

9    informal statements, which do not qualify for *Chevron* deference. *United States v. Mead Corp.*,

10   533 U.S. 218, 226-27 (2001). Moreover, as the EPA is not a party to this action, and its informal

11   actions only impliedly suggest it considers the Project not to be a point source, *Skidmore*

12   deference also does not aid defendants because this court cannot examine the EPA's reasoning or

13   judge the thoroughness of its consideration. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140

14   (1944) (the deference granted an agency "will depend upon the thoroughness evident in its

15   consideration, the validity of its reasoning, its consistency with earlier and later pronouncements,

16   and all those factors which give it power to persuade, if lacking power to control").[4]

17           The court takes note that both the Authority and the EPA have regulatory

18   authority over the discharges at issue in this case and both entity's positions will be carefully

19   considered and assigned weight according to their persuasiveness.

20   ───────────────

21       [4] Defendant Authority, in unsolicited supplemental briefing, argues the Supreme Court's
     recent decision in *Decker v. Northwest Environmental Defense Center*, 568 U.S. __, 133 S. Ct.

22   1326 (2013) supports defendants' contention that deference to the Authority's and the EPA's
     position in this case is warranted. (ECF 65 at 2.) This argument fails for the reasons discussed

23   above and for the additional reason that *Decker* involved *Auer* deference to the EPA's
     interpretation of its own regulation, not *Chevron* deference to an interpretation of a federal

24   statute. 133 S. Ct. at 1337-38; *see Auer v. Robbins*, 519 U.S. 452, 462-63 (1997). If defendant is
     arguing that the EPA's interpretation of the restatement of the "return flows" exemption

25   contained in 40 C.F.R. § 122.3(f) deserves deference, that argument too fails, because that
     regulation simply parrots the statutory language. *See Gonzales v. Oregon*, 546 U.S. 243, 257

26   (2006) ("[T]he near equivalence of the statute and regulation belies the Government's argument
     for *Auer* deference.").

1      B.      Plain Language[5]

2              The court begins its statutory interpretation with the plain meaning of the statute's

3      text. *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008) (citing *Jonah R. v. Carmona*,

4      446 F.3d 1000, 1005 (9th Cir. 2006)).  The Supreme Court has directed courts to "presume that a

5      legislature says in a statute what it means and means in a statute what it says there." *In re Roman*

6      *Catholic Archbishop of Portland in Or.*, 661 F.3d 417, 432 (9th Cir. 2011) (internal quotations

7      omitted) (quoting *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992)).  If a statute's

8      terms are ambiguous, courts may "look to other sources to determine congressional intent, such as

9      the canons of construction or the statute's legislative history." *Nader*, 542 F.3d at 717 (citing

10     *Jonah R.*, 446 F.3d at 1005).  However, courts must be cautious in relying upon legislative history

11     to divine Congressional intent: the use of legislative history can be akin to "entering a crowded

12     cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff*,

13     507 U.S. 511, 519 (1993) (Scalia, J., concurring).

14             "The CWA prohibits the discharge of any pollutant from a point source into

15     navigable waters of the United States without an NPDES permit." *Nw. Envtl. Def. Ctr.*, 640 F.3d

16     at 1070 (quoting *N. Plains Res. Council v. Fid. Exploration & Dev. Co.*, 325 F.3d 1155, 1160 (9th

17     Cir. 2003)).  The parties in this case dispute only whether the Project's discharges are exempt

18     from NPDES permitting under the "return flows from irrigated agriculture" exemption.  The

19     exemption appears in two places in the CWA, in section 1342(l), which covers NPDES

20     /////

21     /////

22     /////

23     /////

24

25     [5] The court's prior order in this case resolved defendant Authority's motion to dismiss. (ECF 47.)  This case is now before the court on cross-motions for judgment on the pleadings, the resolution of which requires the court to interpret definitively the statutory language with the benefit of full briefing from all parties.

26

1   permitting, and section 1362(14).  As noted above, the latter defines "point source" as

2
> any discernible, confined and discrete conveyance, including but
> not limited to any pipe, ditch, channel, tunnel, conduit, well,
3
> discrete fissure, container, rolling stock, concentrated animal
> feeding operation, or vessel or other floating craft, from which
4
> pollutants are or may be discharged. This term does not include
> agricultural stormwater discharges and return flows from irrigated
5
> agriculture.

6   33 U.S.C. § 1362(14).  This case requires the court to interpret the phrase "return flows from

7   irrigated agriculture," because there is no dispute that the Project's discharges would otherwise

8   fall under the definition of a point source and therefore require an NPDES permit.  The CWA

9   does not define the phrase or any of its constituent parts.  Plaintiffs argue that the plain meanings

10   of the constituent words and terms in the "return flows from irrigated agriculture" exemption

11   demonstrate that the exemption does not cover the discharges at issue.  Plaintiffs focus on three

12   terms: "irrigated agriculture," "return," and "entirely," the latter of which does not appear in

13   section 1362(14)[6] but does appear in the statute's other statement of the exemption in subsection

14   1342(l)(1), which reads:  "The Administrator shall not require a permit under this section for

15   discharges composed entirely of return flows from irrigated agriculture, nor shall the

16   Administrator directly or indirectly, require any State to require such a permit."  33 U.S.C. §

17   1342(l)(1).  The court discusses this subsection at length below.

18            1.    "Irrigated Agriculture"

19           Plaintiffs aver the term "irrigated agriculture" "denotes the activity of 'suppl[ying]

20   (as land or crops) with water by artificial means (as by diverting streams, digging canals,

21   flooding, or spraying)" to "cultivat[e] the soil, harvest[] crops, and rais[e] livestock . . . ."  (ECF

22   51 at 19 (citing WEBSTER'S THIRD NEW DICTIONARY (1971) (defining "irrigate" and

23

24

---

25       [6] Nor does "entirely" appear in the EPA's regulation.  *See* 40 C.F.R. § 122.3(f) ("The
following discharges do not require NPDES permits: . . . (f) Return flows from irrigated
26   agriculture.").

1   "agriculture").)[7]  Plaintiffs argue the plain meaning of this phrase contemplates discharges that

2   result from supplying lands with water by artificial means, not discharges that result from

3   draining lands that are drainage impaired.  (*Id.*)  Subsurface drainage water (groundwater),

4   plaintiffs contend, is not the same as irrigation water.  (*Id.*)  The Authority admits that the Project

5   serves one purpose: subsurface drainage.  (ECF 54 at 14-15 (citing ECF 50 at 16).)  Thus, say

6   plaintiffs, the Project's discharges are not covered by the term "irrigated agriculture."  (*Id.*)

7         Federal defendants argue that the Grasslands farmers served by the Project practice

8   "irrigated agriculture."  (ECF 50 at 18.)  The farmers raise crops, an activity which by definition

9   qualifies as "agriculture," and they practice "irrigation," without which crop production on the

10  otherwise arid lands would falter.  (*Id.*)  Federal defendants contend that plaintiffs isolate the

11  word "irrigated" and then focus on the type of water at issue, whereas the relevant term is instead

12  "irrigated agriculture," not "irrigation water."  (ECF 55 at 5.)  Congress used the broad term

13  "return flows from irrigated agriculture" because it intended to exempt drainage from farms

14  practicing crop-production agriculture facilitated by irrigation, rather than focusing on what the

15  components of a particular flow are on any given day.  (*Id.*)

16        As it is undisputed that the crops for which the Project operates are irrigated, the

17  court holds that the Project falls within the plain language of "irrigated agriculture."  (Compl.

18  Ex. 1 at 19; Auth. Answer ¶ 26(d)).  According to plaintiffs' own dictionary definitions, the plain

19  meaning of the term "irrigated agriculture" does not contemplate any type of discharge at all; it

20  simply refers to a noun, agriculture, which covers crops.  That noun is modified by the adjective

21  "irrigated," which means watering using artificial means.  The farmland in question is used to

22  grow crops and those crops are irrigated.

23        The court notes there are factual inconsistencies in defendants' separate briefing

24  on this issue but ultimately finds them immaterial to the court's construction at this stage of the

25  _____

26      [7] For simplicity's sake, the court accepts plaintiffs' dictionary definitions, unless otherwise indicated, as defendants do not dispute their reliability.

litigation.  The inconsistencies are contained only in the briefing on the pending cross-motions, not in the defendants' pleadings.  (*Compare* Auth. Opp'n at 9, ECF 56 ("all of the water being discharged was irrigation water at some point") *with* Federal Defs.' Mot. at 21, ECF 50 (some of the discharged groundwater "pre-dates" farming in the area).)  Plaintiffs plead that the Project discharges "polluted groundwater along with irrigation water." (Compl. ¶ 26.)[8]  Thus, for the purposes of ruling on defendants' 12(c) motion, the court will assume "that a non-insignificant or a substantial portion of the discharge is contaminated groundwater that does not have its source in surface irrigation." (ECF 62 at 5-6 (plaintiffs' counsel's statement that a clear question of law is presented so long as this fact is assumed).)  The parties do agree the only reason the Project exists is to enable the growing of crops.  (Compl. Ex. 1 at 15 (the rising water table threatens crops' root zones); Auth Answer ¶ 26 j, k (same).)  It is undisputed that growing crops in the Grasslands area requires irrigation.  (Auth Answer ¶ 26 j, k.)  Therefore, the Project's drainage of contaminated groundwater through subsurface tiles occurs only because of irrigated agriculture.

        2.      "Return Flows"

        Plaintiffs argue the Project's discharges are not "return flows." (ECF 51 at 20.) They say the word "return" means "to go or come back again (as to a place, person, or condition)," or "to pass back to an earlier possessor." (*Id.* (citing WEBSTER'S THIRD, 1941).)  As an adjective, the word often is used to denote a "trip back," as in a "return trip," or reentry into a "former place," plaintiffs assert. (*Id.* (also citing WEBSTER'S THIRD, 1941).)  Hence, the term

---

        [8] This allegation is ambiguous: this groundwater could come from surface or sub-surface irrigation that has seeped into the ground and collected in the underground tiles or it could come from rain or some other source.  Plaintiffs do not provide a single uniform interpretation of what the exemption language covers or of what the Project does that disqualifies it from the exemption.  Thus, at times the "groundwater" allegation disqualifies the Project because any subsurface water, directly traceable to residual water from irrigation or not, is not a "return flow." (ECF 51 at 23-25.)  Elsewhere, plaintiffs claim that groundwater is not the same as water discharged during irrigation, suggesting that if all water discharged by the Project were traceable to residual water from irrigation then the exemption would apply. (*Id.* at 19.)  Plaintiffs also aver the Project is disqualified because groundwater discharges occur in winter when no irrigation takes place. (ECF 54 at 19 n.10.)

"return flow," according to plaintiffs, means water that is reentering a former location.  Plaintiffs concede that in the instant case the water used to irrigate "returns" to its former location, because it originates in the Delta and then returns to the Delta via "drainage ditches," the Grasslands Bypass Channel, the San Luis Drain, Mud Slough, and the San Joaquin River.  (*Id.*)  However, plaintiffs argue that because the groundwater at issue here did not originate in the Delta, it cannot be "returning" to its former place when discharged into the Delta through the Project's tile drains.  (*Id.*)  Had Congress wished to exempt all flows from irrigated agriculture, plaintiffs contend, it would not have used the words "return flows," which necessarily limit the types of discharges from irrigated agriculture that are exempt.  (*Id.*)

Federal defendants argue that the words "return flows" must be understood as a single term in the context of irrigated agriculture.  (ECF 50 at 18-19.)  Relying on specialized glossaries including the U.S. Geological Survey Water Science Glossary, the Expert Glossary, and the Ecology Dictionary, federal defendants define "return flow" as "(1) That part of a diverted flow that is not consumptively used and returned to its original source or another body of water.  (2) (Irrigation) Drainage water from irrigated farmlands that re-enters the water system to be used further downstream."  (*Id.* at 19 (quoting U.S. Geological Survey Water Science Glossary of Terms).)  The Project is covered by the exemption, federal defendants contend, because it is undisputed that the Project drains water from irrigated agriculture into the Delta, where it reenters the water system.  (*Id.*)  The Authority asserts that the Project clearly discharges only return flows because "all of the water being discharged was irrigation water at some point."  (ECF 56 at 9.)

Plaintiffs counter that even if the court accepts federal defendants' specialized definition, defendants' argument still is incorrect, because federal defendants say in their motion that some of the water collected in the tile drains "pre-dates farming in the area."  (ECF 54 at 16 (citing ECF 50 at 21).)  This water, discharged by the Project along with irrigation water, cannot be a return flow because it is not returning to any "water system" from which it originated.  (*Id.*)
/////

While not ending the required inquiry, the court relies on defendants' specialized definitions, rather than plaintiffs', for two reasons.  First, defendants' definitions take into account the statutory subject matter context in which Congress was legislating: the environment, water, and agriculture.  *Cf. United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1138 n.61 (E.D. Cal. 2001) (using the Water Science Glossary to define contractual term "acre foot" of water); *Nixon v. Mo. Mun. League*, 541 U.S. 125, 133 (2004) (preemption of state laws that prohibit "any entity" from providing telecommunications service means, in context, "any private entity"); *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (using Black's Law Dictionary to determine the ordinary and natural meaning of "cognizable" in the Federal Savings and Loan Insurance Corporation's sue-and-be-sued clause).  The court finds these particularized definitions of the entire term "return flow" more applicable in the CWA context, than a parsing of the term into its constituent parts.  Second, plaintiffs' parsed definition focusing on "return" would result in an untenable construction of the exemption.  Plaintiffs' construction indicates Congress intended would-be exempt farmers to prove that all of their discharged flows return to the exact same source from which they originated.  This requirement would necessarily disqualify water piped in from one stream on one side of a piece of land and drained into another stream on the other side of that same land and thus is untenable.

At the same time, an interpretation of "return flow" relying solely on defendants' specialized definitions would be unsupportably broad as it seemingly equates "return flow" with "all discharges," rendering at least the noun phrase "return flow" superfluous.  *Boise Cascade Corp. v. United States Envtl. Prot. Agency*, 942 F.2d 1427, 1432 (9th Cir. 1991) (in construing a statute, the court must interpret the statute as a whole and not interpret a provision in a manner that renders another provision of the statute "inconsistent, meaningless, or superfluous") (citing SUTHERLAND STAT. CONST. §§ 46.05, 46.06 (4th ed. 1984)).  The term "return flows" must narrow the type of water permissibly discharged from irrigated agriculture, or else Congress would have omitted "return" and simply exempted "flows from irrigated agriculture" or "all

1   discharges from irrigated agriculture."  The language in section 1362(14) does not assist the court

2   in understanding exactly how the term "return flows" limits the permissible discharges.

3   However, Congress also included the exemption verbatim in subsection 1342(l)(1), except for the

4   addition of the phrase "entirely of."  The Senate Report explaining the addition of this phrase

5   sheds light on the meaning of both the addition of this phrase and the term following it, "return

6   flow."

7           3.      "Entirely of"

8           When Congress added the irrigated agriculture exemption to the definition of point

9   source as part of the CWA in 1977, it added the same language, with one addition, to section

10  1342 of the CWA, which concerns NPDES permitting requirements.  As noted above, subsection

11  1342(l), titled "Limitation on permit requirement," reads in relevant part:

12          (1) Agricultural return flows
            The Administrator shall not require a permit under this section for
13          discharges composed entirely of return flows from irrigated
            agriculture, nor shall the Administrator directly or indirectly,
14          require any State to require such a permit.

15  33 U.S.C. § 1342 (l)(1).  The language of this subsection itself does not reveal why Congress also

16  added the "return flows from irrigated agriculture" exemption to this subsection, with the addition

17  of "entirely of."  This curious replication of the exemption language, including  "entirely of" in

18  one instance but not the other, is sufficient to create ambiguity as to Congress's intent in adding

19  the exemption in both places. *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a

20  creature not of definitional possibilities but of statutory context.").  Thus, the court turns for

21  guidance to the legislative history, if guidance can be found there.

22          The word "entirely" was introduced into the CWA in the Senate.  The Senate

23  Report accompanying the proposed Senate version of the CWA explains what the Senate

24  /////

25  /////

26  /////

17

1   Environment and Public Works Committee intended by proposing the word "entirely":

> In exempting discharges composed 'entirely' of return flows from irrigated agriculture from the [NPDES permitting] requirements of section 402, the committee did not intend to differentiate among return flows based upon their content. The word 'entirely' was intended to limit the exception to only those flows which do not contain additional discharges from activities unrelated to crop production.

S. Rep. No. 95-370, *reprinted in* 1977 U.S.C.C.A.N. 4326, 4360.  The Senate version did not amend the definition of "point source," but rather only exempted "return flows from irrigated agriculture" from the NPDES permitting requirement.  *Id.*  While the House version of the CWA ultimately was adopted, that version had no comparable provision exempting return flows from irrigated agriculture.  H.R. Rep. No. 95-830, at 69 (1977) (Conf. Rep.), *reprinted in* 1977 U.S.C.C.A.N. 4424, 4444.  The Senate Report, therefore, written by the same legislators that authored the exemption and which accompanied the proposed language in an effort to explain the language's meaning to the other members of the Senate and House, is the best extra-statutory indication of what Congress intended when it ratified the exemption language.  *See Disabled in Action of Metro. New York v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000) ("Because a conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent.").  The relevant House Report, explaining the amended definition of "point source," states that the CWA, among other things,

> amends section 502(14) of the Act to remove return flows from irrigated agriculture from the definition of the term 'point source'. In addition the amendment to section 402 of the Act is revised to prohibit the Administrator from requiring permits for this type of discharge and to prohibit the Administrator from requiring any State to require such a permit.

H.R. Rep. No. 95-830, at 69 (Conf. Rep)  Read together with the Senate Report, the House Committee's statement about including the exemption in two provisions, rather than just the single "point source" provision, suggests that Congress not only wanted to prohibit the EPA

1    Administrator and individual states from requiring an NPDES permit for the flows covered by the

2    law but also did not want these flows to be considered "point sources" at all.

3              The Senate Report also helps clarify how the term "return flows" limits the type of

4    discharges from irrigated agriculture that are exempt.  If the discharges from irrigated agriculture

5    "do not contain additional discharges from activities unrelated to crop production" then they are

6    exempt.  Otherwise, they are not.  While the Senate Committee in the Report was explaining what

7    it meant by using the word "entirely," not what it meant by using the term "return flows," this

8    distinction is immaterial.  Logically here, the adverb "entirely" can only modify what the

9    following noun phrase describes; "entirely," by itself, has no substantive meaning.  If a woman

10   asks her tailor to make her a dress "entirely of red fabric," her further explanation that she does

11   not want the tailor to use any fabric that does not have a dark red hue is a description of her

12   understanding of "red fabric," not solely of her modifier "entirely."  "[E]ntirely" in 1342(l)(1) is

13   modifying the noun phrase "return flows" in this same manner.   Therefore, the court understands

14   that Congress, by using the language "entirely of return flows from irrigated agriculture" in

15   subsection 1342(l)(1), intended to exempt discharges from irrigated agriculture that are related to

16   crop production.  The court also attributes this meaning, for the purposes of deciding this case, to

17   the very similar exemption language in section 1362(14).  *Boise Cascade Corp. v. U.S. E.P.A.*,

18   942 F.2d 1427, 1432 (9th Cir. 1991) (courts must presume that words used more than once in the

19   same statute have the same meaning (citing SUTHERLAND § 46.06)).  The legislative history also

20   supports this attribution: the Senate Bill inserted the exemption only in subsection 1342(l)(1), so

21   the later[9] decision also to insert it in section 1362(14) suggests that occurrence should bear the

22   same meaning on the question whether an NPDES permit is required here.

23   /////

24   _____

25        [9] As explained above, the House version of the CWA ultimately was adopted. The House
     version incorporated the earlier-adopted Senate language of the exemption, which included
26   "entirely of," and then noted that the definition of "point source" would also be amended by the
     addition of the exemption.  H.R. REP. NO. 95-830, at 69 (Conf. Rep)

1    Plaintiffs argue that this construction of the exemption effectively reads the word

2  "entirely" out of the statute and cannot be squared with relevant case law.  Plaintiffs aver

3  "entirely" means "wholly, completely, [or] fully."  (ECF 54 at 17.)  Accordingly, the use of

4  "entirely" in subsection 1342(l)(1) means that only "discharges composed [wholly, completely or

5  fully] of return flows from irrigated agriculture" are exempted.  (*Id.*)  Therefore, polluted

6  groundwater that originates in the ground, or as rain falling on the ground and then percolating

7  into the water table, does not qualify under the exemption.  (*Id.*)  Moreover, plaintiffs contend

8  several courts have held that many types of discharges "related to crop production," such as water

9  used to wash "farm vehicles," agricultural pesticides, and waste water used to irrigate fields, are

10  not exempt.  (ECF 51 at 21-22 (citing *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma*

11  *Dairy*, 65 F. Supp. 2d 1129, 1151 (E.D. Wash. 1999) ("*CARE*"); *Nat'l Cotton Council of Am. v.*

12  *U.S. E.P.A.*, 553 F.3d 927, 930 (6th Cir. 2009); *United States v. Oxford Royal Mushroom Prods.,*

13  *Inc.*, 487 F. Supp. 852, 854 (D. Pa. 1980)).)

14    Plaintiffs' arguments are unavailing.  Hewing to the plain meaning of "entirely"

15  does not resolve the facial ambiguities in the statute.  Plaintiffs' plain meaning argument does not

16  address what Congress intended by using "entirely" in one version of the exemption but not the

17  other; nor does it assist the court in understanding how the term "return flows" limits the type of

18  discharges that are exempt.  The Senate and House Reports do.  Whatever interpretation the court

19  gives the two instances of the exemption here, a surplusage problem arises.  If the court

20  disregards the phrase "entirely of" to treat the two instances of the exemption identically then that

21  phrase is rendered mere surplusage.  On the other hand, if the court limits its interpretation of the

22  "entirely of" phrase to the single exemption in which it appears in section 1342(l)(1), then the

23  entire exemption from NPDES permitting in that section is rendered surplusage as a permit then

24  would be required under section 1362(14).

25    Additionally, each of plaintiffs' cited cases is readily distinguishable.  *CARE* does

26  not stand for the proposition plaintiffs represent, but rather is about a concentrated animal feeding

1   operation ("CAFO"), not a farm.  65 F. Supp. 2d at 1133.  Water used to wash a CAFO dairy

2   truck is not related to crop production and thus would not be covered by the "entirely of return

3   flows from irrigated agriculture" exemption.  *National Cotton* holds that pesticides are a pollutant

4   under CWA's section 1362(6); the case does not interpret the exemption at issue here.  553 F.3d

5   at 930.  Similarly, the return flows exemption did not feature in *Oxford Royal*; the court did not

6   even consider whether the challenged discharges fell into the exemption.  487 F. Supp. at 854.

7   Rather, the court considered whether uncollected surface runoff could constitute a discharge from

8   a point source.  *Id.*

9          In sum, the court holds that the exemption "return flows from irrigated agriculture"

10  in subsection 1342(l)(1) and section 1362(14) covers discharges from irrigated agriculture that do

11  not contain additional discharges unrelated to crop production.  Thus, if pollutants from an

12  industrial factory, for example, were added to the flows at issue here, they would disqualify the

13  Project from the exemption.  *See* EPA's NPDES Permit Application Regulations for Storm Water

14  Discharges, 55 Fed. Reg. 47,996 (Nov. 16, 1990) (discharge from an industrial facility that is

15  included in such "'joint' discharges may be regulated pursuant to an NPDES permit either at the

16  point at which the storm water flow enters or joins the irrigation flow, or where the combined

17  flow enters waters of the United States or a municipal separate storm sewer.").  At the same time,

18  the court notes that interpreting both statutory occurrences of the exemption to have the same

19  meaning for the purposes of deciding the instant case does not mean both instances of the

20  exemption, only one of which contains the term "entirely of," are identical in meaning in all

21  cases.

22          C.      Surface Flows and Legislative History

23          Plaintiffs contend the same Senate Report that defines "entirely of" actually

24  illustrates that Congress intended to exempt only surface irrigation return flows.  (ECF 51 at

25  23-25.)  Hence, because the Project discharges flows via underground tiles, it requires an NPDES

26  permit.  (*Id.* at 23.)

21

1    Plaintiffs' argument proceeds as follows.  (*Id.* at 23-25; ECF 54 at 20-25.)  In the

2    precursor to the CWA, the 1972 Federal Water Pollution Control Act ("FWPCA"), Congress

3    considered exempting irrigated farmlands from the point source definition.[10]  However, this

4    amendment was rejected in the House.  *See Brown*, 640 F.3d at 1072-73. The EPA nevertheless

5    chose to exempt return flows from farmlands of less than 3,000 acres in its implementing

6    regulations.  *Id.*; *see* 40 C.F.R. § 125.4 (1975).  As noted in the court's prior order, the Natural

7    Resources Defense Council ("NRDC") challenged this initial exclusion as exceeding the EPA's

8    authority and the district court agreed.  *See Natural Res. Def. Council, Inc. v. Train*, 396 F. Supp.

9    1393 (D.D.C. 1975), *aff'd sub nom. Natural Res. Def. Council, Inc. v. Costle*, 568  F.2d 1369

10   (D.C. Cir. 1977).  In *Train*, the court held that, while the EPA was empowered to distinguish

11   point sources from nonpoint sources, it could not wholesale exclude a class of point sources that

12   was covered by the statutory language.  *Id.* at 1400–01 ("[T]he statutory framework now at issue

13   appears too tightly drawn to allow the interpretation made by EPA.").

14   Also as the court has previously noted, while *Train* was being appealed, the EPA

15   issued regulations reversing its earlier position and applying the NPDES permitting requirements

16   to agricultural activities.  *See* 41 Fed. Reg. 28493-28496 (July 12, 1976); *see also Brown*,

17   640 F.3d at 1074 ("While the appeal was pending, EPA grudgingly promulgated revised

18   regulations.").  In those revised regulations, the EPA defined "irrigation return flow" as "surface

19   water, other than navigable waters, containing pollutants which result from the controlled

20   application of water by any person to land used primarily for crops, forage growth, or nursery

21   operations."  40 C.F.R. § 125.53(a)(2) (1976).  "Surface water," in turn, was defined as "water

22   that flows exclusively across the surface of the land from the point of application to the point of

23   discharge."  40 C.F.R. § 125.53(a)(3) (1976).  The District of Columbia Court of Appeals

24   ultimately affirmed the district court decision in *Train*, in the *Costle* as cited above.

25   _____

26   [10] In fact, the very San Luis Drain used by the Project in this case was the symbol of
pollution that opponents of this 1972 exemption invoked.  *See Brown*, 640 F.3d at 1072.

1    Congress responded to *Train* and the EPA's new regulations by writing the

2    irrigation return flow exemption into the CWA.  *See Brown*, 640 F.3d at 1085 ("[I]n 1977,

3    Congress exempted return flows from irrigated agriculture to alleviate the EPA's burden in having

4    to permit 'every source or conduit returning water to the streams from irrigated lands' . . . .").

5    The accompanying Senate Report, like the revised regulations, suggests that only surface water

6    was contemplated by the amendment: "These [irrigation return] flows have been defined by the

7    Environmental Protection Agency as conveyances carrying surface irrigation return as a result of

8    the controlled application of water by any person to land used primarily for crops . . . ."  S. REP.

9    NO. 95-370 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326, 4360.

10   Federal defendants argue in reply, among other things, that if Congress's intent in

11   1977 was to define the exclusion "in harmony with EPA's contemporaneous regulation," as

12   plaintiffs argue in their opposition, then the enacted exclusion must be read as exempting

13   subsurface flows because the EPA had already determined to leave subsurface flows unregulated.

14   (ECF 60 at 6 (citing ECF 54 at 24); ECF 50 at 12-17.)  Plaintiffs' argument, federal defendants

15   suggest, implies that Congress, in vacating the EPA's regulation of surface return flows to free

16   those flows related to crop production from permitting, concomitantly and only implicitly

17   subjected to the permitting scheme an entire category of irrigation return flows that the EPA had

18   not previously been regulating.  (ECF 50 at 16.)  "Or, to put it another way, [p]laintiff's argument

19   is that in enacting these two *exclusions*, Congress should be deemed to have simultaneously

20   (albeit silently) *included* an entire class of irrigating farmers . . . in the permitting scheme."  (*Id.*

21   (original emphasis).)

22   /////

23   /////

24   /////

25   /////

26   /////

1          Here again, the legislative history favors defendants' interpretation of the statute.

2    The relevant CWA Senate Report language reads as follows:

3               Permit requirements under section 402 of the act have been
              construed to apply to discharges of return flows from irrigated
4               agriculture. These flows have been defined by the Environmental
              Protection Agency as conveyances carrying surface irrigation
5               return as a result of the controlled application of water by any
              person to land used primarily for crops.

6

7    S. REP. NO. 95-370.  This passage demonstrates that Congress was reacting to the *Train* decision,

8    which had caused the EPA to regulate surface irrigation return flows where before the EPA had

9    broadly exempted "[d]ischarges of pollutants from agricultural and silvicultural activities,

10   including irrigation return flow."  40 C.F.R. § 125.4 (1975); *Brown*, 640 F.3d at 1085.  Because

11   the EPA used the broader language "irrigation return flow" when it exempted these discharges in

12   1975 and used the narrower language "surface irrigation return [flows]" in 1976 in reacting to

13   *Train*, the court deduces that the 1975 regulation exempting irrigation return flows applied to all

14   such flows, not just surface flows. Therefore, the regulatory backdrop that existed before

15   Congress passed the CWA was that surface irrigation return flows required permits; non-surface

16   irrigation flows did not.

17          This conclusion is supported by the EPA's responses to comments included in its

18   1976 surface flows regulation rule.  The EPA's response strongly suggests that the EPA did not

19   /////

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

24

1    subject subsurface return flows to the permitting requirements:

2    > These commenters suggested that all agricultural runoff that is
3    > channeled into ditches, pipes or culverts before being discharged
     > into navigable waters should be subject to the permit program
4    > regardless of whether or not such runoff is a result of the controlled
     > application of water. According to these commenters, subsurface as
5    > well as surface irrigation return flow should be included. These
     > comments were carefully considered, but it has been determined not
     > to expand the definition of point source at this time.

6

7    41 Fed. Reg. 28493.[11]  This court's conclusion also is supported by a decision from the Eleventh

8    Circuit, the only circuit to have interpreted the exemption.  In *Fisherman Against the Destruction*

9    *of the Environment v. Closter Farms*, 300 F.3d 1294, 1297-98 (11th Cir. 2002), the Eleventh

10   Circuit held that "discharged groundwater and seepage" used to irrigate crops "can be

11   characterized as 'return flows from irrigated agriculture.'"  The water drainage system in that case

12   took excess water from the irrigation canals that ran through the farms and pumped it into the

13   nearby lake.  *Id.* at 1296.  The drainage system was necessary to the continued production of

14   agriculture on those lands because, prior to its construction, the lands were submerged under the

15   nearby lake for parts of the year.  *Id.*  The court found no NPDES permit was required because all

16   the water that had seeped into the canals from the lake, "either above or below ground, has been

17   used in the irrigation process and therefore discharging it back into the lake is a 'return flow.'" *Id.*

18   at 1297.

19       D.       Cross-Motions for Judgment on the Pleadings

20           On the record before it, the court finds this case is not amenable to judgment on

21   the pleadings.  Judgment on the pleadings is proper when, taking all the nonmoving party's

22   allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law.

23   *Merchs. Home Delivery Serv., Inc. v. Frank B. Hall & Co.*, 50 F.3d 1486, 1488 (9th Cir. 1995).

24   _____

25       [11] Even if the EPA's conclusion that subsurface flows "channeled into ditches, pipes or
     culverts" were outside of the definition of point source is inconsistent with the *Costle* decision,
     that conclusion formed the legislative backdrop against which Congress passed the exemption at
26   issue in this case, which is all this court now reviews.

1    Hence, for plaintiffs to prevail on a 12(c) motion, both parties would have to agree that some of

2    the Project's discharges are from activities unrelated to crop production.  Neither party pleads this

3    essential fact, notwithstanding the parties' view that they agree on the essential material facts.

4    For defendants to prevail on a 12(c) motion, both parties would have to agree that no part of the

5    discharges comes from activities unrelated to crop production.  Defendants essentially plead this

6    (see Federal Defs.' Answer ¶ 26; Auth.'s Answer ¶ 26(j)), but plaintiffs do not.  Because the court

7    must construe the pleadings in the light most favorable to plaintiffs when ruling on federal

8    defendants' motion, the court cannot hold that defendants are entitled to judgment as a matter of

9    law.

10           However, plaintiffs do not plead adequate facts to support a claim that some

11   amount of the Project's discharges is unrelated to crop production.[12]  Plaintiffs' conclusory

12   allegation is that some amount of the discharges is unrelated to irrigation.  (Compl. ¶ 26 (the

13   Project "necessarily discharges polluted groundwater along with irrigation water").)

14   Additionally, the complaint is not clear on whether the Project discharges when farmland is not

15   being irrigated, for example, during winter months or when land is retired from crop production.

16   (See, e.g., Compl. Ex. 1 at 19.)  The exhibit to the complaint might be read to imply the Project

17   discharges during winter months when irrigation flows are at their lowest, but plaintiffs do not

18   plead facts to support a claim that the discharges are unrelated to crop production.  Defendant

19   Authority, on the other hand, asserts the individual tile sumps underlying farmlands do not

20   discharge at all when irrigation season ends or when farmers retire their land.  (Auth. Answer ¶

21   26(f), (g).)  It may be that this dispute about off-season discharges is not material; for example, it

22   may be relevant to the agricultural stormwater exception rather than the irrigated agriculture

23   /////

24   _____

25        [12]  This court's prior order denying defendant's motion to dismiss — because the court
     concluded plaintiffs' allegation that some of the Project's discharges are unrelated to *irrigation*
     was plausible — was not based on the court's interpretation of the exemption contained in this
26   order, fashioned with the benefit of full briefing.

1  exemption.  But a dearth of briefing on this issue precludes the court's addressing it at this

2  juncture.

3        Because plaintiffs have not adequately pled essential facts and defendants are not

4  entitled to judgment as a matter of law, the court construes federal defendants' Rule 12(c) motion

5  as a Rule 12(b)(6) motion and dismisses without prejudice plaintiffs' complaint for failure to state

6  a claim upon which relief can be granted.  *See* 5C CHARLES ALAN WRIGHT & ARTHUR R.

7  MILLER, FEDERAL PRACTICE AND PROCEDURE § 1370, at 265 (3d ed. 2004) (stating some Rule

8  12(c) motions can be handled more effectively on a Rule 12(b)(6) motion); *Fed. Election Comm'n*

9  *v. Adams*, 558 F. Supp. 2d 982, 987 (C.D. Cal. 2008) (noting courts have discretion to dismiss

10  causes of action under a 12(c) rather than grant judgment (citing *Amersbach v. City of Cleveland*,

11  598 F.2d 1033, 1038 (6th Cir. 1979), *disapproved of on other grounds by Garcia v. San Antonio*

12  *Metro. Transit Auth.*, 468 U.S. 528, 538 (1985))).

13  IV.    <u>CONCLUSION</u>

14        For the foregoing reasons, the parties' cross-motions for judgment on the pleadings

15  (ECFs 50-51) are DENIED and plaintiffs' complaint (ECF 2) is DISMISSED without prejudice.

16  Plaintiffs may file an amended complaint consonant with this court's decision within twenty-one

17  days.

18        IT IS SO ORDERED.

19  DATED: September 16, 2013.

20

21  _____

22  UNITED STATES DISTRICT JUDGE

23

24

25

26

27