STEPHAN C. VOLKER (CSB #63093)
DANIEL GARRETT-STEINMAN (CSB #269146)
JAMEY M.B. VOLKER (CSB #273544)
M. BENJAMIN EICHENBERG (CSB #270893)
LAW OFFICES OF STEPHAN C. VOLKER
436 14th Street, Suite 1300
Oakland, California 94612
Tel:    510/496-0600
Fax:   510/496-1366

Attorneys for Plaintiffs
PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS, *et al.*

10.497.02

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, FRIENDS OF THE RIVER, SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION, INC., THE INSTITUTE FOR FISHERIES RESOURCES, and FELIX SMITH,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID MURILLO, Regional Director of the United States Bureau of Reclamation, UNITED STATES BUREAU OF RECLAMATION, and SAN LUIS & DELTA-MENDOTA WATER AUTHORITY,<br><br>Defendants. | Civ. No. 2:11-cv-02980-KJM-CKD<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This is a citizen enforcement action under section 505 of the Clean Water Act ("CWA"), 33 U.S.C. section 1365, brought by sports and commercial fishermen and environmental organizations to halt the ongoing ecologic collapse of the San Francisco Bay-Delta ("Bay-Delta") and its tributaries due to the continuing discharge of dangerous pollutants including selenium, arsenic, boron, mercury, uranium, chromium, molybdenum and sodium sulfates. Defendants United States Bureau of Reclamation (the "Bureau") and the San Luis &

Delta Mendota Water Authority (the "Authority") are currently polluting the Bay-Delta and its southern tributaries including the San Joaquin River and Mud Slough by discharging massive quantities of toxic groundwater including contaminants such as selenium and boron through the Grasslands Bypass Project ("Project").[1]  Defendants' discharge of pollutants from the Project into waters of the United States requires a National Pollutant Discharge Elimination System ("NPDES") permit under sections 301(a) and 402(a) of the CWA, 33 U.S.C. sections 1311(a) and 1342(a).  Although defendants admit that the San Luis Drain and Mud Slough are waters of the United States, and that the contaminated groundwater they discharge from the Project into those waterbodies contains pollutants regulated under the CWA, defendants have failed to obtain an NPDES permit for the Project as required by the CWA.  Accordingly, their continuing discharge of pollutants from the Project into waters of the United States without an NPDES permit is an ongoing violation of the CWA.

2.  The Project's pollution threatens some of California's most critical ecological resources.  It degrades water quality in the Bay-Delta, which in turn threatens the Bay-Delta's endangered and threatened fish species, including the Sacramento splittail, delta smelt, salmon, steelhead, and sturgeon.  The Project's polluted groundwater discharge is also drawn into drinking water supplies through the Central Valley Project ("CVP") and State Water Project ("SWP"), thereby degrading drinking water for 20 million Californians.

3.  Plaintiffs seek defendants' compliance with the CWA's NPDES program and termination of their unpermitted pollution of the San Luis Drain, Mud Slough, San Joaquin River, and the Bay-Delta.  Accordingly, plaintiffs seek orders from this Court (1) declaring that defendants have failed to comply with the CWA's NPDES permit system and (2) granting injunctive relief requiring defendants' compliance with the CWA, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees.

---

[1] The Project also discharges irrigation return flows.  These return flows would be subject to a Clean Water Act exemption but for the fact that they are commingled with non-exempt contaminated groundwater discharges.

## JURISDICTION AND VENUE

4. This Court has jurisdiction in accordance with 33 U.S.C. section 1365(a) (action arises under the CWA's citizen suit provision), 28 U.S.C. section 1331 (action raises a federal question under the laws of the United States); 28 U.S.C. section 1346 (United States is defendant); 28 U.S.C. section 1361 (action to compel officers of the United States to perform their duties); and 28 U.S.C. sections 2102-2202 (action requests declaratory and injunctive relief in cases of actual controversy).

5. In compliance with 33 U.S.C. section 1365(b)(1)(A), on June 8, 2011 plaintiffs gave notice of the defendants' ongoing violations of the CWA and of plaintiffs' intent to sue to all applicable parties. A copy of this 60-day notice is attached hereto as Exhibit 1 and incorporated by reference.

6. More than 60 days have passed since this notice was sent and all of the violations alleged therein continue unabated. Defendants remain in violation of the Clean Water Act.

7. Neither the United States nor the State of California has commenced and is diligently prosecuting a civil or criminal enforcement action addressing the violations alleged in plaintiffs' 60-day notice.

8. Venue is proper under 33 U.S.C. section 1365(c)(1) because the unlawful discharges of pollutants at issue occur within the Eastern District of California. Venue is also proper under 28 U.S.C. section 1391(e) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of California.

9. This Complaint is timely filed within the applicable statute of limitations.

10. Plaintiffs have standing to assert their claims.

## PARTIES

11. Plaintiff PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS ("PCFFA") is a non-profit, tax-exempt corporation which represents a coalition of 16 fishermen's organizations in California, Oregon, and Washington with a combined membership of more than 750 fishing men and women. As such, PCFFA is a "person" under CWA section 502(5), 33 U.S.C. section 1362(5) ("an individual, corporation, partnership, association, State,

municipality, commission, or political subdivision of a State, or any interstate body"). In addition, PCFFA is a "citizen" under CWA section 505(g), 33 U.S.C. section 1365(g) ("a person or persons having an interest which is or may be adversely affected"). Each of its members depends on the ocean's fisheries – including many species of anadromous fish such as salmon, steelhead and sturgeon that use the San Joaquin River and Bay-Delta as juveniles when migrating out to sea and again as adults when returning to spawn – for their livelihood. The interests of PCFFA and its members in healthy fisheries in the Bay-Delta and San Joaquin River have been, are being, and unless the relief requested herein is granted, will continue to be adversely affected and injured by defendants' continued discharge of pollutants that harm fish in violation of the CWA. CWA enforcement will help restore and preserve water quality, directly benefitting the fisheries upon which PCFFA's members rely.

12. Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a non-profit corporation organized under the laws of the State of California. CSPA has thousands of members who reside and recreate throughout California. As such, CSPA is a "person" under CWA section 502(5), 33 U.S.C. section 1362(5). In addition, CSPA is a "citizen" under CWA section 505(g), 33 U.S.C. section 1365(g). CSPA's members are citizens who, in addition to being duly licensed sport fishing anglers, are interested in the preservation and enhancement of California's public trust fishery resources and vigorous enforcement of California's environmental laws. CSPA members have been involved for decades in public education and advocacy efforts to protect and restore the public trust resources of California's rivers. CSPA members use California's rivers, including the San Joaquin River, and the Bay-Delta for recreation, scientific study, and aesthetic enjoyment. The interests of CSPA and its members have been, are being, and unless the relief requested herein is granted, will continue to be adversely affected and injured by defendants' continued discharge of pollutants that harm fish in violation of the CWA. CWA enforcement will help restore and preserve water quality, thereby promoting the objectives of CSPA and improving the use and enjoyment of fisheries resources by its members.

13. Plaintiff FRIENDS OF THE RIVER ("FOR") was founded in 1973 and is

incorporated under the non-profit laws of the State of California, with its principal place of business in Sacramento, California. As such, FOR is a "person" under CWA section 502(5), 33 U.S.C. section 1362(5). In addition, FOR is a "citizen" under CWA section 505(g), 33 U.S.C. section 1365(g). FOR has more than 5,000 members dedicated to the protection, preservation, and restoration of California's rivers, streams, watersheds, and aquatic ecosystems. FOR has been involved in activities to protect and restore the Bay-Delta for more than 30 years. Many of Friends of the River's members recreate on California rivers, including the San Joaquin River, and in the Bay-Delta. The interests of FOR and its members have been, are being, and unless the relief requested herein is granted, will continue to be adversely affected and injured by the defendants' continued discharge of pollutants that harm aquatic ecosystems in violation of the CWA. CWA enforcement will help restore and preserve water quality, thereby promoting FOR's objectives and improving the use and enjoyment of aquatic resources by FOR members.

14. Plaintiff SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION, INC. ("SFCBOA") has been protecting the rich seafood fisheries off the coast of San Francisco since 1913. As such, SFCBOA is a "person" under CWA section 502(5), 33 U.S.C. section 1362(5). In addition, SFCBOA is a "citizen" under CWA section 505(g), 33 U.S.C. section 1365(g). SFCBOA's members operate small, family owned fishing boats that catch Dungeness crab, wild California king salmon, herring, and many other fish species that live in the cold waters of the Pacific Ocean. Members are also actively involved in community education, and fishing resource advocacy to ensure that the rich heritage of commercial fishing for Bay Area residents will survive for future generations. The interests of SFCBOA and its members have been, are being, and unless the relief requested herein is granted, will continue to be adversely affected and injured by defendants' continued discharge of pollutants that harm seafood resources in violation of the CWA. CWA enforcement will help restore and preserve water quality, directly benefitting the fisheries upon which SFCBOA's members rely.

15. Plaintiff THE INSTITUTE FOR FISHERIES RESOURCES ("IFR") is a non-profit public benefit corporation headquartered in San Francisco, California. As such, IFR is a "person" under CWA section 502(5), 33 U.S.C. section 1362(5). In addition, IFR is a "citizen"

under CWA section 505(g), 33 U.S.C. section 1365(g).  Since 1993, IFR has been carrying out the fishery research and conservation needs of working fishing men and women.  IFR works on conservation projects and policy issues at the regional, national and international levels.  The interests of IFR and its members have been, are being, and unless the relief requested herein is granted, will continue to be adversely affected and injured by the defendants' continued discharge of pollutants that harm fisheries resources in violation of the CWA.  CWA enforcement will help restore and preserve water quality, directly benefitting the fisheries upon which IFR's members rely.

16.  Plaintiff FELIX SMITH is a veteran fish and wildlife biologist with 37 years of managerial and technical experience with the United States Fish and Wildlife Service prior to his retirement from that agency.  He discovered and reported the deformed migratory birds poisoned by the discharge of contaminated groundwater from farmlands including lands drained by the Project into Kesterson National Wildlife Refuge in June 1983.  He has devoted more than 50 years to improving management of fish, wildlife and their habitat, including four decades studying California's water allocation issues.  He is an outspoken advocate for using the public trust doctrine to protect the public's fish and wildlife resources, their habitats, and associated natural resource uses and values.  Mr. Smith is an avid outdoorsman and uses the Bay-Delta, the San Joaquin River and their tributaries for scientific study, recreation and aesthetic enjoyment.  Mr. Smith's interests have been, are being, and, unless the relief requested herein is granted, will continue to be harmed by the defendants' violation of the CWA.  CWA enforcement will help restore and preserve water quality, directly benefitting the ecosystems that Mr. Smith has spent his professional career trying to protect and restore.

17.  Plaintiffs have no plain, speedy, or adequate remedy at law.  Additionally, plaintiffs' injuries are fairly traceable to defendants' actions.  These injuries are actual, concrete, and imminent and cannot be adequately remedied by money damages.  Accordingly, plaintiffs seek injunctive and declaratory relief from this Court to rectify defendants' unlawful acts.

18. Defendant DAVID MURILLO[2] is the Regional Director of the UNITED STATES BUREAU OF RECLAMATION, and is being sued in his official capacity. The United States Bureau of Reclamation (the "Bureau") is the federal agency within the United States Department of the Interior charged with managing the Nation's water. The Bureau, in association with defendant San Luis & Delta-Mendota Water Authority, operates the Project.

19. Defendant SAN LUIS & DELTA-MENDOTA WATER AUTHORITY (the "Authority") serves 29 member agencies reliant upon water exported from the Bay-Delta by the Bureau's Central Valley Project. The members of the Authority deliver water to approximately 1.1 million acres of farmland and nearly 2 million California residents. The Authority, in association with the Bureau, operates the Project.

## FACTUAL BACKGROUND

20. For decades now, the Bureau and the Authority have been discharging groundwater laden with pollutants harmful to human health and to the fragile ecosystems of Mud Slough, the San Joaquin River, and the Bay-Delta without first obtaining the required NPDES permits. Along with other pollutants, the groundwater discharged by the Project contains high levels of selenium. Elevated selenium levels harm benthic organisms and the fish and waterfowl that feed on them. It kills juvenile salmon and steelhead and causes birth defects in the birds that nest and feed along the shorelines and in the wetlands affected by the Project. According to recent monitoring reports, selenium levels in the San Joaquin River exceed safe drinking water standards. Selenium pollution is also present throughout the entire Bay-Delta, a vital system which, through the Central Valley Project and the State Water Project, serves as the water supply for 20 million Californians.

21. The Project collects and then discharges polluted groundwater from tile drainage systems. These tile drainage systems consist of a parallel network of drain laterals perforated on their upper side and buried at variable depths and spacings. The drain laterals are typically

---

[2] Regional Director Murillo is the successor to former Regional Director and defendant Donald R. Glaser, and is therefore substituted for Mr. Glaser as a defendant pursuant to Federal Rule of Civil Procedure 25(d).

1  installed at depths ranging from 6 to 9 feet below land surface, and spaced horizontally from 100
2  to 600 feet apart. Drainwater production is proportional to the hydraulic gradient between the
3  water table and the drain laterals. Drainflow increases as the water table rises, decreases as the
4  water table declines, and is negligible when the water table is below the drain laterals.

5      22.  The Project's tile drainage system also discharges water that has been used for
6  irrigation purposes. This irrigation water is provided through the San Luis Unit – part of the
7  Central Valley Project and also part of the State of California Water Plan – jointly constructed
8  and operated by the Bureau and the State of California. These facilities supply irrigation water
9  from the Sacramento-San Joaquin Delta to the western portion of Fresno, Kings, and Merced
10 Counties. This irrigation water is commingled with polluted groundwater and then discharged
11 by the Project.

12     23.  The Project's canals, including the San Luis Drain, discharge contaminated
13 groundwater to Mud Slough and the San Joaquin River, and so are tributaries of those
14 waterways. "A 'stream which contributes its flow to a larger stream or other body of water' is a
15 tributary." *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001),
16 quoting *Random House College Dictionary* 1402 (rev. ed. 1980).

17     24.  Although the Project reduced the discharge of pollutants such as selenium into Salt
18 Slough and other nearby freshwater channels and wetlands, it achieved this reduction in part by
19 redirecting those pollutants into the San Luis Drain and Mud Slough. As the Authority has
20 conceded, "[t]he Grassland Bypass Project simply reroutes the drainage water around the
21 wetland areas using several new earthen ditches and a portion of the San Luis Drain." *A Storm*
22 *Event Plan for Operating the Grassland Bypass Project*, Grassland Area Farmers and San Luis
23 & Delta-Mendota Water Authority, August 25, 1997, p. 2. Consequently, the levels of pollution
24 downstream from the Project continue to exceed water quality standards. For example, selenium
25 concentrations at the point where defendants' San Luis Drain discharges into Mud Slough
26 averaged 24.8 micrograms per liter ("ug/L") or parts per billion ("ppb") in December 2012 and
27 31.4 ug/L in January 2013, months when the 97,400 acres of lands that the Grasslands Bypass
28

1   Project drains – the Grassland Drainage Area – are not typically irrigated.[3]  *Grassland Bypass
2   Project Monthly Data Reports* for the months of December, 2012 and January 2013, published
3   by the San Francisco Estuary Institute in May and July, 2013 ("*S.F. Estuary Institute GBP
4   Monitoring Reports*"), Table 2a.  These levels of selenium are four to five times greater than the
5   maximum 4-day average concentration permitted under the applicable water quality standards,
6   5.0 ug/L.  State of California, Regional Water Quality Control Board for the Central Valley
7   Region, *Basin Plan* 4th Ed. (Rev. Oct. 2011) ("*Basin Plan*"), Water Quality Objectives for Trace
8   Elements for Mud Slough (north), Table III-1, p. III-4.00.  The Project discharges other harmful
9   pollutants.  For example, according to the Authority, the discharge of boron from the Grassland
10  Drainage Area via the Project increased by 63 percent between water year 1995 (prior to the
11  Project's commencement of operation in September 1996) and water year 2010.  Letter dated
12  December 29, 2010 from the Authority to the Central Valley Regional Water Quality Control
13  Board, p. 7, Table 1 (showing boron concentration of 5.5 parts per million ("ppm") in water year
14  1995 and 8.0 ppm in water year 2010).

15        25.   The Project's discharges of contaminated groundwater harm the ecology of the Bay-
16  Delta and its tributaries in two ways.  First, they cause elevated levels of pollutants, including
17  selenium, in the waters of the United States that are immediately downstream of the Project
18  including the San Luis Drain and Mud Slough.  For example, in December, 2011, the average
19  concentration of selenium discharged from the Project into Mud Slough was 29.8 ug/L, nearly
20  six times higher than the maximum 4-hour average selenium concentration allowed within Mud
21  Slough under the Basin Plan, 5.0 ug/L.  *Basin Plan*, Water Quality Objectives for Trace

---

[3] Thus, claims advanced by the United States Environmental Protection Agency ("EPA") that the Project constitutes a "Nonpoint Source Program Success Story," based on the reduction in selenium concentrations at one of fourteen sampling locations (Salt Slough, also known as sampling "Site F") are misleading.  EPA, *Section 319 Nonpoint Source Program Success Story* (September 2011), p. 2, annexed as Exhibit 1 to the Authority's Request for Judicial Notice filed herein on January 9, 2012.  Although it is true that the Project has reduced the discharge of selenium to Salt Slough, and also reduced the total selenium discharged from the Drainage Project Area, it has caused the discharge of pollutants, including selenium and boron, into the San Luis Drain and Mud Slough, and waters downstream from them.

Elements for Mud Slough (north), Table III-1, p. III-4.00.  Likewise in January, 2012, the average concentration of selenium discharged by the Project into Mud Slough was 23.1 ug/L, more than four times higher than the maximum 4-hour average selenium concentration allowed within Mud Slough under the Basin Plan, 5.0 ug/L.  *Id.*, Table III-1, p. III-4.00.  These high concentrations occurred at a time of year – December and January – when irrigation would not typically occur.

26.  Second, the Project also harms water quality and dependent fish and wildlife farther downstream, within the Bay-Delta.  Because selenium is a relatively heavy metal and does not biodegrade, it settles on the bottom of Bay-Delta waterways and San Francisco Bay, where it is assimilated by benthic organisms such as clams.  Those benthic organisms, in turn, are consumed by bottom-feeding fishes such as the Sacramento splittail (*Pogonichthys macrolepidotus*).[4]  According to the U.S. Fish and Wildlife Service, selenium is one of three "contaminant threats" that "are of far greater strategic concern specifically for the continued existence of the splittail."  Fish and Wildlife Service, Final Biological Opinion for the Grasslands Bypass Project, October 1, 2001– December 31, 2009, dated September 27, 2001 ("2001 Biological Opinion"), p. 2-23.

27.  According to the National Research Council of the National Academies, which has conducted comprehensive reviews of the causes of the declining ecologic health of the Bay-Delta, "[t]oxic pollutants such as selenium also appear to be significant stressors, especially for sturgeon, with the San Francisco Bay and the San Joaquin River being the areas of greatest concern."  *Sustainable Water and Environmental Management in the California Bay-Delta*, National Research Council of the National Academies (2012) p. 9.  The primary source of the selenium pollution which threatens sturgeon is the "very large reservoir of selenium . . . in the soils of the western San Joaquin Valley . . . ."  *Id.*, p. 94.  The National Research Council has concluded that "[g]reen sturgeon (*Acipenser medirostris*) appears to be the species most at risk from chemical contamination.  Sturgeon tissues contain higher concentrations of selenium and

---

[4] The Sacramento splittail was proposed for listing as a threatened species by the U.S. Fish and Wildlife Service on January 6, 1994.  59 Fed. Reg. 862.  A final rule listing the Sacramento splittail as a threatened species was published on February 8, 1999, and became effective March 10, 1999.  64 Fed. Reg. 5963.

1 mercury than any other fish species, reflecting their position as a top predator in the benthic food
2 web." *Id.*, p. 95, citation omitted. "Because green sturgeon is a long-lived, slowly reproducing
3 species, populations are vulnerable to chemical disruption of reproductive processes (typical
4 effects of selenium and mercury)." *Id.* "[B]ioaccumulative contaminants like selenium and
5 mercury also pose a particular risk for [green sturgeon]. The risks stem from the sturgeon's high
6 trophic position in the benthic food web, the importance of life stages most at risk from these
7 reproductive toxicants, and the poor demographic compensational abilities of this long-lived,
8 slowly reproducing species." *Id.*

9    28.   "San Francisco Bay is listed under section 303(d) of the Clean Water Act as impaired
10 for selenium because bioaccumulation of this element has led to recurring health advisories for
11 local hunters against consumption of diving ducks. Moreover, elevated selenium concentrations
12 found in biota often exceed levels that can cause potential reproductive impacts in white
13 sturgeon and are often higher than levels considered safe for fish and other wildlife species in the
14 estuary." *Total Maximum Daily Load, Selenium in North San Francisco Bay, Preliminary*
15 *Project Report*, State of California Regional Water Quality Control Board, San Francisco Bay
16 Region (January 2011) ("*S.F. Bay Regional Board Selenium Report*"), p. 1. "The estimated
17 whole body selenium concentrations found in sturgeon often exceed the proposed draft United
18 States Environmental Protection Agency (USEPA) limit of 7.91 ug/g (USEPA 2004) and are
19 often above the level of concern (4-12 ug/g) indicated by the US Fish and Wildlife Service
20 recommended ecological risk guidelines (Pressor *et al.* 2004)." *Id.* "Increased levels of
21 selenium in the Bay-Delta have been recognized as a possible contributing factor to the observed
22 decline of some key species, e.g., white sturgeon, Sacramento splittail, starry flounder and surf
23 scoter." *Id.*, pp. 1-2. "The northern segments of the Bay are dominated by the freshwater
24 inflows from [the] Sacramento and San Joaquin rivers that contribute substantial amounts of
25 selenium-enriched sediment and irrigation runoff from [the] Central Valley." *Id.*, p. 2.

26    29.   The discharge of selenium from the Project has a major adverse impact on water
27 quality in the Bay-Delta, and harms its sensitive species including the Sacramento splittail and
28 the white and green sturgeon. "In natural freshwater and estuarian ecosystems selenium

concentrations are typically low ranging from 0.1 to 0.4 ug/L with background concentrations below 1 ug/L." *Id.*, p. 9, citation omitted. Concentrations of selenium discharged by the Project, by contrast, averaged between 24.8 and 31.4 ug/L during the winter months of 2012–2013. *S.F. Estuary Institute, GBP Monitoring Reports*, December 2012 – January 2013, Table 2(a).

30. The discharges of selenium from the Project area have a substantial adverse impact on San Francisco Bay and its fish and wildlife. Of the total selenium load of 2,596 kilograms (kg) during the period 1993–2003, the majority originates from the San Joaquin River and its tributaries including Mud Slough and the San Luis Drain. *S.F. Bay Regional Board Selenium Report*, p. 62, Table 21. Whereas the Sacramento River at Freeport discharged an average annual selenium load of 1,577 kg, the San Joaquin River at Vernalis discharged an average annual selenium load of 2,289 kg. *Id.* at 62, Table 21. By way of comparison, the estimated annual load of selenium discharged by all of the petroleum refineries in North San Francisco Bay is just 538 kg. *Id.*, p. 48, Table 14.

31. "Evidence of fish and wildlife contamination, leading to reduced survival and deformities due to selenium in aquatic and terrestrial food webs, has been documented extensively." *Id.*, p. 17, citations omitted. "These studies confirmed that once selenium enters the aquatic environment it has a high potential to bioaccumulate in zooplankton and benthic invertebrates, and, subsequently, to biomagnify as it reaches top level predators such as fish, birds and mammals." *Id.* A leading researcher has "reported that biomagnification might lead to a two to six-fold increase in selenium concentrations between primary producers and forage fish. This, in turn, may have detrimental effects on fish and waterfowl even when selenium in the water column is present at low concentrations." *Id.*

32. In 1996, defendants obtained an NPDES permit for the discharge of groundwater from the Project. The 1996 permit was rescinded in September 1996. Defendants' current discharges are not authorized by any NPDES permit. The Project collects polluted groundwater and then discharges it into the San Luis Drain, Mud Slough, and eventually into the San Joaquin River and the Bay-Delta, all without an NPDES permit.

**LEGAL BACKGROUND**

33. The CWA states that "[t]he objective of this chapter is to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The CWA prohibits the "discharge of any pollutant by any person" unless done in compliance with the Act. *Id*. at § 1311(a). Section 402 of the CWA requires a permit for the discharge of pollutants from point sources such as pipes and ditches into navigable waters. *Id*. § 1342 (a)(1).

34. Under the CWA, the "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). An addition occurs when a point source introduces a pollutant into a navigable water that would not exist in the same form or concentration but for the addition from the point source. *Rybachek v. EPA*, 904 F.2d 1276, 1285-1286 (9th Cir. 1990); *cf. Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 261 F.3d 810, 815 (9th Cir. 2001) (interpreting "addition" under CWA § 404); *United States v. Deaton*, 209 F.3d 331, 335 (4th Cir. 2000) (same); and *United States v. M.C.C. of Florida, Inc.*, 772 F.2d 1501 (11th Cir. 1985) (same), *vacated on other grounds,* 481 U.S. 1034 (1987), readopted in relevant part, 848 F.2d 1133 (11th Cir. 1988).

35. Under the CWA, "pollutant" is broadly defined to include "dredged soil . . . biological materials . . . heat . . . rock, sand . . . and agricultural waste discharged into water." 33 U.S.C. § 1362(6). The term "pollution" is defined as "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." *Id*. at § 1362 (19). Courts consider the definition of "pollution" in determining whether discharged water is a "pollutant." *PUD No. 1 of Jefferson County v. Washington Department of Ecology,* 511 U.S. 700, 705 (1994); *Northern Plains Resource Council v. Fidelity Exploration and Development Co.*, 325 F.3d 1155, 1162 (9th Cir. 2003). Here, the Project discharges pollutants including selenium and boron, and causes pollution of downstream waters of the United States by altering their chemical, physical and biological integrity.

36. A "point source" is defined as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "[A] point source need not be the original source of the pollutant;" it "need only convey the pollutant to navigable

waters." *South Florida Water Management District v. Miccosukee Tribe of Indians,* 541 U.S. 95, 105 (2004). Here, the Project's canals and ditches that transport groundwater from the drainage area to the San Luis Drain and then to Mud Slough are exactly the type of "discrete conveyance[s]" that are covered by the NPDES program. *Id*.

37. The general category of "nonpoint source pollution is . . . widely understood to be the type of pollution that arises from many dispersed activities over large areas, and is not traceable to any single discrete source." *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1184 (9th Cir. 2002). Nonpoint sources are exempt because their diffuse pollution is, therefore, "very difficult to regulate through individual permits." *Id*.

38. Navigable waters under the Clean Water Act are "waters of the United States." 33 U.S.C. § 1362(7). Mud Slough and the San Joaquin River are navigable waters under the Clean Water Act because they are used by power boats, rowboats, rafts, canoes, kayaks, and other recreational watercraft and are thus navigable in fact. *Rapanos v. United States*, 547 U.S. 715, 731 (2006).

39. The Project's canals, including the San Luis Drain, are waters of the United States because they are tributaries of Mud Slough and the San Joaquin River. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985); *Northern California River Watch v. City of Healdsburg*, 496 F.3d 993, 997 (9th Cir. 2007) ("regulable waters of the United States include tributaries of traditionally navigable waters"); *United States v. Eidson*, 108 F.3d 1336, 1341-42 (11th Cir. 1997) (tributaries are "waters of the United States," and manmade ditches and canals that flow intermittently into creeks may be tributaries); *United States v. TGR Corp.*, 171 F.3d 762, 764 (2d Cir. 1999) (non-navigable tributaries flowing into navigable streams are "waters of the United States"); *United States v. Texas Pipe Line Co.*, 611 F.2d 345, 347 (10th Cir. 1979) (unnamed tributary of creek that is tributary to river is "water of the United States").

40. Although agricultural return flows are exempt from the CWA's permit requirements (33 U.S.C. § 1362(14); 40 C.F.R. § 122.3(f)), the CWA only exempts "discharges composed *entirely* of return flows *from* irrigated agriculture . . . ." 33 U.S.C. § 1342(l)(1), emphasis added; *South Florida Water Management Dist. v. Miccosukee Tribe of Indians*, *supra*, 541 U.S. 95

(agricultural return flows commingled with other water sources required NPDES permit). This exemption was intended to exempt only "conveyances carrying *surface irrigation return* as a result of the controlled *application of water* by any person *to land* used primarily for crops." Sen. Rep. No. 95-370, at 3, emphasis added.[5] Congress never intended this exemption to be applied so broadly that it would exempt conveyances carrying polluted water other than water that had been applied from the surface to crops for the purpose of irrigation. "Claims of exemption, from the jurisdiction or permitting requirements, of the CWA's broad pollution prevention mandate must be narrowly construed to achieve the purposes of the CWA." *River Watch v. City of Healdsburg*, 496 F.3d 99, 1001 (9th Cir. 2007), *cert. den. sub nom. City of Healdsburg, California v. Northern California River Watch*, 552 U.S. 1180 (2008), citing *United States v. Akers*, 785 F.2d 814, 819 (9th Cir. 1986).

41.  The agricultural return flows exemption does not apply because defendants' discharges are not surface irrigation return flows. To the contrary, the Project discharges a substantial quantity of the following categories of polluted groundwater that are not related to irrigated agriculture:

    a.    Contaminated groundwater that pre-dates all farming in the area;

    b.    Contaminated groundwater discharged at times, such as the fall and winter months, when little or no irrigation occurs. The source of this discharge is not irrigation water but instead contaminated groundwater;

    c.    Contaminated groundwater originating from parcels where no farming occurs because, for instance, these parcels have been fallowed or retired from agricultural use.

42.  Because the irrigation water discharged by the Project is commingled with these non-exempt discharges, even when irrigation is occurring, the Project's discharges are not "composed entirely of return flows from irrigated agriculture." The Project's discharges are therefore not exempt from the Clean Water Act's NPDES permit requirement.

---

[5] The House version contained no return flow exemption (H.R. Rep. No. 95-830, at 69 (1977) (Conf. Rep.), reprinted in 1977 U.S.C.C.A.N. 4424, 4444).

1 **CLAIM FOR RELIEF**

2 **(Violation of the Clean Water Act)**

3 **(Against all defendants)**

4     43.    The paragraphs set forth above are realleged and incorporated herein by reference.

5     44.    Section 30l(a) of the CWA, 33 U.S.C. section 1311, prohibits the discharge of pollutants from a point source into navigable waters of the United States, unless pursuant to the terms of an NPDES permit issued under section 402 of the Clean Water Act, 33 U.S.C. section 1342.

9     45.    Defendants have discharged and continue to discharge pollutants from the Project's canals, pipes, and ditches – point sources – into navigable waters of the United States and their tributaries, including the San Luis Drain and Mud Slough, without an NPDES permit.

12     46.    Defendants' actions in discharging and continuing to discharge pollutants into waters of the United States without an NPDES permit violate the Clean Water Act.  33 U.S.C. § 1342(a)(1) (NPDES permit requirement).

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that the Court grant the following relief:

1. Adjudge and declare defendants to have violated and to continue to be in violation of the Clean Water Act.

2. Order defendants to cease discharging pollutants into waters of the United States without a point source discharge permit as required by the CWA and its NPDES permit program.

3. Order defendants to pay civil penalties of $37,500 per day of violation pursuant to 33 U.S.C. section 1319(d) and adjusted for inflation by 40 CFR section 19.4, including violations identified in plaintiffs' 60-day notice letter, violations identified during discovery, and violations committed subsequent to those identified in this Complaint.

4. Issue a remedial injunction ordering defendants to pay the cost of any environmental restoration or remediation, including additional monitoring, deemed necessary and proper by the Court to comply with the CWA and ameliorate the water degradation caused by defendants' violations.

5. Award plaintiffs their reasonable attorneys' fees and costs and expenses incurred in connection with the litigation of this action, as authorized by 33 U.S.C. section 1365(d).

6. Grant plaintiffs such additional relief as the Court may deem just and proper.


Dated:  October 7, 2013    Respectfully submitted,

*/s/ Stephan C. Volker*
STEPHAN C. VOLKER
Attorney for Plaintiffs PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, FRIENDS OF THE RIVER, SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION, INC., THE INSTITUTE FOR FISHERIES RESOURCES, and FELIX SMITH

**CERTIFICATE OF SERVICE**

I, Stephan C. Volker, am a citizen of the United States. I am over the age of 18 years and not a party to this action. My business address is the Law Offices of Stephan C. Volker, 436 14th Street, Suite 1300, Oakland, California 94612.

On October 7, 2013, I served the following documents by electronic filing with the Clerk of the Court using the CM/ECF system, which sends notification of such filing to the email addresses registered in the above entitled action:

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 7, 2013.

                /s/ *Stephan C. Volker*
                STEPHAN C. VOLKER