1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PACIFIC COAST FEDERATION OF              No.  2:11-cv-02980-KJM-CKD
     FISHERMEN'S ASSOCIATIONS, et al.,
12
                     Plaintiffs,
13                                            ORDER
            v.
14
     DAVID MURILLO, Regional Director of
15   the United States Bureau of Reclamation,
     et al.,
16
                     Defendants.
17

18

19              The matter is before the court on cross-motions for summary judgment brought by

20   plaintiffs, the Pacific Coast Federation of Fishermen's Associations, the California Sportfishing

21   Protection Alliance, Friends of the River, San Francisco Crab Boat Owners Association, Inc., the

22   Institute for Fisheries Resources and Felix Smith, as well as by defendants, David Murillo, the

23   United States Bureau of Reclamation (the Bureau), and the San Luis & Delta-Mendota Water

24   Authority (the Authority).  In this order, the court refers to defendants Murillo and the Bureau

25   collectively as "federal defendants."

26              As explained below, plaintiffs' motion for summary judgment is denied.

27   Defendants' motions for summary judgment are granted in part and denied in part.

28   /////

                                                  1

1    I.        PROCEDURAL HISTORY

2              On November 9, 2011, plaintiffs filed the complaint in this action against

3    defendants, alleging defendants violated the Clean Water Act, 33 U.S.C. § 1311(a) (the Act), by

4    discharging pollutants into the waters of the United States without a National Pollutant Discharge

5    Elimination System (NPDES) permit.

6              On September 16, 2013, the court denied cross-motions for judgment on the

7    pleadings by federal defendants, and plaintiffs.  2013 Order, ECF No. 70.  The court converted

8    the federal defendants' Rule 12(c) motion to a Rule 12(b)(6) motion and dismissed plaintiff's

9    complaint with leave to amend.  2013 Order at 26.  On October 7, 2013, plaintiffs filed the First

10   Amended Complaint.  First Amend. Compl. (FAC), ECF No. 71.  On November 15, 2013, federal

11   defendants and the Authority each filed a motion to dismiss.  ECF Nos. 76, 77.  On March 28,

12   2014, the court found plaintiffs had pled sufficient facts to state a claim for a violation of the Act

13   because the Grasslands Bypass Project (the Project) operated by defendants collects and

14   discharges a substantial quantity of contaminated groundwater from fallow land, retired from

15   agricultural use.  FAC ¶ 41(c); 2014 Order, ECF No. 87 at 7.  The court struck the balance of the

16   allegations in the First Amended Complaint.  2014 Order at 8.

17             On October 16, 2015, defendants and plaintiffs filed the pending cross-motions for

18   summary judgment.  Fed. Defs.' Mem. P. & A. (FDM), ECF No. 110; Authority's Mem. P. & A.

19   (AM), ECF No. 111-1; Pls.' Mem. P. & A. (PM), ECF No. 112.  Plaintiffs, federal defendants

20   and the Authority opposed one another's motions.  Fed. Defs.' Opp'n, ECF No. 114; Authority's

21   Opp'n (AO), ECF No. 115; Pls.' Opp'n to the Authority (POA), ECF No. 116; Pls.' Opp'n to

22   Fed. Defs. (POFD), ECF No. 117.  Each also filed a reply.  Fed. Defs.' Reply (FDR), ECF No.

23   119; Authority's Reply (AR), ECF No. 120; Pls.' Reply to Fed. Defs. (PRFD), ECF No. 123;

24   Pls.' Reply to the Authority (PRA), ECF No. 124.  The parties have submitted multiple

25   declarations in support of their motions.  *See, e.g.*, ECF Nos. 111-3, 112-9, 114-1, 115-2, 115-3,

26   116-4, 120-1, 120-2, 123-2.  The declarations of Stephen Bond, Joe McGahan, Michael Eacock,

27   and Dennis Falaschi, provoked a storm of evidentiary objections and motions to strike.  ECF Nos.

28   116-4, 118, 123-1, 124-2, 124-3, 126, 127, 128.  Plaintiffs' motions to strike, filed after the

1   evidentiary objections, contained arguments duplicative of those in the evidentiary objections,

2   and may have been filed in response to the Authority's argument that plaintiff had neither filed

3   notices of motions to strike nor met and conferred as required prior to filing the motions.

4   Authority's Resp. to Pls.' Obj. to McGahan Decl., ECF No. 120-3 n.1; Authority's Opp'n to Pls.'

5   Mot. to Strike McGahan Decl., ECF No. 130.

6   II.      EVIDENTIARY OBJECTIONS

7          A.     Authentication

8                 Plaintiffs object to Exhibit A to the Eacock declaration, ECF No. 114-1, on the

9   basis of improper authentication.  The court finds it unnecessary to consider the exhibit to resolve

10  the cross-motions for summary judgment.  The reported levels of selenium in Exhibit A are not

11  relevant to whether the "return flow" exemption applies to the Project, the issue raised in the

12  cross-motions.  *See Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 11221 (E.D. Cal.

13  2006) (courts consider only relevant evidence in a motion for summary judgment).  Plaintiffs'

14  motion to strike the exhibit is denied as moot.

15         B.     Undisclosed Experts

16                Plaintiffs argue the McGahan, Falaschi and Eacock declarations represent

17  undisclosed expert opinion, because they convey testimony that an untrained layman could not

18  possibly make.  Mot. to Strike McGahan Decls., ECF No. 126-1 at 3–5; Mot. to Strike Falaschi

19  Decls., ECF No. 127-1 at 4; Mot. to Strike Eacock Decl., ECF No. 128-1 at 4.  The Authority

20  argues Mr. McGahan and Mr. Falaschi offer only factual testimony about the Project based on

21  their experience working on and managing the Project and its drainage.  Authority's Opp'n to

22  Mot. to Strike, ECF No. 130 at 6.  It notes Mr. McGahan has been the Drainage Coordinator for

23  the Project since its inception, and Mr. Falaschi is the general manager of the Panoche Water

24  District and the manager of the Charleston Drainage District.  *Id.*

25                1.     Rule of Evidence 701

26                Plaintiffs' objections rely in part on Federal Rules of Evidence 701(c).  Rule

27  701(c) limits a witness who is not testifying as an expert to opinions that are "not based on

28  scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid.

701(c).  Rule 702 provides "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," among other requirements.  Fed. R. Evid. 702.

Subsection (c) was added to Rule 701 in 2000 to prevent parties from proffering expert testimony under the guise of a lay opinion.  *See* Fed. R. Evid. 701 Adv. Comm. Note (2000).  The Advisory Committee specifically noted that this amendment was meant to prevent non-experts from testifying using "a process of reasoning which can be mastered only by specialists in the field."  *Id.*  Instead, lay witnesses employ a "process of reasoning familiar in everyday life," and provide opinions drawn from a series of personal observations over time.  *Id.*; *see also United States v. Holmes*, 229 F.3d 782, 788–89 (9th Cir. 2000) (witness's six previous thirty-minute meetings with defendant provided sufficient foundation for her lay opinion testimony identifying him on a surveillance tape).  Additionally, lay witnesses may offer opinions based on a combination of their personal observations and specialized knowledge obtained through their vocation.  *See United States v. Crawford*, 239 F.3d 1086, 1090–91 (9th Cir. 2001) (witness could testify to a university's use of a term, based on his experience with university policies).

The 2000 amendment to Rule 701 "does not distinguish between expert and lay witnesses, but rather between expert and lay testimony."  Fed. R. Evid. 701 Adv. Comm. Note (2000).  It is possible for an expert to provide lay testimony.  *Id.*  Thus, simply because a lay witness testifies to opinions drawn from her work experience she is not necessarily offering expert testimony if her opinion is "rationally based on the witness's perception."  *See* Fed. R. Evid. 701.

The Authority's attempt to characterize all statements in the McGahan and Falaschi declarations as factual rather than opinion testimony is unhelpful, as that is not the key distinction in applying Rule 701.  Rather, the question is whether Mr. McGahan and Mr. Falaschi, as lay witnesses, are providing factual testimony or opinions beyond what could rationally be

4

1   drawn from their non-expert perceptions.  The court finds these declarants do not require any

2   special education to determine the number of acres in the GDA, or the number of acres each

3   individual water district oversees.  The motion to strike this testimony is denied and the

4   corresponding objections are overruled.

5                  2.      Federal Rule of Evidence 702

6          Plaintiff also relies on Rule 702, set forth above, and the court next considers to

7   what extent the challenged declarations do present expert testimony.

8                  a)      McGahan Declarations

9          Mr. McGahan opines about the existence and the source of drainage of lands in the

10  GDA, selenium concentrations, and the water table of the subsurface drainage systems.  *See, e.g.*,

11  McGahan Decl. ¶ 17, ECF No. 111-3; McGahan Opp'n Decl. ¶¶ 3–8, 15, ECF No. 115-3.  The

12  court is unpersuaded that a lay person without special expertise can opine on features of

13  subsurface drainage systems other than to say they may exist under a particular land parcel.

14  While Mr. McGahan has years of experience working as the Drainage Coordinator for the

15  Project, that experience does not preclude the need for specialized knowledge to reach the

16  opinions considered here.  *Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1006 (9th

17  Cir. 2001) ("[P]ersons experienced in a particular field may have a 'practical' expertise or

18  specialized knowledge" that qualifies them as experts); *cf. James River Ins. Co. v. Rapid Funding,*

19  *LLC*, 658 F.3d 1207, 1215 (10th Cir. 2011) (finding a lay witness provided improper expert

20  opinion where the testimony was derived from previous professional experience and technical

21  analysis).  To the extent Mr. McGahan discusses whether a plot discharges subsurface drainage

22  and identifies the system's water level and selenium concentrations, these statements are stricken.

23          With respect to plaintiff's argument that Mr. McGahan also provides expert

24  opinion when he discusses the collection and analysis of data and scientific metrics, the court

25  finds the statements immaterial to its decision on the cross-motions because they are not relevant

26  to the subject matter at issue.

27          The motion to strike statements related to Mr. McGahan's work experience and

28  qualifications, the substance of which is not questioned, are denied as moot.  Mr. McGahan's

1    remaining statements may be considered as those of a lay witness. The balance of plaintiffs'

2    motion to strike is denied.

3                              b)      Falaschi Declarations

4                Plaintiffs argue Mr. Falaschi's statements on Charleston Drainage District's lease

5    agreements, irrigation practices, and practices within the SJRIP are improper lay opinions that

6    require specialized knowledge.  Mot. to Strike Falaschi Decls., ECF No. 127-1 at 7.  To the extent

7    Mr. Falaschi provides opinions on the history of the Charleston Drainage District, the various

8    contracts and accompanying documents related to the district, the history of the Vega Solar

9    Project, and the operations of the SJRIP, these statements are proper lay witness opinions.  *See,*

10   *e.g.*, Falaschi Decl. ¶¶ 2–11; Falaschi Reply Decl. ¶ 2.  Mr. Falaschi is familiar firsthand with the

11   history and administration of the water districts he works with now or has worked with

12   previously.  *See San Luis & Delta-Mendota Water Auth. v. Salazar*, No. 09-407, 2009 WL

13   1516798, *4–5 (E.D. Cal. 2009) (lay witnesses can provide opinions related to their professions

14   and do not require any scientific, technical or other specialized knowledge).  This lay opinion

15   evidence is not scientific or technical in nature, and is admissible.

16               On the other hand, to the extent Mr. Falaschi states that "[e]ssentially all of the

17   commingled drainage water is diverted to the SJRIP . . . ," this is improper as it requires scientific

18   and technical understanding.  Falaschi Decl. ¶ 12.  The court is unpersuaded that a lay person,

19   through his perception alone, can testify whether a large proportion of water from a subsurface

20   drainage system is completely diverted to a certain place.  Plaintiffs' motion to strike is granted in

21   this respect.

22                              c)      Eacock Declaration

23               Lastly, the court reaches the Eacock declaration, provided in support of the federal

24   defendants' opposition.  The court denies plaintiffs' motion as moot, because the court finds

25   Eacock's data on selenium concentration and loads immaterial.  Once again, the amount of

26   selenium is irrelevant because it is not determinative of whether the "return flow" exception

27   applies.

28

1       C.     Late Disclosure of Bond's Expert Opinion

2           Defendants move to strike some or all of the declaration of Steven Bond, Bond

3 Decl., ECF No. 116-2, filed in support of plaintiffs' opposition to defendants' motions.  Mot. to

4 Strike Bond Decl., ECF No. 118 at 1.  Defendants argue Bond's statements are a late disclosure

5 of expert opinion testimony, seek to change previously disclosed opinions, attempt to expand the

6 scope of Mr. Bond's previous reports, and contain legal arguments.  *Id.* at 3.  Plaintiffs contend

7 the Bond declaration merely applies the opinions he had timely disclosed in his prior expert and

8 supplemental expert reports.  Opp'n to Mot. to Strike Bond Decl., ECF No. 121 at 3.

9           Plaintiffs are correct that the information Mr. Bond provides in his reply

10 declaration is based on his previously disclosed expert and supplemental expert reports.  His

11 opinions, evidence, or calculations are based on data contained in the first expert report that was

12 available at the time expert disclosure was required.  *See* ECF No. 104-1; ECF No. 108-1; ECF

13 No. 113-8; ECF No. 116-2.  Defendants did not move to strike the supplemental expert report as

14 untimely.

15           Accordingly, the court overrules defendants' objection to Bond's reply declaration

16 and denies their motion to strike.

17 III.     UNDISPUTED FACTS

18           The Project drains the Grassland Drainage Area (GDA), which comprises 97,400

19 acres on the west side of the San Joaquin Valley.  Stmt. of Undisp. Facts (SUF) No. 1, ECF No.

20 124-1.  The Project is jointly administered by the Bureau and the Authority, and does not have a

21 current NPDES permit.  SUF Nos. 13, 97.  The Project conveys waters from the GDA through the

22 Grassland Bypass Channel (Bypass) to the San Luis Drain and into Mud Slough.  SUF No. 8.

23 Mud Slough is a wetland adjacent to national and state wildlife refuges, and is considered a water

24 of the United States under the Act.  SUF Nos. 9, 67.  Mud Slough then empties into the San

25 Joaquin River, which flows into the Sacramento and the San Joaquin River Delta, and into the

26 San Francisco Bay.  *Id.*  Within the GDA, at least 30,800 acres have subsurface drainage systems.

27 SUF No. 17.  Water within the subsurface drainage systems also flows to the Bypass, and into the

28 San Luis Drain, where it is subsequently discharged into Mud Slough.  SUF No. 18.  The waters

1  discharged into Mud Slough by the Project contain pollutants including selenium, boron, and

2  salts.  SUF No. 65.  Prior to reaching the Bypass, water from the GDA goes through the San

3  Joaquin River Improvement Project (SJRIP), and is reused on parcels of land within the SJRIP.

4  Suppl. Stmt. of Undisp. Facts (Suppl. SUF) No. 18, ECF No. 116-1.  Most of the land used by the

5  SJRIP is within the Mercy Springs Water District.  Suppl. SUF Nos. 9, 18.

6        Outside of the SJRIP, the GDA includes land overseen by various local agencies,

7  including the Charleston Drainage District, the Widren Water District, and the Broadview Water

8  District.  Suppl. SUF No. 1.  The Vega Solar Project occupies part of the Charleston Drainage

9  District, which is a participating member in the Project.  SUF Nos. 100, 101.  The solar

10  installation in the Vega Solar Project was constructed after July 1, 2014.  Falaschi Decl. ¶ 9, ECF

11  No. 115-2.  The land beneath the Vega Solar Project has a subsurface drainage system.  SUF No.

12  105.  Water from this system first enters an onsite sump, into which other nearby subsurface

13  drainage system also discharges, and then all the collected water flows into the Project, and is

14  finally discharged into Mud Slough through the San Luis Drain.  SUF Nos. 105–08.  The land

15  within the Widren and the Broadview Water Districts is retired from agricultural use, and are no

16  longer irrigated.  SUF Nos. 114–15.

17  IV.    LEGAL STANDARD

18        Summary judgment is appropriate where the court is satisfied "that there is no

19  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

20  Fed. R. Civ. P. 56(a).  The "threshold inquiry" is whether "there are any genuine factual issues

21  that properly can be resolved only by a finder of fact because they may reasonably be resolved in

22  favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  When the

23  court looks at the evidence presented by the parties, "[t]he evidence of the non-movant is to be

24  believed, and all justifiable inferences are to be drawn in . . . [the] [non-movant's] favor." *Id.* at

25  255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

26  obligation to produce a factual predicate from which the inference may be drawn. *See*

27  *Mayweathers v. Terhune*, 328 F. Supp. 2d 1086, 1092–93 (E.D. Cal. 2004); *UMG Recordings,*

28  *Inc. v. Sinnott*, 300 F. Supp. 2d 993, 997 (E.D. Cal. 2004).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could do anything but find in his favor. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. *See James River Ins. Co. v. Schenk, P.C.*, 523 F.3d 915, 923 (9th Cir. 2008). If a moving party satisfies this initial burden, the burden then shifts to the non-moving party, who "must establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)). If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

In resolving the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotations omitted). The court, however, is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

/////

/////

9

1   V.      DISCUSSION

2            Before reaching the central claim at issue here, violation of the Act, the court first

3   addresses the threshold issues of standing, necessary party, and what claim or claims remain in

4   light of the 2014 Order.

5            A.      Standing

6            The Authority briefly raises the issue of Article III standing, arguing even if

7   plaintiffs' "interests are harmed by selenium pollution, [p]laintiffs still cannot show any harm

8   caused by the regulation of the Project as a non-point source . . . ." AO at 13.  This argument

9   relies on a mischaracterization of the "injury in fact" requirement in environmental cases.

10           To establish Article III standing, a plaintiff must show that "(1) he or she has

11  suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury

12  is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a

13  favorable court decision." *WildEarth Guardians v. U.S. Dept. of Agric.*, 795 F.3d 1148, 1154

14  (9th Cir. 2015).  The Authority's argument focuses on the second prong of the test.

15           Properly framed, the issue is not whether plaintiffs are harmed by regulation of the

16  Project as a non-point source.  Rather, the issue is whether plaintiffs are harmed by the result of

17  that regulation.  Specifically, are plaintiffs harmed by the discharge of pollutants from the Project

18  if the Project should have been considered a point source, because it falls outside of the

19  regulations' agricultural exemption.  Plaintiffs' declarations show that they and their members use

20  the San Joaquin River, the Bay-Delta, and Mud Slough for commercial and sport fishing,

21  scientific study, boating, kayaking, and other recreational and educational activities.  *See, e.g.*,

22  Jennings Decl. ¶¶ 2–3, 16, ECF No. 112-3; Collins Decl. ¶¶ 2–14, ECF No. 112–4; Stork Decl.

23  ¶¶ 2–13, ECF No. 112-5; Sloan Decl. ¶¶ 2–15, ECF No. 112-6; Smith Decl. ¶¶ 2–12, ECF No.

24  112-7.  Defendants do not dispute that the Project discharges pollutants "known to be harmful to

25  human health and aquatic life at certain volumes and concentrations."  SUMF Nos. 69, 71.  The

26  Act prohibits "the discharge of any pollutant by any person" by the Project into the waters of the

27  United States without a permit issued under the NPDES, unless the Project falls within the

28  agricultural exemption.  *See* 33 U.S.C. §§ 1311(a), 1342(l); *see also* 40 C.F.R. § 122.3.  If the

1   Project does not qualify for the exemption, it cannot discharge any pollutant without an NPDES

2   permit, which both sides agree defendants do not have.  SUMF No. 147.  Plaintiffs will suffer

3   harm caused by the Project's discharge of pollutants if the Project in fact is not exempted.

4          B.      Necessary Party

5              In the 2013 Order, the court indirectly discussed the role of a state agency with

6   respect to deference, but did not explicitly find whether the state agency, in this case the Board, is

7   a necessary party under the Clean Water Act.  2013 Order at 9–10.  For the purpose of

8   clarification, the court now addresses whether the Board as the state agency that administers the

9   NPDES permitting program under the Act is a necessary party to a citizen suit, when that agency

10   has "taken the position for two decades that no NPDES permit is required for the Project's

11   discharge."  AO at 10.

12             The Ninth Circuit has already decided this question in a prior case.  In *Ass'n to*

13   *Protect Hammersley, ELD, & Totten Inlets v. Taylor Res., Inc.*, the defendant argued that because

14   the plaintiff was attempting to overturn the state regulatory agency's decision regarding the

15   necessity of an NPDES permit, that agency was a necessary party to the citizen suit.  299 F.3d

16   1007, 1014 (9th Cir. 2002).  The Ninth Circuit found the state regulatory agency that issues or

17   denies NPDES permits is "not needed at all for federal court relief," because in the state

18   regulatory agency's absence, complete relief can still be accorded to the parties.  *Id.* at 1014–15.

19   Furthermore, the state regulatory agency's absence does not subject the parties to any multiple or

20   inconsistent obligations.  Finally, the general rule is that "federal and state agencies administering

21   federal environmental laws are not necessary parties in citizen suits to enforce the federal

22   environmental laws."  *Id.* at 1014 (citations omitted).  This rule aligns with the principle behind

23   the provision for citizen suits in the Clean Water Act; when a citizen is seeking to enforce the

24   requirements of the Clean Water Act, "it is the government agency's alleged failure to act that

25   'brings the citizen suit into play.'"  *Id.* (citing *Friends of Earth v. Carey*, 535 F.2d 165, 173 (2d

26   Cir. 1976)).

27   /////

28   /////

11

1          The Authority relies on a district court case as support for its position.  AO at 11

2   (quoting *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, No. 10-121, 2013 U.S. Dist. LEXIS

3   42179, *12–17 (N.D. Cal. 2013)).  But that case is distinguishable from this case and

4   *Hammersley*.  Here, unlike in *Ecological Rights*, plaintiffs are not arguing the EPA or the Board

5   should revise their interpretations of the Act and their implementation of the regulations.

6   Plaintiffs argue instead that defendants are violating the Clean Water Act by discharging

7   pollutants without an NPDES permit and the Project does not fall under the irrigation return flow

8   exemption.  The distinction may seem minor, as the plaintiffs in *Ecological Rights* also "styled

9   [the] action [as one] to force [the defendant] to obtain NPDES permits."  *Ecological Rights*, 2013

10  U.S. Dist. LEXIS 42179, *16–17.  But the plaintiff in that case conceded that under EPA's

11  interpretation of the Act and its regulations, no permit would be required, and argued instead that

12  the Board had adopted a broader approach than the EPA.  *Id.* at 13–14.  Here, as opposed to

13  challenging the Board's interpretation and implementation of the regulations, plaintiffs claim

14  discharges from the Project violate the Act.

15          As this court previously has observed, citing *Hammersley*, "neither the EPA nor an

16  authorized state agency has exclusive authority to determine whether a discharge violates the

17  [Act]."  2013 Order at 10.  "Both entity's positions will be carefully considered and assigned

18  weight according to their persuasiveness," *id.*, but simply because the state regulatory agency is

19  not a party to this case does not render the court's opinion advisory.  The court next considers

20  whether plaintiffs have standing.

21          C.     Claims Remaining

22          In defendants' oppositions, they argue plaintiffs' motion for summary judgment

23  raises arguments that go beyond the parameters set by the First Amended Complaint.  Fed. Defs.'

24  Opp'n at 13; Authority's Opp'n at 1–2.  In the 2014 Order, the court found that the only issue

25  remaining based on plaintiffs' Clean Water Act claim is whether the Project is exempt from the

26  NPDES permit requirement as covered by the "return flow from irrigated agriculture" exemption.

27  2014 Order at 6–7.  The court interpreted the exemption to exclude additional discharges

28  unrelated to crop production.  *Id.* at 7.  The court found plausible the allegation that groundwater

1    from retired parcels of land is unrelated to crop production, but struck the balance of the

2    allegations in the First Amended Complaint, finding they did not state a plausible claim for relief.

3    *Id.* at 7–8.  The court's 2013 Order dispensed with conclusory allegations that the Project

4    "necessary discharges polluted groundwater along with irrigation water."  Given that no  second

5    amended complaint was filed after the court issued the 2014 Order, the First Amended Complaint

6    must be read in light of that order.  The 2014 Order had the effect of eliminating plaintiffs'

7    allegation in the First Amended Complaint that the Project violated the Act by discharging

8    polluted groundwater with contaminated groundwater that pre-dates all farming in the area.  The

9    2014 Order also eliminated plaintiffs' allegations that contaminated groundwater discharged at

10   certain times, such as fall and winter months when little or no irrigation occurs, and whose source

11   is not irrigation water, is not related to irrigated agriculture.

12          The Authority argues the court had previously rejected plaintiffs' contention that

13   any commingling of any water not used for irrigated agriculture would result in discharges not

14   consisting entirely of irrigation return flow, and objects to plaintiffs' now advancing theories

15   premised on (1) discharges of water from "land that is used for public infrastructure, businesses,

16   and residences, among other uses," (2) discharge of "deep groundwater" that flows into the

17   subsurface drainage system regardless of irrigation, (3) discharge of stormwater runoff, and (4)

18   seepage into the San Luis Drain and the sediment contained therein.  AO at 2–3.

19          When "the complaint does not include the necessary factual allegations to state a

20   claim, raising such claim in a summary judgment motion is insufficient to present the claim to the

21   district court."  *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008).  A

22   motion for summary judgment "is not a procedural second chance to flesh out inadequate

23   pleadings."  *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006)

24   (internal quotations and citation omitted).  The Authority is correct that the first, third, and fourth

25   theories identified in the previous paragraph fall outside the operative allegations in the First

26   Amended Complaint.  Nothing remains of these claims in the First Amended Complaint

27   following the court's order.  Accordingly, plaintiffs' arguments based on discharges from

28   highways, residences, seepage into the San Luis Drain from adjacent lands, and sediments from

13

1    within the San Luis Drain are stricken.[1]  The third theory of discharge of stormwater runoff not

2    only falls outside the operative allegations in the First Amended Complaint, but is also

3    unsupported by case law.  Allegations of "generalized stormwater runoff do not establish a 'point

4    source' discharge absent an allegation that the stormwater is discretely collected and conveyed to

5    waters of the United States." *Ecological Rights Found. v. Pac. Gas and Elec. Co.*, 713 F.3d 502,

6    509 (9th Cir. 2013).  Accordingly, only the claim based on discharge of groundwater that flows

7    into the San Luis Drain, regardless of irrigation, remains.

8            D.    Clean Water Act

9            With the clarification made above, the court reaches the merits of the cross-

10   motions to the extent they raise arguments framed by the pleadings.  The question the court must

11   answer is whether defendants violated the Act in their administration of the Project by

12   discharging pollutants into the waters of the United States without an NPDES permit.

13           As noted above, the Act prohibits the discharge of pollutants into the waters of the

14   United States without an NPDES permit issued by the EPA or a state under section 402 of the

15   Act, 33 U.S.C. § 1342.  *See also* 33 U.S.C. § 1311(a).  In California, the Porter-Cologne Water

16   Quality Control Act of 1969 (Porter-Cologne) implements the NPDES permitting program and

17   regulates exempt discharges.  Volker Decl., Ex. 4 (Project FEIS/FEIR) at 4-6.  For a plaintiff to

18   succeed on a claim under the Act, she must show a defendant (1) discharged (2) a pollutant

19   (3) into a navigable water (4) from a point source (5) without a permit.  *See Comm. to Save*

20   *Mokelumne R. v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993).  The issue in this

21   case is whether the Act's "return flow from irrigated agriculture" exemption applies.  33 U.S.C.

22   § 1342(l); 40 C.F.R. § 122.3.  As the court stated above, the Act explicitly excludes "return flow

23   from irrigated agriculture" from the definition of a "point source."  33 U.S.C. § 1362(14).

24   _____

25           [1] Even if not stricken, plaintiffs' arguments based on their lumping together of discharges
     from highways, residences, and other non-irrigated lands to Mud Slough would not survive a
26   motion for summary judgment.  The burden of proof lies with plaintiffs to show defendants
     violated the Act.  Generalized statements that the lands adjacent to the San Luis Drain are non-
27   irrigated and do not fall under the exemption at issue, unsupported by evidence, are not sufficient
     to affirmatively demonstrate that no reasonable trier of fact could find other than for plaintiffs.
28   *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

1    The parties dispute only the fourth element of plaintiffs Clean Water Act claim:

2  whether the Project is a point source or not.  2014 Order at 6–7.  They essentially agree if the

3  "return flow from irrigated agriculture" exemption applies to the Project then the Project is not a

4  point source.  *See generally* FDM at 5–6; AM at 12–14; PM at 8–12.

5              1.    Exemption of Return Flow from Irrigated Agriculture

6                 a)    Review of Prior Statutory Interpretation

7    As indicated in the court's prior orders, application of the return flow exemption is

8  not a simple matter.  Plaintiffs and defendants dispute the proportion of additional discharges

9  unrelated to crop production needed to qualify the Project's discharges for the agricultural

10  exemption.  Plaintiffs argue any non-agricultural discharges, or at most "substantial" non-

11  agricultural discharges, are enough.  *See, e.g.*, POFD at 3; POA at 1 & 3.  Defendants contend

12  that non-agricultural discharges must make up a majority of the total discharges before an

13  NPDES permit is required.  *See, e.g.*, FDM at 7; AM at 10.

14    In its 2013 Order, this court engaged in a thorough statutory interpretation, starting

15  with the plain language and reviewing the legislative history of the statute.  2013 Order at 11–25.

16  At that point, plaintiffs had argued that "entirely" denotes the meaning of "wholly, completely,

17  fully" or "exclusively, solely."  *Id.* at 20.  This interpretation, if taken to its logical conclusion,

18  would lead to an absurd result: the Project would not be covered by the exemption if even a single

19  drop of discharge was unrelated to crop production.  *See id.* at 20.

20    In interpreting the statute, the court looked to both "the specific context in which

21  that language is used and the broader context of the statute as a whole."  *Robinson v. Shell Oil*

22  *Co.*, 519 U.S. 337, 341 (1997).  The court, in applying its interpretation of the exemption in a

23  later order observed, "[t]he general purpose of the [Act] is to 'restore and maintain the chemical,

24  physical, and biological integrity of the Nation's waters.'"  2014 Order at 6 (citing 33 U.S.C.

25  § 1251(a)).  "'Claims of exemption, from the jurisdiction or permitting requirements, of the

26  [Act]'s broad pollution prevention mandate must be narrowly construed to achieve' this purpose."

27  *Id.* (citing *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 1001 (9th Cir. 2007)).  The

28  Senate Report, as noted by the 2014 Order, provided that "the word 'entirely' was intended to

15

1   limit the exception to only those flows which do not contain additional discharges from activities

2   unrelated to crop production." *Id.* (citing S. Rep. No. 95-370, *reprinted in* 1977 U.S.C.C.A.N.

3   4326, 4360).  On the other hand, the exemption was created, at least in part, to "level the playing

4   field between farmers who rely on irrigation and those who do not." *Id.*

5           The meaning of the word "entirely" is not the subject of any Ninth Circuit opinion

6   and has not been addressed by a majority of the circuits.  *See* 2013 Order at 25.  The only circuit

7   that has applied the exemption, the Eleventh, has done so by identifying the source of the

8   pollutants to categorize the discharges as agricultural or not.  *See id.* (citing *Fishermen Against*

9   *Destruction of Environment, Inc. v. Closter Farms, Inc.*, 300 F.3d 1294, 1297–98 (11th Cir.

10   2002)).  Yet, identifying or defining the source, as this court previously has stated, is not the be-

11   all and end-all of the application of the "return flow" exemption.  2014 Order at 8.  In other

12   words, the court cannot simply decide whether the source was original rainfall or agricultural

13   irrigation.  A focus on the source, while adhering to the rule of narrowly construing the Act's

14   exemptions, would neglect the *raison d'être* of the "return flow" exemption: to level the playing

15   field between farmers relying on irrigation and those who do not.  Applying the exemption,

16   therefore, as the court previously determined, requires an inquiry "into whether a majority of the

17   total commingled discharge is in fact related to crop production." *Id.*

18           b)     Application of the Exemption

19           The plaintiffs argue the agricultural runoff exemption cannot apply because the

20   groundwater in this case is discharged into the waters of the United States from non-irrigated

21   lands unrelated to crop production.

22           The parties' motions focus on non-irrigated lands in four different water/drainage

23   districts within the Project: (a) Charleston Drainage District, (b) Widren Water District, (c)

24   Broadview Water District, and (d) Mercy Springs Water District.

25           (1)     Charleston Drainage District

26           The Charleston Drainage District includes the Vega Solar Project.  As a threshold

27   matter, the court finds the Vega Solar Project is within the parameters set by the First Amended

28   Complaint to the extent still operative.

1          The Authority argues, to the contrary, that at the time plaintiffs filed the First

2    Amended Complaint on October 7, 2013, the Vega Solar Project had not been retired from

3    farming yet.  AO at 6 n.3.  While it is undisputed that by July 2014 irrigation of the Vega Solar

4    Project land had ceased,. SUMF No. 104, the court finds there is a genuine dispute whether the

5    land was irrigated prior to that date.  *See* Volker Decl., Ex. 38, ECF No. 113-38 at 6; Falaschi

6    Decl. ¶¶ 4–7.

7          Upon a careful review of the record, the court also finds there is a genuine dispute

8    of material fact with respect to whether any pollutant from the subsurface drainage systems

9    beneath the Vega Solar Project originated from the Vega Projector from adjoining lands.  The

10   federal defendants argue discharges from Vega are not substantial or a majority of the total

11   discharges from the Project.  FDM at 10–12.  The Authority, on the other hand, argues the Vega

12   Solar Project is no longer irrigated and thus does not discharge into the subsurface drainage

13   systems.  AM at 17.  Instead, it says, the subsurface drainage system beneath the Vega Solar

14   Project carries water from nearby irrigated land.  *Id.*; *see also* Buescher Decl., Ex. N (illustrating

15   the extension of the subsurface drainage system into lands outside of the Vega Solar Project).

16   Plaintiffs contend the discharges originate from non-agricultural land.  PM at 12–13; POA at 3;

17   *see also* Bond Supp. Report at 4.  Specifically plaintiffs argue high concentrations of selenium, a

18   pollutant, were found in shallow groundwater on the site of the Vega Solar Project.  Bond Expert

19   Report at 5; *see also id.* at 3.  Shallow groundwater flows into the subsurface drainage system and

20   into the San Luis Drain, which ultimately flows into the San Joaquin River from Mud Slough.  *Id.*

21   A genuine material issue of fact exists, as a reasonable juror could find for any party.  Defendants

22   have provided sufficient evidence to raise an inference that the subsurface drainage system

23   beneath the Vega Solar Project carries water from agricultural activities.  Plaintiffs also have

24   provided sufficient evidence to raise an inference that discharges underneath the Vega Project

25   originate from the solar project itself, as opposed to other nearby agricultural lands.

26          The court also finds that no party has established beyond dispute that the SJRIP

27   captures all discharges from the Vega Solar Project.  Conclusory, unsupported statements that

28   "essentially all of the drainage water collected from the [Project] is conveyed . . . [to] the

17

1    Project's reuse area, known as the [SJRIP]," McGahan Decl. ¶ 20, are insufficient.  Because no

2    party has shown whether discharges from the Vega Solar Project were collected at the SJRIP, the

3    court need not reach the question of whether the discharges collected at the SJRIP were reused for

4    agricultural activities.

5              Lastly, plaintiffs' expert opines that while the contribution of the Vega Solar

6    Project, by itself, is very small in comparison to the discharges from the entire project, Bond Dep.

7    at 193:21–24, it is possible for a rational trier of fact to find that all discharges from non-irrigated

8    lands make up a majority of the discharges from the Project.

9              The cross-motions for summary judgment by plaintiffs and defendants are denied

10   with respect to the Charleston Drainage District, specifically the Vega Solar Project.

11                        (2)      Widren Water District

12             The court next considers discharges from the Widren Water District.  Defendants

13   move for summary judgment with respect to discharges from this water district.  FDM at 10; AM

14   at 16–17.  Plaintiffs first argue that it is "unclear whether Widren [Water] District lands are

15   irrigated or not."  PM at 16.  Subsequently, in opposition to the Authority's motion, plaintiffs

16   argue they have shown Widren discharges into the San Luis Drain and Mud Slough.  POA at 13–

17   14 (citing Bond Decl. in Support of Opp'n ¶ 15, ECF No. 116-2).  However, plaintiffs make only

18   general statements that Widren Water District is retired, "the San Luis Drain collects selenium

19   contaminated drainwater from approximately 130 miles of unlined ditches and other

20   conveyances, many of which drain non-irrigated land such as highways, residences, and wetland

21   areas;" and "[o]f the 97,400-acre GDA, over 66,000 acres are without any subsurface tile

22   drainage."  Bond Decl. in Support of Opp'n ¶ 15.  General statements such as these, without

23   more, do not show indisputably that non-agricultural discharges come from any particular water

24   district much less the Widren Water District.

25             Accordingly, defendants' motion for summary judgment is granted with respect to

26   the Widren Water District.

27

28

1          (3)      Broadview Water District

2          Plaintiffs contend the Broadview Water District has been retired.  PM at 16.

3   Federal defendants argue the Broadview Water District does not contribute any discharge to the

4   Project.  FDM at 9–10.  The Authority argues the Broadview Water District has withdrawn from

5   formal participation in the Project and no longer discharges into the Project.  AM at 17.  Though

6   plaintiffs contend Broadview contributed non-agricultural discharges to the Project and ultimately

7   into Mud Slough, plaintiffs' own expert says the Broadview district lands are too far away to be

8   relevant to the question of the applicability of the "return flow" exemption here.  Bond Dep. at

9   122:20–24.  The lands in the Broadview Water District may have been retired; however, as with

10  the Widren Water District, plaintiffs have not established this district is the source of pollutants.

11         Defendants' motion for summary judgment is granted with respect to the

12  Broadview Water District.

13         (4)      Mercy Springs Water District

14         Defendants argue the lands in the Mercy Springs Water District are irrigated and

15  farmed as part of the SJRIP reuse area.  AM at 17–18 (citing McGahan Decl. ¶ 18–23); FDM at 9

16  n.8.  Plaintiffs do not oppose this argument or otherwise provide any evidence to show there is a

17  genuine dispute of material fact with respect to the lands in the Mercy Springs Water District as a

18  source of pollutants and non-agricultural discharges.

19         Defendants' motion for summary judgment is granted with respect to Mercy

20  Springs Water District.

21  VI.    CONCLUSION

22         Plaintiffs' motions to strike the McGahan and Falaschi declarations are

23  GRANTED in part and DENIED in part.  Plaintiffs' motion to strike the Eacock declaration is

24  DENIED.  Defendants' motion to strike the Bond declaration filed in support of plaintiffs'

25  opposition to the Authority's summary judgment is DENIED.

26         Plaintiffs' motion for summary judgment is DENIED.  The motions for summary

27  judgment by defendants with respect to the Charleston Drainage District, specifically the Vega

28

19

1    Solar Project, are DENIED.  The balance of defendants' motions for summary judgment is

2    GRANTED.

3             As previously ordered by the court, the parties shall file a pretrial conference

4    statement with a schedule and plan to resolve the remaining issues **within thirty (30) days** of the

5    filed date of this order.  Scheduling Order, ECF No. 100.  A final pretrial conference is set for

6    **October 7, 2016** at 10:00 a.m. in Courtroom No. 3.

7             This order resolves ECF Nos. 109, 111, 112, 118, 126, 127, 128.

8             IT IS SO ORDERED.

9   DATED:  September 2, 2016.

10

11

12                             UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28