1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PACIFIC COAST FEDERATION OF              No.  2:11-cv-02980-DAD-CKD
     FISHERMEN'S ASSOCIATIONS, et al.,
12
                   Plaintiffs,
13                                            ORDER DENYING PLAINTIFFS' MOTION
            v.                                FOR SUMMARY JUDGMENT AND
14                                            GRANTING IN PART AND DENYING IN
     ERNEST A. CONANT, et al.,                PART DEFENDANTS' MOTIONS FOR
15                                            SUMMARY JUDGMENT
                   Defendants,
16                                            (Doc. Nos. 219, 221, 226)
            and
17
     GRASSLAND WATER DISTRICT,
18
                   Intervenor Defendant.
19

20          This matter came before the court on January 31, 2023 for a hearing on three motions for

21   summary judgment.  The first motion was filed on behalf of defendants Ernest A. Conant (the

22   Regional Director of the U.S. Bureau of Reclamation),[1] and the U.S. Bureau of Reclamation

23   (together, "federal defendants").  (Doc. No. 219.)  The second motion was filed on behalf of

24   defendant San Luis & Delta-Mendota Water Authority ("the Authority") and intervenor defendant

---

[1]  Under Federal Rule of Civil Procedure 25(d), when a public official who has been sued in their
official capacity ceases to hold office while the action is pending, the public officer's successor is
automatically substituted as a party.  Thus, although the docket states that Donald R. Glaser is the
Regional Director of the U.S. Bureau of Reclamation, the court will direct the Clerk of the Court
to update the docket to reflect that Ernest A. Conant has been substituted as the current holder of
the position of Regional Director of the U.S. Bureau of Reclamation.  (Doc. No. 220 at 1 n.1.)

1   Grassland Water District (together, "local defendants").  (Doc. No. 221.)  The third motion was

2   filed on behalf of plaintiffs:  the Pacific Coast Federation of Fishermen's Associations, the

3   California Sportfishing Protection Alliance, Friends of the River, San Francisco Crab Boat

4   Owners Association, the Institute for Fisheries Resources, and Felix Smith (collectively,

5   "plaintiffs").  (Doc. No. 226.)  At the hearing, attorney Stephan Volker appeared on behalf of

6   plaintiffs; attorney Martin McDermott appeared on behalf of federal defendants; and attorneys

7   Julie Fieber, Ellen Wehr, and Diane Rathmann appeared on behalf of local defendants.  For the

8   reasons explained below, plaintiffs' motion for summary judgment will be denied; local

9   defendants' motion for summary judgment will be granted in part and denied in part; and federal

10  defendants' motion for summary judgment will be granted in part.

11                                      **BACKGROUND**

12         This case arises from a water project in California's Central Valley that collects water

13  used to irrigate agricultural land through an underground capture system and then moves the

14  collected drainage water through a concrete-lined conveyance for many miles before it dispenses

15  into a wetland.

16         "Irrigation and drainage are inherently linked.  Any water project that brings fresh water

17  to an agricultural area must take the salty water remaining after the crops have been irrigated

18  away from the service area."  *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 571 (9th Cir.

19  2000).  "Otherwise, irrigating the selenium and salt-rich soils causes pollutants to leach into

20  groundwater."  *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1080 (9th Cir.

21  2019).  The Grasslands Bypass Project ("Project")—the subject of this litigation—was created for

22  this purpose.  *Id.*  The Project, which is jointly administered by defendants, "is a tile drainage

23  system that consists of a network of perforated drain laterals underlying farmlands in California's

24  Central Valley that catch irrigated water and direct[s] it to surrounding waters."  *Id.* (internal

25  quotations omitted).

26         In this action, plaintiffs allege that defendants are discharging pollutants through the

27  Project that end up in the San Joaquin River and ultimately the San Francisco Bay Delta without

28  complying with the permit requirements under the Federal Water Pollution Control Act, 33

                                            2

1   U.S.C. §§ 1251, *et seq.* ("Clean Water Act" or "the Act").  (Doc. No. 71 at ¶¶ 1–3.)  To remedy

2   this alleged violation, plaintiffs seek orders from this court declaring that defendants have failed

3   to comply with the Act's permitting system; granting injunctive relief requiring defendants'

4   compliance with the Act; imposing civil penalties pursuant to the Act; and an award of costs,

5   attorneys' fees, and expert fees.  (*Id.* at ¶ 3.)

6   **A.     Undisputed Facts[2]**

7       The Project drains the Grassland Drainage Area ("Drainage Area").  (Doc. No. 228-1 at

8   ¶ 1.)  The Drainage Area includes approximately 97,400 acres located in Merced and Fresno

9   counties on the west side of the San Joaquin River within the Delta-Mendota sub-basin of the San

10  Joaquin Valley.  (*Id.*)  At least 30,800 acres within the Drainage Area have subsurface

11  agricultural tile drainage systems.  (*Id.* at ¶ 3.)  Water that is collected through the subsurface tile

12  drains in the Drainage Area is conveyed through the Grassland Bypass Channel ("Bypass"), then

13  into the San Luis Drain ("Drain"), where it travels 27 miles until it ultimately flows into a

14  wetland referred to as "Mud Slough."  (*Id.* at ¶¶ 2, 3.)  Mud Slough is a wetland adjacent to

15  national and state wildlife refuges and is a water of the United States.  (Doc. No. 229-2 at ¶¶ 9,

16  67.)  Mud Slough empties into the San Joaquin River, which, in turn, flows into the Sacramento-

17  San Joaquin River Delta, and ultimately into the San Francisco Bay.  (*Id.* at ¶ 8.)  The water

18
19  [2]  As an initial matter, in plaintiffs' response to local defendants' statement of undisputed facts
    (which federal defendants joined), plaintiffs purport to dispute nearly all of the facts put forth by
20  defendants in that statement.  (*See* Doc. Nos. 220 at 6; 228-1.)  In several instances (e.g., Doc.
    No. 228-1 at ¶¶ 17, 26, 32, 37, 38), plaintiffs purport to dispute a fact without citing any evidence
21  at all, thereby failing to satisfy the requirements of Federal Rule of Civil Procedure 56(c).  In
    even more instances (e.g., Doc. No. 228-1 at ¶¶ 6, 23, 27, 44), the evidence cited by plaintiffs is
22  not "sufficiently specific from which to draw reasonable inferences about other material facts" or
    fails to constitute "significantly probative evidence tending to" dispute the particular fact asserted.
23  *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221–22 (9th Cir. 1995); *see also Anderson*
    *v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) ("If evidence is merely colorable or is not
24  significantly probative, summary judgment may be granted.") (internal citations omitted).
    Frequently, plaintiffs put forth two different, lengthy string citations of evidence to dispute facts
25  throughout their response to defendants' statement of undisputed facts, but those string citations
    often fail to address the particular fact at issue.  (*See, e.g.*, Doc. No. 228-1 at ¶¶ 6, 11, 22, 23, 25,
26  35, 36.)  In other instances, the court has narrowed a fact asserted to the portion that is
    undisputed.  (*See, e.g.*, *id.* at ¶¶ 46, 47.)  The court has closely scrutinized the evidence put forth
27  by defendants and plaintiffs for genuine disputes and thus finds the following facts used in this
    order are undisputed unless otherwise noted.
28

3

1   conveyed from the Drainage Area and into Mud Slough contains pollutants, such as selenium and

2   salt, that are naturally present in the area soils.  (Doc. Nos. 228-1 at ¶ 2; 229-2 at ¶ 65.)  The

3   Project does not have a National Pollutant Discharge Elimination System ("NPDES") permit.

4   (Doc. No. 229-2 at ¶ 97); *see also Env't Def. Ctr., Inc. v. U.S. E.P.A.*, 344 F.3d 832, 841 (9th Cir.

5   2003) (noting that NPDES permit are issued under the Act and require "dischargers to comply

6   with technology-based pollution limitations").

7          The land in the Drainage Area consists of active farmland, retired farmland, and non-

8   irrigable land used for public infrastructure, businesses, and residences (among other uses);

9   however, there are no lands within the Drainage Area that have never been irrigated.  (Doc. Nos.

10  228-1 at ¶ 6; 229-1 at ¶ 119.)  For example, the Vega Solar Project—completed in the summer of

11  2015—sits upon 139 acres[3] of retired farmland within the Drainage Area that had previously been

12  irrigated until 2014.  (Doc. No. 228-1 at ¶ 15.)  The tile drains beneath the Vega Solar Project are

13  eight feet below the surface and also serve surrounding farmland.  (*Id.*)  This is representative of

14  how the tile drains operate more generally; the drains are not limited to particular fields but

15  extend across multiple fields, land use types, and land ownerships and collect all of the captured

16  water into common sumps.  (Doc. Nos. 228-1 at ¶¶ 3, 16; 229-2 at ¶ 121.)  After the collected

17  water leaves the Drainage Area, there are no sumps, pumps, culverts, pipes, or similar facilities

18  that discharge surface water to the Drain.  (Doc. No. 228-1 at ¶ 23.)

19         The 27-mile-long Drain is a concrete lined canal that was intentionally designed with

20  "weep" holes or valves on its bottom surface to alleviate below-ground hydrostatic pressure that

21  would otherwise damage or destroy it by popping up or cracking the concrete lining.  (*Id.* at ¶ 34.)

22  The more-than-50-year-old Drain also has areas where the concrete lining is cracked or buckled

23  thereby allowing additional interface with the surrounding groundwater table.  (*Id.*)  Typically,

24  seepage of groundwater travels into the Drain in the winter when the groundwater table is high,

25  and out of the Drain in the summer when the groundwater table is low.  (*Id.* at ¶ 27.)  This

26  _____

27  [3]  Although plaintiffs fully admit this fact, in another portion of their response to defendants'
    statement of undisputed facts, plaintiffs contend that the Vega Solar Project occupies 178.3 acres

28  of retired farmland.  (Doc. No. 228-1 at ¶ 6.)  The court notes this potential dispute but does not
    find that it is material for purposes of resolving the pending motions.

4

groundwater seepage into the Drain is the result of passive groundwater flow.  (*Id.*)  Groundwater seepage also is not unique to the Drain.  Most agricultural drainage channels are built into the ground and, whether concrete lined or not, have some interface with the groundwater table via seepage.  (*Id.* at ¶¶ 26, 38.)  In other words, seepage is inevitable for agricultural drains.  (*Id.* at ¶ 26.)  Most importantly, none of the seepage into the Drain comes from adjacent industrial activities, nor does it contain pollution from industrial dischargers.  (*Id.* at ¶ 32.)  Between 1997 and 2015, seepage into the Drain accounted for some of the selenium pollution in the Drain.  (*Id.* at ¶ 29.)  In addition to seepage, the Drain also has been accumulating sediments since it was originally constructed.  (Doc. No. 229-2 at ¶ 38.)  These sediments come from dust, wind-blown plant debris, algae, cattails, and suspend sediments in the return flows.  (*Id.*)  This sediment is periodically removed from the Drain.  (Doc. No. 228-1 at ¶ 48.)

**B.      Procedural Background**

Plaintiffs initiated this action pursuant to the citizen suit enforcement provision of the Act on November 9, 2011.  (Doc. Nos. 1, 2.)  On September 16, 2013, following cross-motions for judgment on the pleadings by federal defendants and plaintiffs, the court dismissed plaintiffs' complaint with leave to amend.  (Doc. No. 70.)  On October 7, 2013, plaintiffs filed the operative first amended complaint ("FAC").  (Doc. No. 71.)  The FAC asserts a single claim for relief alleging violation of the Act based on several theories of liability.  (*Id.* at ¶ 41.)

Shortly thereafter, federal defendants and the Authority each filed a motion to dismiss plaintiffs' FAC and the court granted those motions, in part, on March 28, 2014.  (Doc. No. 87.)  Specifically, the court found that plaintiffs had pled sufficient facts to state a claim for a violation of the Act based on the allegation that the Project operated by defendants collects and discharges a substantial quantity of contaminated groundwater from fallow land, which is land retired from agricultural use.  (Doc. No. 87 at 7.)  However, the court struck all remaining allegations in the FAC that pertained to plaintiffs' other theories of liability.  (Doc. Nos. 87 at 8; 138 at 13.)

On October 16, 2015, the parties filed cross-motions for summary judgment.  (Doc. Nos. 109, 111, 112.)  On September 2, 2016, the court issued an order denying plaintiffs' motion for summary judgment and granting in part defendants' motions for summary judgment.  (Doc. No.

1  138.)  The court also denied subsequent motions by plaintiffs to amend their FAC and for

2  reconsideration of its order ruling on the summary judgment motions.  (Doc. Nos. 162, 175).  On

3  August 31, 2017, plaintiffs dismissed their only remaining theory of liability before trial because

4  plaintiffs conceded that as a result of the court's rulings they were "unlikely to succeed" on that

5  claim at trial.  (Doc. No. 182 at 3.)  Once judgment was entered, plaintiffs filed a notice of appeal

6  to the Ninth Circuit on October 18, 2017.  (Doc. No. 184.)

7        A little less than two years later, on September 9, 2019, the Ninth Circuit issued a decision

8  reversing this district court's order on summary judgment and remanding the case back to this

9  court.  (Doc. Nos. 188, 189, 190.)  The Ninth Circuit held that this district court had erred, in part,

10  in its interpretation of an exception to the Act's NPDES permitting requirement "for discharges

11  composed entirely of return flows from irrigated agriculture."  (Doc. No. 190 at 10–17) (quoting

12  33 U.S.C. § 1342(l)(1)).  The Ninth Circuit also disagreed with this court's decision to strike

13  plaintiffs' alternative theories of liability.  (*Id.* at 19–20.)  The Ninth Circuit found that this court

14  had erred "by striking [plaintiffs'] theories of liability 'based on discharges from highways,

15  residences, seepage into the [Drain] from adjacent lands, and sediments from within the [Drain]'

16  from Plaintiffs' motion for summary judgment" because those claims were in fact encompassed

17  by the allegations in the FAC under Federal Rule of Civil Procedure 8's pleading standard.  (*Id.* at

18  19.)  As a result, the Ninth Circuit remanded these stricken claims along with an additional claim

19  that plaintiffs had voluntarily dismissed—regarding the Vega Solar Project—to be reconsidered

20  by this court under the correct interpretation of § 1342(l)(1).  (*Id.* & n.3.)

21        In this court's first post-remand order, on April 7, 2020, the court authorized a discovery

22  plan in anticipation of the parties "re-litigating the original summary judgment motions" and

23  limiting discovery to the time period of September 10, 2006 to July 31, 2015.  (Doc. No. 197 at

24  2.)  Several months later, on October 13, 2020, the court granted Grassland Water District's

25  motion to intervene as a defendant in this action.  (Doc. No. 204.)

26        Finally, on March 3, 2022, federal defendants and local defendants each filed their own

27  motions for summary judgment.  (Doc. Nos. 219, 221.)  On May 27, 2022, plaintiffs separately

28  filed a motion for summary judgment and a single opposition addressing both of the two pending

1   motions for summary judgment filed on behalf of the defendants.  (Doc. Nos. 226, 228.)  On July

2   22, 2022, federal defendants and local defendants each filed their own briefs that served both as

3   oppositions to plaintiffs' pending motion for summary judgment and replies in support of their

4   own pending motions.  (Doc. Nos. 229, 230.)  On September 9, 2022, plaintiffs filed two separate

5   reply briefs thereto.  (Doc. Nos. 236, 237.)  After this case was reassigned to the undersigned on

6   August 25, 2022, the hearing on the pending cross-motions for summary judgment was specially

7   set for January 31, 2023.  (*See* Doc. Nos. 232, 239).

8                                              **LEGAL STANDARD**

9            Summary judgment is appropriate when the moving party "shows that there is no genuine

10   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

11   Civ. P. 56(a).

12            In summary judgment practice, the moving party "initially bears the burden of proving the

13   absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

14   (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

15   may accomplish this by "citing to particular parts of materials in the record, including

16   depositions, documents, electronically stored information, affidavits or declarations, stipulations

17   (including those made for purposes of the motion only), admissions, interrogatory answers, or

18   other materials," or by showing that such materials "do not establish the absence or presence of a

19   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

20   Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial,

21   "the moving party need only prove that there is an absence of evidence to support the non-moving

22   party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R.

23   Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate time for

24   discovery and upon motion, against a party who fails to make a showing sufficient to establish the

25   existence of an element essential to that party's case, and on which that party will bear the burden

26   of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an

27   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

28   *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as

whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party, *see Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs. Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). To demonstrate a genuine issue, the opposing party "must do more than

8

1    simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

2    taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

3    'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

4            Finally, where, as here, "parties submit cross-motions for summary judgment, '[e]ach

5    motion must be considered on its own merits.'"  *Fair Hous. Council of Riverside Cnty., Inc. v.*

6    *Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citation omitted); *see also Tulalip Tribes of*

7    *Wash. v. Wash.*, 783 F.3d 1151, 1156 (9th Cir. 2015).  "In fulfilling its duty to review each cross-

8    motion separately, the court must review the evidence submitted in support of each cross-

9    motion."  *Riverside Two*, 249 F.3d at 1136.  The parties' assertions that there are no disputed

10   issues "does not vitiate the court's responsibility to determine whether disputed issues of material

11   fact are present.  A summary judgment cannot be granted if a genuine issue as to any material fact

12   exists."  *Id.* (quoting *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978)).

13                                            **ANALYSIS**

14           The court will first address local defendants' challenge to plaintiffs' Article III standing to

15   maintain this action.  The court will then turn to the merits of plaintiffs' Clean Water Act claim.

16   **A.      Standing**

17           To establish Article III standing, "plaintiff must have (1) suffered an injury in fact, (2) that

18   is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

19   by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see also*

20   *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc).  The

21   redressability prong requires that plaintiff to show that the relief sought is both substantially

22   likely to redress the claimed injuries and within the district court's power to award.  *See Juliana*

23   *v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020).  "[A] plaintiff must demonstrate standing

24   separately for each form of relief sought."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*

25   *(TOC), Inc.*, 528 U.S. 167, 185 (2000); *see also Bates*, 511 F.3d at 985.

26           Local defendants argue that plaintiffs have not satisfied the redressability requirement of

27   Article III standing.  (Doc. No. 221-1 at 10–11.)  Specifically, local defendants contend that the

28   Project is regulated under a "waste discharge requirement order ('WDR') issued by the State of

                                                    9

1   California pursuant to the [Act]," and due to the WDR, an order by this court "[r]equiring an

2   NPDES permit would achieve nothing more" than what the WDR already achieves. (*Id.* at 6–7,

3   11.)  Local defendants also maintain that under a use agreement governing the operations of the

4   Project, "all agricultural related subsurface discharges through the Drain terminated December

5   31, 2019" and "since April 2015, all discharges into the Drain have been limited to those related

6   to storm events." (*Id.* at 11.)  Thus, local defendants maintain that plaintiffs' claim is now

7   "moot." (Doc. No. 229 at 9.)

8          The court is unpersuaded and finds that local defendants' argument in this regard is

9   unavailing for several reasons.  First, even with the cessation of "all agricultural related

10   subsurface discharges," local defendants do not contend that *all* discharges into the Drain have

11   ceased dispensing into Mud Slough.  Yet, plaintiffs seek an order requiring that an NPDES permit

12   be obtained for any discharge from the Drain into Mud Slough, i.e., the bases underlying

13   plaintiffs' allegation that the Act is being violated do not depend on the discharge into Mud

14   Slough containing "agricultural related subsurface discharges." (*See* Doc. No. 71 at 17.)  As

15   plaintiffs argue in their reply brief, an NPDES permit "would remedy the Drain's continuing

16   discharge of pollutants from lands *not* used for irrigated agriculture into Mud Slough" by

17   imposing water quality limits on the pollutants stemming from non-agricultural sources. (Doc.

18   No. 236 at 7) (emphasis added).  If this court were to agree with plaintiffs and find that the

19   discharges from the Drain are non-agricultural, then there would be a substantial likelihood that

20   an NPDES permit would remedy the alleged injury of unpermitted discharges of pollutants into

21   Mud Slough.  *See Deschutes River All. v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1158–59 (9th

22   Cir. 2021) (finding redressability satisfied under the Act when plaintiffs sought to compel

23   compliance with a permit, which plaintiff "interpret[ed] as requiring compliance with particular

24   water quality criteria," despite defendant's contention that plaintiff had "not explained what

25   available relief would improve water quality").

26          Second, when evaluating whether the Article III standing elements are satisfied, the court

27   must look at the facts as they existed at the time the complaint was filed.  *See Nat. Res. Def.*

28   *Council v. U.S. Env't Prot. Agency*, 38 F.4th 34, 56 (9th Cir. 2022).  Here, there is no dispute that

10

1   plaintiffs' claim was redressable when the operative complaint in this action was filed, and the

2   voluntary cessation of certain discharges into the Drain does not negate plaintiffs' explicit right to

3   enforce the Act's requirements.  *See S.F. Baykeeper v. City of Sunnyvale*, No. 5:20-cv-00824-

4   EJD, 2022 WL 4138648, at *9 (N.D. Cal. Sept. 12, 2022) (rejecting the defendants' challenge to

5   redressability where plaintiffs were seeking injunctive relief regarding remediation and the

6   defendants contended that they were in the process of implementing a proposed remedial plan);

7   *see also Nat. Res. Def. Council*, 38 F.4th at 56 (holding that the organizational plaintiff's

8   Endangered Species Act claim satisfied redressability even though the EPA had issued a

9   biological evaluation during litigation because when plaintiff filed suit, it was unclear how the

10   EPA would respond, and the plaintiff's current ability to seek a more aggressive deadline was

11   sufficient to establish standing).  Here, the local defendants' challenge is also ineffectual in light

12   of this court's order limiting the relevant time period for the pending motions to September 10,

13   2006 to July 31, 2015, (Doc. No. 197 at 2), a fact local defendants did not dispute at the hearing.

14         Finally, as plaintiffs contended at the hearing on the pending motions, their underlying

15   claim seeking that an NPDES permit be required is still redressable notwithstanding local

16   defendants' contractual agreements or the WDRs because an NPDES permit provides certain

17   procedural safeguards that have not otherwise been imposed.  *See, e.g.*, 33 U.S.C. § 1342(b)

18   (requiring that NPDES permits must be preceded by public notice and an "opportunity for a

19   public hearing"); *see also* 40 C.F.R. § 123.25 (imposing various procedural requirements on state-

20   run permit programs).  This is also an adequate basis to establish redressability for a claim

21   brought under the Act.  *See Or. Nat. Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1094 (9th Cir.

22   1998) (holding that a "procedural right of certification under [33 U.S.C.] § 1341" was sufficient

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

1    to establish redressability for a Clean Water Act claim).[4]

2            In addition to plaintiffs' requested relief of requiring defendants to obtain an NPDES

3    permit for the Project, plaintiffs also seek the imposition of civil penalties and an injunction

4    requiring remedial activities.  (*See* Doc. No. 71 at 17.)  At the hearing, local defendants did not

5    dispute plaintiffs standing to pursue those remedies, which are all within the court's power to

6    grant under the Act.  *See* 33 U.S.C. § 1365(a); *Friends of the Earth*, 528 U.S. at 188 (holding that

7    a citizen suit brought under the Act satisfies the redressability requirement as to civil penalties

8    "for violations that are ongoing at the time of the complaint and that *could continue* into the

9    future if undeterred") (emphasis added).

10           Accordingly, the court concludes that plaintiffs have satisfied their "relatively modest"

11   burden of establishing the redressability requirement for Article III standing to seek an order

12   requiring compliance with the Act, including its NPDES permit program.  *Deschutes River All.*, 1

13   F.4th at 1159 (citation omitted); *see also Juliana*, 947 F.3d at 1170 ("Redress need not be

14   guaranteed, but it must be more than 'merely speculative.'") (citation omitted).

15   **B.    Clean Water Act**

16           Congress enacted the Clean Water Act to "restore and maintain the chemical, physical,

17   and biological integrity of the Nation's waters" through limiting pollution from "point sources."

18   *Nw. Env't Def. Ctr. v. Brown*, 640 F.3d 1063, 1070 (9th Cir. 2011), *rev'd on other grounds sub*

19

---

20   [4]  Defendants also rely on the district court's decision in *Coal. for a Sustainable Delta v. Carlson*,
     No. 1:08-cv-00397-OWW-GSA, 2008 WL 2899725 (E.D. Cal. July 24, 2008) in support of their
21   contention that plaintiffs have not established redressability.  (Doc. No. 221-1 at 10.)  However,
     the decision in *Carlson* is distinguishable from this case.  There, the district court found that
22   plaintiffs lacked standing as to their Endangered Species Act claim because the relief they sought
     (the invalidation of fishing regulations) was insufficient on its own to redress the alleged harm
23   (that listed species were being harmed).  2008 WL 2899725 at *10.  The district court in *Carlson*
     identified other critical factors that were unconnected to the specific relief sought by the plaintiffs
24   in that case, such as water deliveries being monitored in a separate court action and non-party
     federal agencies changing their conclusions regarding the status of listed species.  *Id.* at *9.  Here,
25   by contrast, if plaintiffs obtain an order requiring that defendants secure an NPDES permit for the
     Project, the effectiveness of that permit would not be limited by the WDRs; rather, the discharge
26   from the Drain into Mud Slough would be the subject of additional regulation and related
     procedural safeguards associated with that regulation (the relief plaintiffs seek).  Thus, the court
27   finds that the decision in *Carlson* is inapposite.

28
                                                    12

1  *nom. Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597 (2013).  "A cornerstone of the Clean Water Act

2  is that the 'discharge of any pollutant' from a 'point source' into navigable waters of the United

3  States is unlawful unless the discharge is made according to the terms of an NPDES permit

4  obtained from either the United States Environmental Protection Agency ("EPA") or from an

5  authorized state agency."  *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res*., 299

6  F.3d 1007, 1009 (9th Cir. 2002).

7      The Act defines the terms used in its provisions as follows.  "Discharge of a pollutant" is

8  defined as "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. §

9  1362(12).  A "pollutant" is defined broadly, including, *inter alia*, "heat, . . . rock, sand, cellar dirt.

10  . . and agricultural waste discharged into water."  33 U.S.C. § 1362(6).  "Navigable waters"

11  means "the waters of the United States."  33 U.S.C. § 1362(7).  A "point source" is "any

12  discernible, confined and discrete conveyance, including but not limited to any pipe, ditch,

13  channel, tunnel, conduit, well, [or] discrete fissure . . . [but] does not include agricultural

14  stormwater discharges and return flows from irrigated agriculture."[5]  33 U.S.C. § 1362(14).  In

15  addition to this definitional exclusion of irrigated agriculture return flows from the term "point

16  source," Congress incorporated a nearly identical exception under its NPDES permitting

17  provisions, which provides that "[t]he Administrator shall not require a permit under this section

18  for discharges composed entirely of return flows from irrigated agriculture . . . ."  33 U.S.C.

19  § 1342(l)(1).[6]

20      The Act can be enforced through a citizens suit's provision, which allows lawsuits to be

21  initiated by "a person or persons having an interest which is or may be adversely affected."  33

22  U.S.C. §§ 1365(a), (g).  These citizen suits can impel future compliance with the Act by obtaining

23  _____

24  [5]  Although not defined in the Act, "nonpoint source pollution is . . . widely understood to be the
type of pollution that arises from many dispersed activities over large areas, and is not traceable

25  to any single discrete source.  Because it arises in such a diffuse way, it is very difficult to
regulate through individual permits."  *League of Wilderness Defs. v. Forsgren*, 309 F.3d 1181,

26  1184 (9th Cir. 2002).

27  [6]  The irrigation return flows exception is also restated in the EPA's own regulations, in language
identical to § 1362(14).  *See* 40 C.F.R. § 122.3(f) ("The following discharges do not require

28  NPDES permits: . . . (f) Return flows from irrigated agriculture.").

1   relief from district courts, including injunctive relief and civil penalties payable to the United

2   States Treasury.  *See Friends of the Earth*, 528 U.S. at 173 (citing 33 U.S.C. § 1365(a)).  To

3   establish a violation of the Act, a plaintiff in a citizen suit "must prove that defendants (1)

4   discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source."  *Pac.*

5   *Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019) ("*PCFFA*"),

6   (citation omitted); *see also* 33 U.S.C. § 1311(a).  If a plaintiff carries their initial burden of

7   establishing the elements of a violation under the Act, then the defendant bears the burden of

8   proving that an exception provided for in the Act applies.  *See PCFFA*, 945 F.3d at 1083.

9          Here, based on the evidence before the court on summary judgment, plaintiffs have

10  established a violation under the Act.  The specific violation identified by plaintiffs is the addition

11  of water containing pollutants stemming from the Project being dispensed into Mud Slough

12  without an NPDES permit, as required.  (Doc. Nos. 226-1 at 16–17; 228 at 11–12; 236 at 9.)

13  First, the undisputed facts establish that the Project "conveys water from the [Drainage Area]

14  through the [Bypass] to the [Drain] and then to Mud Slough," which is considered a water of the

15  United States.  (Doc. Nos. 228-1 at ¶ 2; 229-2 at ¶¶ 8, 9.)  It is also undisputed that the water

16  conveyed by the Project and discharged into Mud Slough contains pollutants including selenium,

17  salt, and boron.  (Doc. No. 229-2 at ¶¶ 65, 67, 79.)  Finally, it is undisputed that the Project,

18  jointly administered by the defendant Authority and the federal defendants, does not have an

19  NPDES permit.  (Doc. Nos. 228-1 at ¶ 2; 229-2 at ¶ 97.)  Thus, plaintiffs have shown that

20  pollutants (selenium, salt, boron, among others) are being added to a navigable water (Mud

21  Slough) from a point source (the Project, and specifically, the Drain).  Accordingly, plaintiffs

22  /////

23  /////

24  /////

25  /////

26  /////

27  /////

28  /////

14

1    have established a violation of the Act.[7]

2           Defendants maintain that the violation is cured under the exception provided by the Act in

3    § 1342(l)(1).  (Doc. Nos. 220 at 13; 221-1 at 12.)  As noted, § 1342(l)(1) is an exception to the

4    Act's permitting requirements for discharges that are "composed entirely of return flows from

5    irrigated agriculture."  33 U.S.C. § 1342(l)(1).  Defendants contend that they have carried their

6    burden of establishing that § 1342(l)(1) applies to the Project's discharges, thereby exempting the

7    Project from the Act's permitting requirements.[8]  (Doc. Nos. 220 at 13; 221-1 at 12.)

8           Plaintiffs counter that they have identified four separate discharges of pollutants that have

9    "commingled" with the water collected in the Project and are ultimately discharged into Mud

10   Slough.  (Doc. Nos. 226-1 at 17–25; 228 at 15–19; 236 at 9.)  Due to this commingling of

11   polluted water streams, plaintiffs maintain that § 1342(l)(1) does not apply to the Project because

12   the water in the Drain is no longer "composed *entirely* of return flows from irrigated agriculture."

13   33 U.S.C. § 1342(l)(1) (emphasis added); (Doc. No. 236 at 8–9.)

14          Accordingly, to resolve the pending cross-motions for summary judgment, the court must

15   first determine the scope of the agricultural return flows exception provided by § 1342(l)(1).

16   /////

---

17   [7]  The court acknowledges that it would appear that part of plaintiffs' burden to establish a
18   violation of the Act is to establish that the Project is a "point source," which, in its statutory
     definition, requires that the Project "not include . . . return flows from irrigated agriculture."  33
19   U.S.C. § 1362(14).  The district court previously interpreted this definitional exclusion and the
     related exception to the permitting requirement under § 1342(l)(1), as a burden borne by plaintiffs
20   in establishing a violation of the Act.  (*See* Doc. No. 138 at 15) ("The parties dispute only the
     fourth element of plaintiffs Clean Water Act claim:  whether the Project is a point source or
21   not.").  However, in its order reversing this court's prior ruling on summary judgment, the Ninth
     Circuit rejected this interpretation of the burden of proof associated with the definitional
22   exclusion and exception.  (Doc. No. 190 at 11–12.)  Accordingly, consistent with the Ninth
     Circuit's decision, the court now clarifies that defendants bear the burden of proof to establish
23   that the exception under § 1342(l)(1) applies here.

24
     [8]  Local defendants' pending motion primarily focuses on application of the § 1342(l)(1)
25   exception to the Project.  Federal defendants join in those arguments.  (Doc. Nos. 220 at 6, 13–16,
     21.)  The court assumes that the Grassland Water District is similarly situated to the Authority
26   because these local defendants submitted a single motion for summary judgment.  (Doc. No. 221-
     1.)  Plaintiffs also do not purport to differentiate between any defendants in their pending motion.
27   (*See* Doc. No. 226-1 at 7.)  Thus, if the § 1342(l)(1) exception applies to the established violation
     here, all defendants will be free from liability under the Act with regard to the Project.
28

1    1.    The Agricultural Return Flows Exception (33 U.S.C. § 1342(l)(1))

2         Under § 1342(l)(1), "[t]he Administrator shall not require a permit . . . for discharges

3    composed entirely of return flows from irrigated agriculture, nor shall the Administrator directly

4    or indirectly, require any State to require such a permit."  33 U.S.C. § 1342(l)(1).  In its order

5    remanding this action, the Ninth Circuit provided guidance as to how this statutory exception

6    should be construed.  (*See* Doc. No. 190 at 11–17.)

7         First, although the Ninth Circuit found error with this court's interpretative method, it

8    nevertheless held "that the district court's interpretation of the phrase [irrigated agriculture] was

9    accurate" and "that Congress intended to define the term 'irrigated agriculture' broadly."[9]  (Doc.

10   No. 190 at 16.)  Specifically, this court previously found that the phrase "discharges . . . from

11   irrigated agriculture" in § 1342(l)(1) "meant discharges that 'do not contain additional discharges

12   from activities unrelated to crop production.'"  (Doc. No. 190 at 12–13, 17) ("The text

13   demonstrates that Congress intended for discharges that include return flows from activities

14   unrelated to crop production to be excluded from the statutory exception, thus requiring an

15   NPDES permit for such discharges."); (Doc. No. 70 at 21) (explaining that "if pollutants from an

16   industrial factory, for example, were added to the flows at issue here, they would disqualify the

17   Project from the exemption").[10]

18        Next, the Ninth Circuit rejected this court's interpretation of "entirely" to mean "that §

19   1342(l)(1) exempts discharges from the [Act]'s permitting requirement unless a 'majority of the

20   total commingled discharge' is unrelated to crop production."  (Doc. No. 190 at 16) (finding that

---

21   [9]  Contrary to plaintiffs' counsel's insistence at the hearing, the Ninth Circuit squarely held in this
22   case that the term "irrigated agriculture" as used in § 1342(l)(1)'s exception is defined "broadly,"
     notwithstanding the case law cited providing that, in general, exceptions to the Act are to be
23   construed narrowly.  (*See* Doc. No. 190 at 13–15.)

24   [10]  This example from this court's prior order construing the § 1342(l)(1) exception was taken
25   from the EPA's Final Rule for NPDES Permit Application Regulations for Storm Water
     Discharges.  (Doc. No. 70 at 21) (citing 55 Fed. Reg. 47996 (Nov. 16, 1990)).  In response to a
26   comment regarding the interplay between irrigation flows and stormwater discharges, the EPA
     explained that a discharge from an industrial facility that is "included in such 'joint' discharges
27   may be regulated pursuant to an NPDES permit either at the point at which the storm water flow
     enters or joins the irrigation flow, or where the combined flow enters waters of the United States
28   or a municipal separate storm sewer."  (*Id.*)

1   the district court's "majority rule interpretation misconstrued the meaning of 'entirely,' as used in

2   § 1342(l)(1)").  Instead, the Ninth Circuit held that "'[e]ntirely' is defined as 'wholly, completely,

3   [or] fully'" and reasoned that because there are "many activities related to crop production that

4   fall under the definition of 'irrigated agriculture,' Congress's use of 'entirely' to limit the scope of

5   the statutory exception thus makes perfect sense."  (*Id.*) (citation omitted).

6        The issue then for this court, is to determine whether defendants have carried their burden

7   of establishing on summary judgment that the Project's discharges "do not contain additional

8   discharges from activities unrelated to crop production."  (Doc. No. 190 at 13.)  Put another way,

9   if any of the four sources of pollutants identified by plaintiffs do in fact exist and constitute an

10  "additional discharge[] from [an] activit[y] unrelated to crop production," (*id.*), then the Project's

11  discharges into Mud Slough would no longer be "composed *entirely* of return flows from

12  irrigated agriculture."  33 U.S.C. § 1342(l)(1) (emphasis added).  If this were the case, the

13  exception would *not* apply.

14       With this guidance in mind, the undersigned turns now to the specific terms used in the

15  phrase "discharges that 'do not contain additional discharges from activities unrelated to crop

16  production.'"  (Doc. Nos. 190 at 13; 70 at 21.)  The phrase "additional discharges" means a

17  "discharge" that is "[a]dded, extra, or supplementary to what is already present or available."

18  *Additional*, Oxford Dictionaries Online, Oxford University Press, https://premium.

19  oxforddictionaries.com/definition/american_english/additional (last accessed on Feb. 16, 2023).

20  Importantly, the meaning of the word "discharge" under the Act presumes the existence of a point

21  source which, as mentioned previously, is limited to a discernible, confined, and discrete

22  conveyance.  *See Dombeck*, 172 F.3d at 1096–97 ("The term "discharge" in § 1341 is limited to

23  discharges from point sources."); *see also* (Doc. No. 70 at 3) ("The term 'discharge' is a term of

24  art under the [Act] that presumes the presence of a 'point source.'")  It follows then, as the Ninth

25  Circuit has reasoned, that the term "discharge" does not include within its scope nonpoint sources

26  of pollutants.  *See Dombeck*, 172 F.3d at 1096, 1088–89 (holding that the term "discharge" under

27  the Act did not apply to nonpoint sources of pollutants including, for example, the grazing of

28  cattle); *see also Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 785 (9th Cir. 2008)

1   ("[W]hile Congress could have defined a 'discharge' to include generalized runoff as well as the

2   more obvious sources of water pollution, . . . it chose to limit the permit program's application to

3   the latter [point source] category.") (citation omitted).  Thus, to qualify for the exception

4   defendants must establish that plaintiffs' alleged four sources of pollutants are not added to the

5   Project from an extra or supplementary *point source*.

6          The court is also mindful of recent guidance from the Supreme Court regarding the

7   relationship between a "discharge" under the Act and a "point source."  *See Cnty. of Maui, Haw.*

8   *v. Haw. Wildlife Fund*, __ U.S. __, 140 S. Ct. 1462, 1468 (2020).  In *County of Maui*, the

9   Supreme Court found that when pollutants originate from a point source, but are conveyed

10  through a nonpoint source into a navigable water—for example, "a sewage treatment plant

11  discharges polluted water into the ground where it mixes with groundwater, which, in turn, flows

12  into a navigable river"— an NPDES permit is required for the addition of the pollutants into the

13  groundwater if it constitutes "the functional equivalent of a direct discharge from a point source

14  into navigable waters."  *Id.*  "An emission of polluted water is therefore a 'discharge' for [Clean

15  Water Act] purposes only 'when a point source directly deposits pollutants into navigable waters,

16  or when the discharge reaches the same result through roughly similar means.'"  *Inland Empire*

17  *Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 836 (9th Cir. 2021), *cert. denied*, __ U.S. __, 142

18  S. Ct. 1444 (2022) (quoting *County of Maui*, 140 S. Ct. at 1176.  The Supreme Court went on to

19  explain that "[w]hether pollutants that arrive at navigable waters after traveling through

20  groundwater are 'from' a point source depends upon how similar to (or different from) the

21  particular discharge is to a direct discharge."  *County of Maui*, 140 S. Ct. at 1476.  In applying

22  this approach, the Supreme Court listed some factors "that may prove relevant (depending upon

23  the circumstances of a particular case)."  *Id.*  Those factors included:

24              (1) transit time, (2) distance traveled, (3) the nature of the material
            through which the pollutant travels, (4) the extent to which the
25          pollutant is diluted or chemically changed as it travels, (5) the
            amount of pollutant entering the navigable waters relative to the
26          amount of the pollutant that leaves the point source, (6) the manner
            by or area in which the pollutant enters the navigable waters, (7) the
27          degree to which the pollution (at that point) has maintained its
            specific identity. Time and distance will be the most important
28          factors in most cases, but not necessarily every case.

1   *Id.* at 1476–77.  At bottom, however, in either situation involving a "discharge"—i.e., a "direct

2   discharge" or the "functional equivalent of a direct discharge"—there must still be a point source

3   from which the pollutants originate.  *See County of Maui*, 140 S. Ct. at 1177.

4        Moreover, to overcome application of the § 1342(l)(1) exception, the "additional

5   discharges" must come "from activities unrelated to crop production."  (Doc. No. 190 at 13.)

6   "Activities" means "[a] thing that a person or group does or has done."  *Activity*, Oxford

7   Dictionaries Online, Oxford University Press, https://premium.oxforddictionaries.com/definition/

8   american_english/activity (last accessed on Feb. 16, 2023).  This definition of "activities"

9   indicates the "additional discharge" must come from something being done by a person,[11] which

10  is consistent with the requirement that a discharge must come from a point source.  *See Froebel v.*

11  *Meyer*, 217 F.3d 928, 937–38 (7th Cir. 2000) (interpreting "point source" as "an artificial system

12  for moving water, waste, or other materials" and "an artificial mechanism [which] introduces a

13  pollutant"); *see also* 33 U.S.C. § 1311(a) ("[T]he discharge of any pollutant by *any person* shall

14  be unlawful.") (emphasis added).

15       Turning to whether certain activities are related or unrelated to crop production, the court

16  is mindful of the Ninth Circuit's confirmation "that Congress intended for 'irrigated agriculture,'

17  as used in § 1342(l)(1), to be defined broadly."  (Doc. No. 190 at 16.)  Consistent with this broad

18  interpretation of "irrigated agriculture," for an activity to "relate to" crop production, it must

19  merely "[h]ave reference to" or "concern" crop production.  *Relate*, Oxford Dictionaries Online,

20  Oxford University Press, https://premium.oxforddictionaries.com/definition/american_english/rel

21  ate?q=relate+to (last accessed on Feb. 16, 2023).  For example, the Ninth Circuit found in this

22  case that water draining from beneath retired or fallow farmland fell within the exception's scope.

23  (*See* Doc. No. 190 at 15–16.)  Thus, such drainage was found to be related to crop production,

24  even though the retired farmland itself was no longer used to produce crops.  In reaching that

25  conclusion, the Ninth Circuit reasoned that because defendants had been ordered by a court in

26

27  [11]  The Act defines "person" as "an individual, corporation, partnership, association, State,
    municipality, commission, or political subdivision of a State, or any interstate body."  33 U.S.C.

28  1362(5).

                                              19

1    separate litigation "to provide drainage 'to lands receiving water through the San Luis Unit,'" it

2    would lead to "contradictory and illogical results" if the court were "to require Defendants to

3    provide a drainage plan that includes the retirement of farmland, on the one hand, and hold that

4    those activities violate the [Act] absent a permit, on the other." (*Id.*)  In other words, so long as

5    the activity producing the alleged source of pollutants is related to the function and operation of

6    the overall drainage plan, it also relates to crop production.

7        This reading of the exception regarding whether an activity is related to crop production

8    also draws support from the evidence in this case.  As reflected in the evidence submitted to the

9    court on summary judgment, it is undisputed that the Project was designed and operated for the

10   discharge of agricultural return flows and serves an exclusively agricultural purpose.  (Doc. No.

11   228-1 at ¶¶ 22, 35.)[12]  Further, as a result of the Project's design and operating restrictions, it is

12   undisputed that the Project remains isolated from any other type of discharge, including, for

13   example, any inlet or discharges from industrial activities.  (Doc. No. 228-1 at ¶ 22.)  Indeed,

14   according to federal defendants, the current state-imposed regulatory regime on the Project

15   dictates that it does not "permit any discharges from activities other than those related to crop

16   production."  (Doc. No. 220-1 at 12.)  Thus, this court finds based upon the evidence before it on

17   summary judgment that any alleged source of pollutant that concerns or relates to the Project's

18   operation or function falls under the broad scope of that "related to crop production."

19       Therefore, based on the court's close parsing of the Ninth Circuit's guidance, in order to

20   establish that the § 1342(l)(1) exception applies here, defendants must establish that plaintiffs'

21   alleged sources of pollutants, which are purportedly "commingling" with the Project's return

22

23   [12]  Although plaintiffs purport to dispute the facts appearing in these paragraphs, the evidence
     they cite does not contradict the defendants' evidence regarding what the Project was designed
24   and operated to do, as well as the Project's purpose.  Indeed, the Ninth Circuit did not reverse this
     court's previous findings that "the Project falls within the plain language of 'irrigated
25   agriculture'" and that "[t]he parties do agree the only reason the Project exists is to enable the
     growing of crops." (Doc. No. 70 at 13–14.)  As plaintiffs' expert admitted in his deposition, the
26   Project's purpose "is to convey irrigation return flow out of the grassland area" and that the
     Project, the Drain, and tile drains all facilitate agricultural production.  (Doc. No. 220-1 at 4–5.)
27   Thus, the court finds that plaintiffs have not created a genuine dispute of material fact regarding
     the Project's function and operation or that it is exclusively serving an agricultural purpose.
28

1    flows, are not added from an extra or supplementary point source that is unrelated to the Project's

2    overall drainage function.

3        2.    Whether Plaintiffs' Alleged Sources of Pollutants Prevent Application of the

4              § 1342(l)(1) Exception

5        According to plaintiffs, the four alleged sources of pollutants that are commingling with

6    the return flows from irrigated agriculture in the Drain are:  (1) groundwater originating from

7    beneath "non-irrigated" land adjacent to the Drain which seeps into the Drain through cracks and

8    weep holes; (2) sediment that has settled out over time in the Drain from the waters it carries and

9    which is purportedly discharged into Mud Slough "when it is scoured and reworked by flows in

10   the Drain"; (3) water transported into tile drains underneath the retired agricultural land occupied

11   by the Vega Solar Project; and (4) flows of polluted water in the Drainage Area that allegedly

12   stem from "highways, residences and other non-irrigated lands."  (Doc. No. 226-1 at 17–25.)

13       Defendants counter that these four sources of additional discharges are either (i)

14   independently exempt under the Act as nonpoint sources, (ii) related to crop production, (iii)

15   unproven in their existence, or a combination of all three.[13]  (Doc. Nos. 229 at 6; 230 at 12–14.)

16       As an initial matter, plaintiffs contend that their sources of alleged pollutants need not

17   stem from point sources to prevent application of the § 1342(l)(1) exception, calling such an

18   interpretation "wrong as a matter of law," but citing no case law in support of that proposition.

19   (Doc. No. 236 at 9, 14, 16.)  Indeed, plaintiffs have never squarely addressed, in their briefing or

20   at the hearing on the pending motions, the Ninth Circuit's holding that this court's prior

21   interpretation that "discharges . . . from irrigated agriculture" means "discharges that do not

22   contain *additional discharges* from activities unrelated to crop production" was "accurate."  (Doc.

23   No. 190 at 13–14, 16.)  At most, plaintiffs maintained at the hearing that the decision in *S. Fla.*

24   *Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004) supported their position

25

26   [13]  Defendants contend, in the alternative, that the water transfer rule (40 C.F.R. § 122.3(i))
     exempts the discharges of water from the Drain into Mud Slough from the Act's permitting
27   requirements.  (Doc. No. 220 at 21–23; 230 at 5–11.)  Local defendants join this argument.  (Doc.
     No. 229 at 21–22.)  However, the court need not reach this issue because it will find in
28   defendants' favor based on application of 33 U.S.C. § 1342(l)(1).

                                         21

1  that their alleged sources did not need to be added to the Project from a point source.  To be sure,

2  the Supreme Court in *Miccosukee* held that the definition of "discharge of a pollutant" under the

3  Act "includes within its reach point sources that do not themselves generate pollutants."  541 U.S.

4  at 105.  The Supreme Court also rejected an argument that a point source is exempt from the Act

5  when pollutants discharged from the point source originated from elsewhere and merely passed

6  through the point source.  *See id.*  However, this court has hewed to the holding in *Miccosukee*

7  because it has found that an initial violation of the Act occurred in this case based on the Drain's

8  discharges into Mud Slough regardless of where the pollutants within those discharges originated.

9  Plaintiffs fail to explain how *Miccosukee* affects the Ninth Circuit's decision interpreting the §

10  1342(l)(1) *exception* to the Act, as opposed to the finding of an initial violation of the Act, as was

11  the case in *Miccosukee*.   Here, the Ninth Circuit concluded that the § 1342(l)(1) exception

12  requires an "*additional* discharge"—i.e., an extra or supplementary point source as this court

13  found—to prevent its application.  (Doc. No. 190 at 13–14) (emphasis added).  Thus, the court

14  finds plaintiffs argument in this regard unpersuasive.

15        Accordingly, below the court will address each of plaintiffs' alleged sources of pollutants

16  to determine if on summary judgment defendants have carried their burden of establishing that

17  these sources do not constitute "additional discharges from activities unrelated to crop

18  production."  (*See* Doc. No. 190 at 13–14.)

19              *a.    Seepage and Sedimentation*

20        The first two sources of pollutants identified by plaintiffs as allegedly preventing

21  application of the § 1342(l)(1) exception—seepage and sedimentation—both occur within the

22  Drain.

23        First, plaintiffs contend that groundwater beneath "non-irrigated land" adjacent to the

24  Drain seeps into the Drain through cracks and weep holes throughout its 27-mile length.  (Doc.

25  No. 226-1 at 18.)  The parties do not dispute that the Drain's concrete lining contains weeps holes

26  or cracks, both of which allow groundwater to passively flow into or out of the Drain based on

27  seasonal groundwater table changes.  (Doc. No. 228-1 at ¶¶ 27, 34.)  Because this seepage flows

28  passively and stems from groundwater, defendants have established that the seepage into the

22

1    Drain is diffuse and not traceable to any discrete source, meaning it is a nonpoint source.  *See*

2    *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1141 n.4 (10th Cir. 2005) (citing

3    *Forsgren*, 309 F.3d at 1184) ("Groundwater seepage that travels through fractured rock would be

4    nonpoint source pollution, which is not subject to NPDES permitting."); *see also County of Maui*,

5    140 S. Ct. at 1177 (finding that pollution from groundwater may only require an NPDES permit

6    when there is a discharge into groundwater from a point source).  Moreover, defendants have

7    established that the Drain's purpose is to facilitate irrigated agriculture by moving returns flows

8    from the Drainage Area to Mud Slough, and that the seepage occurring in the Drain is inherent to

9    the Drain's operation and common among agricultural canals generally.  (Doc. No. 228-1 at ¶¶

10   23, 26, 34, 38.)  Specifically, defendants have established that weep holes relieve hydrostatic

11   pressure that would—in their absence—cause the concrete lining of the Drain to pop out from the

12   ground, and that cracks in the lining of the Drain are an unavoidable fact of working with

13   concrete, which is the most common material used to line agriculture drainage canals in the

14   world.  (Doc. Nos. 228-1 at ¶¶ 34–38; 221-4 at 48.)  Thus, the court finds that this undisputed

15   evidence before it on summary judgment is sufficient to establish that the seepage into and out of

16   the Drain is both a nonpoint source and related to crop production.[14]

17        Second, plaintiffs argue that accumulated sediment in the Drain is scoured or reworked by

18   flows that remobilize selenium into the Drain's flow.  (Doc. No. 226-1 at 20.)  It is undisputed by

19   the parties that there are sediment deposits containing selenium in the Drain, and that these

20   sediment deposits come from a variety of sources, including suspended sediment contained within

21   the return flows coming from the Bypass, dust, wind-blown plant debris, algae, and cattails.

22   (Doc. No. 229-2 at ¶¶ 31, 38.)  It is also undisputed that the Project is limited to a velocity of one

23   foot per second to prevent sediments from mobilizing, that there is a monitoring program in place

---

24

25   [14]  In light of the court's finding in this regard, the court need not address or resolve the parties'
vigorous dispute as to the nature of the land adjacent to the Drain, i.e., whether that land is

26   "agricultural" or "non-agricultural."  (Doc. Nos. 221-1 at 19; 226-1 at 18; 236 at 12.)  It is
undisputed—because plaintiffs failed to cite evidence in support of their position as required

27   under Federal Rule of Civil Procedure 56(c)—that none of the seepage into the Drain comes from
adjacent industrial activities, nor does that seepage contain pollution from industrial dischargers.

28   (Doc. No. 229-2 at ¶ 32.)

23

to measure sediment accumulation, and that sediment is periodically removed from the Drain. (Doc. No. 228-1 at ¶¶ 44–47.)  Based on this evidence, the court readily concludes that sediment management and removal is undisputedly related to the Project's operation and function.  It follows that sediments collected into the Drain and its potential remobilization are both related to crop production.  Both of plaintiffs' theories regarding sediment—i.e., accumulation of sediment in the Drain or the remobilization of already-accumulated sediment—as a basis to prevent application of the § 1342(l)(1) exception also fail for additional reasons discussed below.

As to the accumulation of sediment in the Drain, defendants have established by the evidence presented on summary judgment that this sediment is either:  (a) directly related to crop production because, as local defendants' counsel emphasized at the hearing, the sediment is suspended in return flows discharged into the Drain, making it directly related to the Drain's function and operation (Doc. Nos. 229-2 at ¶¶ 31, 38; 228-1 at ¶¶ 44–47); or (b) added from a nonpoint source, such as wind-blown dust, which are dispersed and cannot be traced to any single discrete source, and, thus, do not constitute a "discharge."  *See Forsgren*, 309 F.3d at 1184; *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 224 (2d Cir. 2009) (holding that pollutants traveling as airborne dust did not constitute a discharge from a point source); *cf. Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1152 (9th Cir. 2010) ("The text of [the Act] and the case law are clear that some type of collection or channeling is required to classify an activity as a point source.").

As for the remobilization of sediment in the Drain, there is a dispute regarding whether any scouring or reworking of the sediment ever occurs and if it has resulted in an addition of selenium to Mud Slough, at least in 2015.  (*See* Doc. No. 104-1 at 10–11) (plaintiffs' expert opining that during a 2015 site visit he observed two locations where a sediment deposit appeared to have been scoured and reworked by flowing water and concluded that "selenium is discharged from the [Drain] into Mud Slough" based on this observation).  Notwithstanding this disputed fact, defendants have established that—contrary to plaintiffs' unsupported assertion otherwise (Doc. No. 229-2 at ¶ 46)—selenium deposits are not resuspended when water is released into the Drain from the Bypass due to, among other things, the controlled velocity rate.  (Doc. Nos. 221-6

at 12–14; 228-1 at ¶¶ 44–45.)[15]  In addition, the only other source of a high flow that plaintiffs contend would mobilize sediment in the Drain would be from a "sufficiently strong rainfall event."  (Doc. No. 229-2 at ¶ 47.)  Defendants maintain that although a "sufficiently strong rainfall event" is hypothetically possible, plaintiffs have presented no competent evidence suggesting what is "sufficiently strong," whether such a rainfall event has ever occurred or will occur in the future, or whether such an event would in fact result in discharges of pollutants into Mud Slough.  (*Id.*)  The court agrees with defendants that there is no such evidence before the court on summary judgment and that plaintiffs' expressed concern is purely hypothetical.  Moreover, and even more importantly, even if plaintiffs' contention in this regard was supported by any competent evidence, a "sufficiently strong rainfall event" does not constitute an "additional discharge" because here plaintiffs do not even allege that a hypothetical rainfall event would enter the Drain through a confined, discrete conveyance.  *See Brown*, 640 F.3d at 1070 ("Stormwater that is not collected or channeled and then discharged, but rather runs off and dissipates in a natural and unimpeded manner, is not a discharge from a point source as defined by § 502(14).").

>           b.      *Vega Solar Project and Highways, Residences, and Other Non-Irrigated Land Within the Drainage Area*

Plaintiffs next two sources of pollutants that allegedly prevent application of the § 1342(l)(1) exception—seepage and runoff from the Vega Solar Project and non-irrigated land—both purportedly occur within the Drainage Area before the collected drainage water is piped through the Bypass and into the Drain.

First, plaintiffs allege that subsurface tile drains beneath the Vega Solar Project collect rainwater falling onto the solar site, runoff from solar panel washing, and upwelling of groundwater from underneath the solar site, and that this "non-agricultural" water mixes with other water from irrigated agriculture collected throughout the Project.  (Doc. No. 226-1 at 22.)  However, defendants have established by evidence presented on summary judgment that neither

---

[15]  Plaintiffs have also failed to cite competent evidence establishing that releasing water from the Bypass into the Drain results in remobilization of sediment.  (*See* Doc. No. 229-2 at ¶ 46.)

1   rainwater nor water used to wash the solar panels at the Vega Solar Project can penetrate eight

2   feet below ground to the subsurface tile drains below.  (Doc. No. 228-1 at ¶ 17.)[16]  As for the

3   natural upwelling of the groundwater into the subsurface tile drains beneath the Vega Solar

4   Project site, this would fail to constitute an "additional discharge" because groundwater is

5   typically a nonpoint source.  *See County of Maui*, 140 S. Ct. at 1468 (concluding that no permit is

6   required for the addition of pollutants through groundwater unless it amounts to "the functional

7   equivalent of a direct discharge from a point source").

8          Furthermore, the subsurface tile drains beneath the Vega Solar Project are not intended to

9   protect it from groundwater, which is contrary to plaintiffs' unsupported contention that this was

10   their purpose.  (*See* Doc. Nos. 221-6 at 9–10, 14–15, 22; 229-2 at ¶ 106.)  In fact, defendants have

11   established on summary judgment that the tile drains underneath those 138 acres pre-existed the

12   Vega Solar Project and still serve adjacent irrigated lands.  (Doc. No. 228-1 at ¶ 16.)  Aside from

13   this factually incorrect contention, there is nothing in plaintiffs' pending motion to suggest that

14   the upwelling of groundwater is connected in any way to the above-the-ground Vega Solar

15   Project itself.  (*See* Doc. No. 226-1 at 23.)  In other words, defendants have shown that any

16   natural upwelling of groundwater captured by tile drains beneath the Vega Solar Project is related

17   to the Project's operation and function, and thus, is related to crop production.  Lastly, to the

18   extent plaintiffs contend that the upwelling groundwater underneath the Vega Solar Project

19   defeats the § 1342(l)(1) exception because that land on which it sits is retired farmland and no

20   longer supports irrigated agriculture, that argument was already squarely rejected by the Ninth

21   Circuit.  (*See* Doc. No. 190 at 15–16.)[17]

---

[16]  Plaintiffs purport to dispute this fact by merely citing defendants' own expert report and then
explaining how defendants misread its import.  (Doc. No. 228-1 at ¶ 17.)  However, the court
finds defendants' description of the report to be entirely accurate and therefore finds this fact to
be undisputed.

[17]  Federal defendants contend that plaintiffs' notice of intent to sue issued pursuant to the Clean
Water Act failed to include sufficient information regarding the Vega Solar Project.  (Doc. No.
220 at 17.)  The court finds that the notice of intent to sue provided adequate notice of the
"activity alleged to constitute a violation" with respect to the Vega Solar Project.  40 C.F.R. §
135.3(a).  Specifically, as described in the notice, the activity alleged to constitute a violation of
the Act was the ordinary operation of the Project without an NPDES permit.  (Doc. No. 71-1 at 6–

1    There is an additional reason that plaintiffs' argument regarding the Vega Solar Project

2    fails, which also serves to narrow the scope of their last remaining theory of liability.  Defendants

3    have established that before reaching the Project, drainage water from the Drainage Area is

4    reused for irrigation on parcels of farmland within the San Joaquin River Improvement Project

5    ("SJRIP"), which irrigate salt tolerant crops.  (Doc. No. 228-1 at ¶ 11.)  Some of the irrigation

6    water in the SJRIP is further collected and re-used for irrigation within the SJRIP before those

7    return flows are discharged into the Bypass and conveyed to the Drain.  (*Id.*)  Defendants have

8    also established that from 2008 through 2015, the amount of water reused for irrigation within the

9    SJRIP before being discharged to the Drain substantially exceeded the amount of water measured

10   entering the Drain at "Site A," a location at the beginning of the Drain used as a measuring station

11   for a state-required monitoring program.  (Doc. No. 221-6 at 12–15, 30).  Plaintiffs have failed to

12   offer any evidence on summary judgment disputing these facts for the time period established by

13   defendants.  (Doc. No. 236 at 17) (citing evidence showing that the amount of water recycled for

14   irrigation through SJRIP was only 27 percent "between 2002 and 2007").  Through the evidence

15   they have presented on summary judgment, defendants have established that between 2008–2015

16   all the water captured in the Drainage Area—to the extent it was not already used for irrigated

17   agriculture in the Drainage Area—was used or reused to irrigate salt-tolerant crops in the SJRIP

18   before being discharged from the Drainage Area into the Bypass.  Because it is undisputed that

19   the retired farmland was not converted to the Vega Solar Project until the summer of 2015, any

20   runoff from the solar site would have been reused for irrigation in the SJRIP.  (Doc. No. 228-1 at

21   _____

22   8.)  Moreover, plaintiffs asserted that the agricultural return flows exception did not apply to the
     Project's activity because discharges from the Project were alleged to be "predominately
     contaminated groundwater, not just irrigation return flows" and not "composed *entirely* of return

23   flows from irrigated agriculture."  (*Id.*)  Defendants were thus put on notice that the alleged
     "contaminated groundwater" was captured by the Project's subsurface tile drains and ultimately

24   pumped into Mud Slough.  (*Id.* at 7.)  Moreover, the Ninth Circuit rejected defendants' arguments
     that they lacked notice of plaintiffs' seepage, sedimentation, and non-agricultural land discharge

25   theories as alleged in the FAC despite plaintiffs' failure to "specifically allege [those] . . . theories
     of liability" beyond a reference to "polluted groundwater."  (Doc. No. 190 at 19–20) (noting that

26   defendants conceded that they had notice of plaintiffs' theories of liability).  Like the Ninth

27   Circuit, this court rejects federal defendants very similar argument with respect to notice of
     plaintiffs' claim related to the Vega Solar Project, finding that plaintiffs complied with the Act's

28   60-day notice provision in this regard.

¶ 15.)  Moreover, any sources of pollutants purportedly originating from the Drainage Area that were not used for irrigation in the SJRIP would be limited to the time period September 10, 2006 to December 31, 2007.  (*See* Doc. No. 197 at 2) (order issued after remand limiting the time period for discovery in this action regarding violations of the Act to September 10, 2006 to July 31, 2015).  As a result, plaintiffs' final theory of liability—that non-agricultural lands within the Drainage Area are contributing polluted water to the Project—is limited to that almost 15-month time period, which the court will turn to now.

Next, plaintiffs allege that discharges from highways, residences, and other non-irrigated lands in the Drainage Area is collected in the subsurface tile drains and commingles with the return flows collected from the irrigated agriculture activity and is ultimately dispensed into the Drain.  (Doc. No. 226-1 at 24.)  It is undisputed on summary judgment that the Drainage Area includes some non-irrigable land and that there are subsurface tile drains underneath some of those lands.  (Doc. No. 229-2 at ¶¶ 119, 121.)  However, plaintiffs specifically argue that the source of this alleged non-irrigation water entering the Project is either runoff from annual rainfall or seepage from unidentified, non-agricultural conveyances into groundwater, which is picked up in the subsurface tile drains and mixed with all the other water collected by the Project.  (Doc. No. 226-1 at 24.)  As defendants correctly point out (Doc. No. 229 at 19), plaintiffs failed to identify evidence of any specific point source for this alleged "additional discharge," and it is undisputed that the Project is isolated from any other type of discharge and has no inlets to accept discharges.[18]  (Doc. No. 228-1 at ¶ 22.)  As the court has concluded above, seepage is a nonpoint

---

[18]  To the extent plaintiffs generally contend that any of the unlined ditches and canals on or adjacent to non-agricultural land within the Drainage Area constitute a point source by collecting seepage and rainfall runoff and conveying it directly or indirectly into the Project's tile drains, there is no evidence before the court on summary judgment supporting this theory of liability, nor any evidence suggesting that such sources are adding pollutants.  (*See* Doc. Nos. 226-1 at 24–25; 229-2 at ¶¶ 133–35.)  The court also notes that a very broad reading of the Ninth Circuit's guidance on burden shifting would create some practical tension related to this particular characterization of plaintiffs' theory of liability.  (Doc. No. 190 at 11-12.)  It seems counterintuitive, if not impracticable, to require a defendant to *disprove* a plaintiff's vague allegations as to a theory of this nature by establishing, as would be required here, that all 130 miles of unlined ditches within the Project (Doc. No. 229-2 at ¶ 134) do *not* collect and convey *any* non-agricultural water carrying pollutants without requiring plaintiffs to first identify with supporting evidence what specific ditches, canals, and non-agricultural land they are referring

source, and rainfall or stormwater runoff (which is not collected, channeled, and conveyed) presents a classic example of nonpoint source.[19]  *See Ecological Rights Found. v. Pac. Gas and Elec. Co.*, 713 F.3d 502, 509 (9th Cir. 2013) (finding that "generalized stormwater runoff do not establish a 'point source' discharge absent an allegation that the stormwater is discretely collected and conveyed to waters of the United States"); *Dombeck*, 172 F.3d at 1098 ("Congress had classified nonpoint source pollution as runoff caused primarily by rainfall around activities that employ or create pollutants.  Such runoff could not be traced to any identifiable point of discharge.") (citation omitted); *see also County of Maui*, 140 S. Ct. at 1471 ("Rainwater, for example, can carry pollutants (say, as might otherwise collect on a roadway); it can pollute groundwater, and pollution collected by unchanneled rainwater runoff is not ordinarily considered point source pollution.").

/////

/////

_____

to.  Relatedly, in this court's view, plaintiffs' theory here—that runoff or seepage from non-agricultural land is collected and conveyed into the tile drains within the Drainage Area—is actually better viewed as an allegation of a direct violation of the Act requiring plaintiffs to satisfy their own initial burden.  (Doc. No. 190 at 11–12.)  In fact, plaintiffs' theory appears more akin to the situation confronted in *County of Maui* where the Supreme Court found that pollutants discharged into groundwater that eventually made their way into navigable waters through groundwater seepage could require an NPDES permit if that initial discharge into the groundwater amounted to "the functional equivalent of a direct discharge" based on the application of several factors outlined in the Supreme Court's decision.  140 S. Ct. at 1176–77.  Here, it is true that the unlined canals and ditches allegedly collecting non-agricultural runoff or seepage could constitute a point source that adds pollutants to the tile drains within the Drainage Area.  However, whether that would amount to the "functional equivalent of a direct discharge" into a navigable water—i.e., by traveling through the Project's otherwise NPDES-exempt subsurface tile drains, then through the Bypass, into the Drain, and finally into Mud Slough—would depend on application of the *County of Maui* factors tracing that path of non-agricultural runoff and seepage.  On the evidence before this court on summary judgment, there is no basis to conduct that analysis and plaintiffs have not carried their burden of coming forward with evidence of such a violation.  For this reason as well, the court concludes that plaintiffs' theory of seepage and runoff from non-agricultural lands also fails.

[19]  In addition, stormwater discharges do not require a permit under the Act unless those discharges are "associated with industrial activity."  33 U.S.C. 1342(p)(2)(B).  Here, it is undisputed on summary judgment that there is no industrial activity related to the Project.  (Doc. No. 228-1 at ¶¶ 22, 32.)  Further, the definition of "point source" specifically excludes "agricultural stormwater discharges."  33 U.S.C. 1362(14).  Thus, rainfall runoff is also exempt.

1    Accordingly, based on the evidence before it on summary judgment, the court concludes

2    that there is no genuine dispute of material fact regarding whether plaintiffs' alleged sources of

3    pollutants constitute nonpoint sources or whether they stem from "activities related to crop

4    production," and, thus, these alleged sources of pollutants do not prevent application of the §

5    1342(l)(1) exception to the Project.  Put another way, the alleged sources of pollutants are, on this

6    evidence of record, nonpoint sources or stem from activities related to crop production.

7    Therefore, they are all covered under the § 1342(l)(1) exception.

8    This conclusion is further bolstered by the legislative history of the exception's enactment,

9    and thus to find otherwise would undermine Congress's intent.  (*See* Doc. No. 190 at 14–15.)  An

10    overly technical reading of the exception as inapplicable when any pollutant added to the Project

11    did not directly arise from water irrigating active farmland would have an absurd result.  *See*

12    *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1529 (11th Cir. 1996) ("In interpreting the liability

13    provisions of the [Act] we realize that Congress is presumed not to have intended absurd

14    (impossible) results.").  As explained by local defendants' expert, Dr. Charles Burt, the Project's

15    operation of collecting water through subsurface tile drains and moving it through agricultural

16    canals like the Drain is emblematic of how irrigated agriculture works generally.  (*See* Doc. No.

17    221-4 at 7–14, 47.)  Requiring large drainage projects to obtain NPDES permits because of their

18    existing operation would effectively wipe out the exception for return flows from irrigated

19    agriculture and put farmers who rely on irrigated agriculture, as opposed to natural rainfall, at a

20    severe disadvantage, which is precisely what the exception was intended to prevent.  (*See* Doc.

21    No. 190 at 14–15) (explaining that the exception was enacted "to treat equally under the [Act]'s

22    permitting requirement farmers relying on irrigation and those relying on rainfall" and that it

23    "corrects what has been a discrimination against irrigated agriculture") (citation omitted).  Indeed,

24    demonstrating that Congress was aware of how agricultural drains such as the Project operated

25    when the exception was enacted, the Ninth Circuit pointed in this case to one legislator's

26    statement that "an NPDES permit would not be required for 'a vast irrigation basin that collects

27    all of the waste resident of irrigation water in the Central Valley and places it in [the San Luis

28    /////

1   Drain] and transport[s] it . . . [to] the San Joaquin River.'" (Doc. No. 190 at 15) (citing *Brown*,

2   640 F.3d at 1072).

3       The court pauses to make one additional point clear. The evidence presented to it on

4   summary judgment in *this* case does not call upon the court to examine the *County of Maui*

5   factors to determine whether the otherwise exempt agricultural tile drainage system within the

6   Drainage Area is conveying *covered point source* pollution to a navigable water. The court

7   expresses no opinion as to how those factors might apply under different circumstances or in a

8   different case.

9                                  **CONCLUSION**

10      For the reasons explained above,

11  1.      Plaintiffs' motion for summary judgment (Doc. No. 226) is denied;

12  2.      Local defendants' motion for summary judgment (Doc. No. 221) is granted in part

13          and denied in part as follows:

14          a.      Local defendants' motion for summary judgment as to plaintiffs' Article III

15                  standing is denied;

16          b.      Local defendants' motion for summary judgment as to plaintiffs' Clean

17                  Water Act claim is granted based on the application of 33 U.S.C.

18                  1342(l)(1) to the discharges from the Project into Mud Slough;

19  3.      Federal defendants' motion for summary judgment (Doc. No. 219) is granted in

20          part as follows:

21          a.      To the extent federal defendants join and incorporate local defendants'

22                  arguments regarding the application of 33 U.S.C. § 1342(l)(1) to the

23                  discharges from the Project into Mud Slough, federal defendants' motion

24                  for summary judgment is granted;

25          b.      Due to the court's granting of summary judgment in favor of defendants,

26                  the remaining arguments presented in federal defendants' motion for

27                  summary judgment are not reached by the court;

28  /////

4.      The Clerk of the Court is directed to update the docket to reflect that defendant Donald R. Glaser is no longer the Regional Director of the U.S. Bureau of Reclamation, and the proper defendant is now:  Ernest A. Conant, Regional Director of the U.S. Bureau of Reclamation; and

5.      The Clerk of the Court is directed to enter judgment in favor of defendants and close this case.

IT IS SO ORDERED.

Dated:   **February 17, 2023**

_Dale A. Drozd_
UNITED STATES DISTRICT JUDGE